# EXHIBIT 2

# IN THE UNITED STATES BANKRUPTCY
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE:<br><br>COLLINS ASSET GROUP, LLC,<br><br>Debtor. | §<br>§<br>§<br>§<br>§ | CHAPTER 7<br>Case No. 25-10994<br><br>U.S. Bankruptcy Court<br>for the District of Delaware |
| JUDY A. MUSGROVE, individually and as beneficiary of the Mainstar Trust, Cust. FBO Judy A Musgrove IRA, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>BROOKLYNN CHANDLER WILLY, *et al.*<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Adv. Proc. No. 25-05047-CAG<br><br>Removed from the 438th Judicial District Court, Bexar County, Texas<br>Case No. 2023-CI-22575 |
| JOHN PATRICK LOWE in his capacity as Court Appointed Receiver,<br><br>Plaintiff,<br><br>v.<br><br>Collins Asset Group, LLC, *et al.*,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | |

## RECEIVER'S SECOND AMENDED COMPLAINT
## ASSERTING CLAIMS AGAINST DEBTOR, OLIPHANT PARTIES AND
## METROPOLITAN PARTNERS

John Patrick Lowe, Court appointed Receiver, files this Second Amended Complaint asserting claims against Defendants, Debtor Collins Asset Group LLC (sometimes below, "CAG"), the Oliphant Parties identified below, and Metropolitan Partners Group Administration LLC (sometimes below, "Metropolitan Partners").

## SUMMARY OF CLAIMS

1.  The Receiver stands in the shoes of Ferrum Capital LLC, which raised money from investors in a Ponzi scheme and loaned much of the money to CAG under promissory notes secured in part by liens on consumer debt accounts CAG purchased with the money Ferrum Capital loaned to CAG.  CAG failed to pay Ferrum Capital the amounts due on the loans.  CAG also was a substantial net winner of money raised in and transferred out of the Ferrum Capital Ponzi scheme.  CAG transferred much of its net winnings to its affiliates, the Oliphant Parties.

2.  CAG and the Oliphant Parties received millions of dollars on the accounts securing payment of the Ferrum Capital loans to CAG and have failed to account properly to the Receiver for the collections or to pay the collections due Ferrum Capital over to the Receiver.

3.  The Receiver asserts five counts in this Amended Complaint against CAG, two counts against all of the Oliphant Parties, one count against AIM (one of the Oliphant Parties), and one count against Metropolitan Partners.

4.  In **Counts One and Two** below, the Receiver states his claims against CAG on the CAG-to-Ferrum Capital promissory notes described below. CAG disputes the Receiver's claims on those promissory notes.  In **Count Three**, the Receiver asserts a claim against CAG for its failure to account for and pay proceeds of Oliphant-to-CAG promissory notes CAG pledged as collateral to Ferrum Capital.  In **Count Four**, the Receiver asserts a claim against CAG under TUFTA for its transferee liability to recover the amount of the net winnings CAG received from the Ferrum Capital Ponzi scheme.  In **Count Five**, the Receiver asserts a claim against CAG to recover proceeds of promissory

notes payable by one of the Oliphant Parties, affiliates of CAG, which CAG pledged as collateral for loans from Ferrum Capital. The substance of **Counts One through Five** is the same as the Counts in the Receiver's Proof of Claim in the main case.

5. Then, the Receiver asserts two additional counts or claims against the Oliphant Parties. First, as the Receiver for Ferrum Capital, the Receiver is entitled for the benefit of the Receivership Estate to money the Oliphant Parties have collected on the accounts securing payment of the loans from Ferrum Capital. In **Count Six** below, the Receiver sues the Oliphant Parties to recover the amount of the proceeds they have collected on those loans due Ferrum Capital but not paid to Ferrum Capital or the Receiver.

6. In **Count Seven** below, the Receiver asserts claims against the Oliphant Parties for transferee liability under TUFTA.

7. In **Count Eight** below, the Receiver asserts claims against AIM to recover the proceeds AIM has received of collateral debt accounts CAG pledged to Ferrum Capital to secure payment of loans by Ferrum Capital to CAG.

8. In **Count Nine** below, the Receiver asserts claims against Metropolitan Partners to recover proceeds of collections on collateral debt accounts AIM purchased using proceeds of loans by Ferrum Capital to CAG or using proceeds of accounts CAG pledged as collateral to Ferrum Capital.

## PARTIES

9. Plaintiff is John Patrick Lowe in his capacity as Receiver for the assets and affairs of Ferrum Capital LLC and Ferrum IV LLC under the Order Appointing Receiver signed on January 5, 2024, in *Judy Musgrove et al. v. Brooklyn Chandler Willy et al.,* civil

action no.2023CI22575 in the 438th Judicial District Court of Bexar County, Texas ( below, the "Musgrove Action") and under the Agreed Order Granting Plaintiffs' Application to Expand Receivership Powers signed in the Musgrove Action on July 5, 2024. Lowe lives and works and administers the Receivership Estate of Ferrum Capital and Ferrum IV in the Western District of Texas.

10. Defendants are: CAG, Oliphant Financial, LLC ("Oliphant Financial"), Oliphant USA, LLC ("Oliphant USA"), Oliphant Inc., Accelerated Inventory Management, LLC ("AIM"), Tesota, LLC (Oliphant Financial, Oliphant USA, Oliphant, Inc. AIM, and Tesota collectively below, the "Oliphant Parties"); and Metropolitan Partners Group Administration LLC. CAG, Oliphant Financial, Oliphant USA, Oliphant, Inc. and AIM are already before the Court and they are served with a copy of this Amended Complaint by delivery to their counsel in this case.

11. Defendant Tesota, LLC is a limited liability company organized under the law of Delaware with its office at 5725 W Hwy 290, Ste. 103, Austin, Texas 78735. Tesota was registered to do business in Texas. If counsel for the other Oliphant Parties does not accept service for Tesota, a summons should be issued for Tesota and it should be served as permitted under Rule 7004 by delivery of a summons and copy of this Amended Complaint to Walt Collins or the person managing the business of Tesota.

12. Defendant Metropolitan Partners is a limited liability company organized under the laws of Delaware. A summons should be issued for Metropolitan Partners and it should be served with a copy of this Complaint as permitted under Rule 7004 by delivery to its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

## JURISDICTION AND VENUE

13.     The Court has jurisdiction over the subject matter of the Receiver's claims stated in this Complaint under 28 USC § 1452 because the Oliphant Parties removed this proceeding to this Court under that section and the claims stated in this Complaint relate to CAG's Chapter 7 Bankruptcy case in this Court.  The Court also has jurisdiction over the subject matter of the Receiver's claims stated in this Complaint under 28 USC § 1334 because the claims relate to the CAG Chapter 7 Bankruptcy Estate.  The Receiver contends that this is a core proceeding under 28 USC 157(b).  The Receiver consents to entry of final orders if the Court concludes this is not a core proceeding.

14.     All parties are subject to the jurisdiction of this Court.

15.     Venue is proper in this Court under 28 USC 1408 and 1409.

## FACTS AND CLAIMS

## BACKGROUND FACTS

### The CAG Debt to Ferrum Capital
### and the CAG-to-Ferrum Capital promissory notes

16.     The Receiver is the owner and holder (for the benefit of the Receivership Estate) of the CAG-to-Ferrum Capital promissory notes and the Ferrum Capital claims against CAG.

17.     Ferrum Capital loaned a total of $47,025,622.33 to CAG under 98 separate CAG-to-Ferrum Capital promissory notes.[1]  Most of the promissory notes had a term to

---

[1] This amount is according to the schedule prepared by Greg Murray, CPA, the forensic accountant the Receiver engaged to recreate the books and records of Ferrum Capital. That report is included with the Receiver's Proof of Claim as **Receiver's Proof of Claim Exhibit 2**.

maturity of four years. A few had a term to maturity of five years.[2] CAG renewed or rolled over many of the promissory notes when they matured. Loan numbers 1041-1075 matured according to their original terms. Loan numbers 1076-1101 are renewals or rollovers of earlier loans. The dates, original principal amounts, and interest rate on the CAG-to-Ferrum promissory notes with these loan numbers are shown on **Receiver's Proof of Claim Exhibit 1**.

18.     Payment of the loans under the CAG-to-Ferrum Capital promissory notes is secured by a Master Security Agreement between CAG and Ferrum Capital and by liens under UCC-1 financing statements in favor of Ferrum Capital on consumer debt accounts CAG purchased with the money Ferrum Capital loaned CAG and on other promissory notes made by Oliphant Financial, an affiliate of CAG, payable to CAG. The Master Security Agreement is **Receiver's Proof of Claim Exhibit 3**. A Master Loan Agreement between CAG and Ferrum Capital is **Receiver's Proof of Claim Exhibit 4**. The UCC-1 financing statements are together in **Receiver's Proof of Claim Exhibit 5**.

19.     In 2023, CAG asked Ferrum Capital to confirm for CAG's auditors that, as of December 31, 2022, the unpaid balance due in the aggregate on the CAG-to-Ferrum Capital debt was $51,012,893.11 as of December 31, 2022. That request and Ferrum Capital's confirmation are reproduced here and are **Receiver's Proof of Claim Exhibit 6**:

---

[2] Exhibit 1 summarizes and contains all 98 of the CAG-to-Ferrum Capital promissory notes. When many of the promissory notes matured in 2021 and 2022 they were "rolled over" into new promissory notes with new loan numbers. Today there are 62 outstanding or unpaid CAG-to-Ferrum Capital promissory notes.



September 18, 2023

Ferrum Capital, LLC
connie@fe26capital.com

RE: Promissory Notes Outstanding 2022

Our independent external auditors, FORVIS LLP, are performing an audit of our annual financial statements for the year ending December 31, 2022. Please provide, in the space provided below, the outstanding balance of all promissory notes issued to Collins Asset Group, LLC as of December 31, 2022. Our records indicate:

Total Outstanding Balance:  $51,012,893.11

After signing and dating your reply, please email directly to Nick Mullen at Nick.Mullen@forvis.com or mail to the address below.

FORVIS, LLP
Attn: Nick Mullen
400 N. Ashley Dr. Suite #2540
Tampa, FL 33602

Very truly yours,

Richard Shuster
Chief Financial Officer

To: FORVIS LLP

The preceding information provided is the Subordinated Notes balance as of 12/31/2022.

Signature:
Title: Manager
Date: 9/28/2023

20. Jack Davis was the Chief Financial Officer of CAG in 2024. Davis created a schedule of Ferrum Capital to CAG cash activity showing the cash Ferrum Capital loaned to CAG and the payments CAG made back to Ferrum Capital included as **Receiver's Proof of Claim Exhibit 7**.[3] An excerpt of deposition testimony by Davis authenticating and explaining the schedule is **Receiver's Proof of Claim Exhibit 8**. The Davis schedule shows on the last two pages that CAG made payments to Ferrum Capital

---

[3] **Receiver's Proof of Claim Exhibit 7** (Davis schedule) with the Receiver's Proof of Claim shows Ferrum Capital loaned $46,816,333 to CAG compared to the $47,025,622 Greg Murray reports in **Receiver's Proof of Claim Exhibit 2**.

totaling $857,905.94 in 2023 after CAG and Ferrum Capital agreed to the $51,012,893.11 balance due as of December 31, 2022.

21.     The debt CAG owed Ferrum Capital accrued interest at the rates stated in the promissory notes[4] after CAG and Ferrum Capital confirmed the balance due as of December 31, 2022, at $51,012,893.11. **Receiver's Proof of Claim Exhibit 2** provides the calculation of the unpaid principal balance Ferrum Capital loaned CAG with the interest accrual under the promissory notes as of June 2, 2025.  The outstanding balance as of June 2, 2025, was $63,441,789, with interest accruing as shown in **Receiver's Proof of Claim Exhibit 2**.

22.     In 2023, CAG stopped paying interest due on the CAG-to-Ferrum Capital promissory notes[5] and announced it was suspending payments due on the promissory notes.  On October 26, 2023, Ferrum Capital sent CAG the Notice of Defaults, Demand for Payment And Reservation of Rights included as **Receiver's Proof of Claim Exhibit 15**.  Ferrum Capital raised the money it loaned to CAG by taking in money from retail investors and issuing them its own promissory notes payable to the investors.[6]  At some point in 2023, Ferrum Capital notified its investors holding promissory notes from Ferrum Capital that it had "suspended" its "commercial lending program" with CAG based on "CAG's failure to make payments due on notes from and since July 1, 2023,"  That notice is **Receiver's Proof of Claim Exhibit 16**.

---

[4] Some of the promissory notes accrue interest at 8% annually.  Others accrue interest at 10% annually.  In the loan numbers for the promissory notes in Exhibit 1, "408" indicates an 8% interest rate, and "410" indicates a 10% interest rate.

[5] Because CAG never provided an accounting of its payments to Ferrum Capital  for principal and interest, the Receiver doesn't know how much, if any, CAG paid Ferrum in principal.  In any event, CAG stopped all payments to Ferrum Capital in 2023.

[6] Those Ferrum Capital-to-Investor promissory notes were fraudulent, unregistered securities. The sale of those promissory notes was a Ponzi scheme. See **Count Four** below.

23. On May 9, 2025, through his counsel, the Receiver notified CAG through its counsel in a letter that day that of CAG's default under the promissory notes and the Receiver's acceleration of the unpaid principal balance due on the promissory notes. A copy of the May 9, 2025, letter is **Receiver's Proof of Claim Exhibit 9**.

24. The CAG-to-Ferrum Capital promissory notes are nonrecourse. CAG was to pay Ferrum Capital a portion out of proceeds of or collections on the collateral debt accounts. The promissory notes state the portion CAG was to pay Ferrum Capital using these defined terms from paragraph 6 of the promissory notes:

6. Definitions.

    a. Net Proceeds is defined as the Net Revenue attributable and received by Maker relating to the usage of the proceeds of the principal sum of this Note utilized by Maker ("Maker's Efforts") during the Note term less Net Court Costs.

    b. Collateral Proceeds is defined as an amount no less than thirty five percent (35%) of the Net Proceeds.

    c. Net Court Costs is defined as the sum of court costs expended by Maker on an individual asset by asset basis during the Note Term pursuant to the Maker's Efforts less the sum of court costs recovered on an individual asset by asset basis during the Note Term.

    d. Net Revenue is defined as the gross revenue received pursuant to the Maker's Efforts less fees and expenses due Maker's agents, representatives and attorneys relating to the Maker's Efforts.

    e. Collins Proceeds is defined as an amount no greater than sixty five percent (65%) of the Net Proceeds.

25. Then, using those definitions, the promissory notes CAG and Ferrum Capital say in paragraph 7 of the promissory notes that the proceeds or collections of collateral debt accounts would be divided between Ferrum Capital and CAG as follows:

> Maker shall have the right to retain and keep up to and no greater than the remaining Sixty-Five Percent (65.00%) of Collateral Proceeds from any such Maker's Efforts as part of the Collins Proceeds, and such Collins Proceeds from any such efforts shall not be part of the Collateral securing this Note and shall instead be retained by and belong to Maker under all circumstances.

26. The CAG-to-Ferrum Capital promissory notes do not permit CAG (or the Oliphant Parties or anyone else) to charge Ferrum Capital or deduct from the Ferrum

Capital share of collections on the debt accounts for any "Overhead" or "Estimated Overhead" of CAG or any of the Oliphant Parties, or anyone else.  Deductions from gross revenue or collections on the collateral debt accounts are permitted only for genuine documented expenses CAG actually paid or incurred in obtaining revenue or collections on the collateral debt accounts.

27.     The promissory notes say nothing about any deduction for any "servicer fees." There is no servicing contract between CAG and the Oliphant Parties or anyone else.

28.     CAG provided Ferrum Capital no evidence of any fees or expenses CAG paid or incurred to any agent, representative, or attorney to collect any on any of the collateral debt accounts.

29.     Although the promissory notes say CAG charges for "Maker's Efforts" would be no greater that 65% of collateral proceeds, CAG and Ferrum Capital agreed that the portion of collections to CAG for "Maker's Efforts" would never exceed 50% without Ferrum Capital's consent.  Walt Collins, who founded CAG and for whom CAG is named, confirmed that agreement with Ferrum Capital in 2017 as follows**:**

> Regarding CAG Fees: CAG's fees will not exceed 50% of the gross recovered revenue, i.e., $1,000 recovered, no more than $500 paid to CAG in recovery fees. In the unusual event that a greater recovery fee is required CAG will contact the lender with an explanation and seek approval.

30.     That e-mail from Walt Collins in 2017 is **Receiver's Proof of Claim Exhibit 10**. An excerpt of Walt Collins' testimony confirming this explanation of the agreed upon charges for collection between CAG and Ferrum Capital and the promise that CAG's portion of collections would never exceed 50% is included in **Receiver's Proof of Claim Exhibit 11**.

31.     Walt Collins has testified that the promissory notes have the cap on charges for "Maker's Efforts" at 65% because there is one "miniscule" category of the collateral accounts more difficult to collect that the other categories.  For CAG's charge for "Maker's Efforts" in collecting that one miniscule category of accounts, Walt Collins testified, CAG's charge might be as much as 65%.  But even including collections on that one miniscule category of accounts, in the aggregate across collections on all of the collateral debt accounts, CAG's charges for "Maker's Efforts" cannot exceed 50% without approval of Ferrum Capital (or the Receiver). Walt Collins' testimony explained here is included in **Receiver's Proof of Claim Exhibit 11**.

32.     The 50% cap on collections for "Maker's Efforts" does not relieve CAG from providing evidence of actual costs paid or incurred in collecting the collateral debt accounts.  CAG is not entitled to 50% (or 65%) of collections simply because 50% (or 65%) is the cap on the charge for "Maker's Efforts."  CAG should get nothing for "Maker's Efforts" unless its charges are for documented and reasonable expenses actually paid or incurred.

33.     CAG provided Ferrum Capital no evidence of any amounts actually paid or incurred in collecting the Ferrum Capital collateral debt accounts.   CAG has provided the Receiver no such evidence.   Nor is there evidence that CAG ever contacted Ferrum Capital before January 2024 with any explanation for any charge by or fee to CAG exceeding 50%.  Nor is there any evidence that Ferrum Capital ever approved any charge by or fee to CAG exceeding 50%.  The Receiver has not agreed to any charge by or fee to CAG exceeding 50%.

**Additional Information on Collections on
the Ferrum Capital Collateral Accounts**

34.     CAG and the Oliphant Parties have collected at least $56,163,554 on the Ferrum Capital collateral debt accounts in the period from 2017 through April 2025, as explained in paragraph 36 below.

35.     According to a report prepared by CAG and the Oliphant Parties included in the Ferrum Managers Certification filed in the records of the state court, CAG and the Oliphant Parties collected $49,297,644 in proceeds of the collateral consumer debt accounts, through August 2023. Here is an excerpt from that report:

| | | |
|---|---|---|
| Gross Revenue (Receipts) | $    49,297,654.65 | |
| Less Maker's Efforts: | | |
| Estimated Representatives Cost (Internal) | $      9,126,026.20 | 29.5% |
| Representatives Cost (Agency) | $      5,416,781.92 | |
| Estimated Servicer Fees | $      4,929,765.47 | 10.0% |
| Estimated Overhead Allocation | $    12,324,413.66 | 25.0% |
| Total Maker's Efforts (Estimated) | $    31,796,987.25 | |
| Net Revenue (including estimates) | $    17,500,667.40 | |
| | | |
| Less Net Court Costs: | | |
| Court Costs | $         790,139.64 | |
| Court Costs Recovered | $        (246,744.15) | |
| Net Court Costs | $         543,395.48 | |
| Net Proceeds (including estimates) | $    16,957,271.92 | |

That Ferrum Capital Managers' Certification is included in the Court's records of the Musgrove Adversary at Doc.#1-8, p. 147.  The page from the Ferrum Capital Managers' Certification reproduced here is at Doc.#1-8, p. 187 and is also included in **Receiver's Proof of Claim Exhibit 12**.

36.     Jack Davis was the CFO of CAG (and its affiliated "Oliphant Parties") in 2024.  Davis' testimony admitting he prepared the portion of the Ferrum Managers'

Certification included as Exhibit C in the Certification from which **Receiver's Proof of Claim Exhibit 12** is taken is included with **Receiver's Proof of Claim Exhibit 8**.

37.     CAG and the Oliphant Parties wrongly claimed for themselves 64.5% of the $49,297,654.65 in "Gross Revenue" or collections from the collateral consumer debt accounts shown on the report on collections through August 2023, or $26,380,205, attributing what they took for themselves to "<u>Estimated</u> Representatives Cost (Internal)," "<u>Estimated</u> Servicer Fees," and "<u>Estimated</u> Overhead Allocation" as shown on **Receiver's Proof of Claim Exhibit 12**.  Those charges against or deductions from Gross Revenue or collections are not proper.  CAG had no right to deductions for *estimates* of anything. And CAG had no right to deduct for its overhead or for servicer fees for which it had no contract and which it probably didn't actually pay.

38.     Although CAG has provided no evidence to support the CAG charge of $5,416,781 on **Receiver's Proof of Claim Exhibit 12** for "Representative Cost (Agency)," the Receiver does not dispute that amount probably was for charges of outside collection agencies CAG actually paid or incurred.  The Receiver accepts that charge as a cost of "Maker's Efforts."

39.     CAG says its affiliated "Oliphant Parties" have serviced the collateral debt accounts securing payment of the CAG-to-Ferrum Capital promissory notes since some time in 2021 or 2022.  And since then, the Oliphant Parties have controlled the books and records of CAG and its recordkeeping for collection on the Ferrum Capital collateral accounts and the collections on those accounts.  Since some time in at least 2022, CAG has been a zombie entirely under the control of the Oliphant Parties.

40.     *There is no servicing agreement between CAG and the Oliphant Parties*.

41.     CAG reported to the Receiver that CAG has collected an additional $6,865,899 on the Ferrum Capital collateral debt accounts in the period from October 2023 through April 2025.  **Receiver's Proof of Claim Exhibit 13**.  CAG provided no evidence of any costs or expenses it incurred in collecting that $6,865,899.

42.     Adding the $49,297,654.65 in collections on the collateral reported on **Receiver's Proof of Claim Exhibit 12** and the $6,865,899 in collections reported on **Receiver's Proof of Claim Exhibit 13** shows CAG (or the Oliphant Parties acting for or as CAG) collected at least $56,163,554 on the Ferrum Capital collateral through April 2025.

43.     The correct method for determining the Ferrum Capital share of the $56,163,554 is to deduct from that sum for "Maker's Efforts" the amount in documented charges for fees and expenses CAG actually paid or incurred for reasonable charges by CAG's agents, representatives, and attorneys in collecting the $56,163,554.

44.     There is no evidence of any such documented charges CAG paid or incurred. The $12,324,413 deducted from gross revenue or collections for "Estimated Overhead Allocation" as shown in **Receiver's Proof of Claim Exhibit 12** should not be included or counted as costs of "Maker's Efforts."   Nor should the deductions from Gross Revenue claimed on **Receiver's Proof of Claim Exhibit 12** for "Estimated Representative Cost (Internal)" and "Estimated Servicer Fees" be included or counted as "Maker's Efforts."  The only permitted deduction from Gross Revenue CAG claimed on **Receiver's Proof of Claim Exhibit 12** should be the $5,416,781 for "Representative Cost (Agency)."

45.     After adding back into Gross Revenue or collections the amounts for "<u>Estimated</u> Overhead Allocation," "<u>Estimated</u> Representative Cost (Internal)," and "<u>Estimated</u> Servicer Fees" CAG wrongly deducted for "Maker's Efforts from collections from 2017 through August 2023 (but giving CAG credit for the $5,416,781 for "Representative Cost (Agency)"), the Ferrum Capital share of the $49,297,654 in Gross Revenue is $43,880,870.

46.     The Receiver contends that all of the $6,685,899 in collections CAG reported for the period from October 2023 through April 2025 belongs in the Ferrum Capital share because CAG has provided no evidence of any permissible cost or expense of "Maker's Efforts."

47.     Combining the $43,880,870 from the period from the period from 2017 through August 2023 with the $6,865,899 in collections in the period from October 2023 through April 2025 brings the total Ferrum Capital share of collections on the collateral debt accounts through April 2025 to $50,746,773.  Therefore, the Receiver contends CAG should have paid Ferrum Capital or the Receiver $50,746,773 from collections on the collateral debt accounts through April 2025.

48.     Alternatively, and as a minimum share due Ferrum Capital, if the Court concludes that CAG is entitled to anything more than the $5,416,781 for "Representative Cost (Agency)" the Receiver concedes, the Receiver is entitled to at least 50% of the $56,163,554 in gross revenue or collections through April 2025.

49.     This alternative minimum method of 50% to Ferrum Capital should apply only if the Court concludes CAG is not required to show actual expenses incurred or paid in "Maker's Efforts." Using this method, there would be no reduction from the $56,163,554

in total collections through April 2025 for any actual cost inside or outside CAG. CAG would simply receive 50% of the total collections. Under this method, CAG should have paid Ferrum Capital or the Receiver at least $28,081,777 for collections on the collateral debt accounts through April 2025.

50. The Court should reject any objection or complaint from CAG or the Oliphant Parties about the range between the $50,746,773 amount in paragraph 44 and the $28,081,777 amount in paragraphs 45 and 46. The range is the result of CAG and the Oliphant Parties providing no accounting or records of any actual "fees and expenses due Maker's agents, representatives and attorneys relating to Maker's Efforts."

### What CAG Paid Ferrum Capital and the Receiver

51. CAG has paid Ferrum Capital and the Receiver a total of only $16,900,784 owed Ferrum Capital and the Receiver from collections on the collateral debt accounts.

52. As shown by the schedule prepared by forensic accountant Murray included as **Receiver's Proof of Claim Exhibit 14**, CAG paid Ferrum Capital $16,097,374 through 2023. Since then, CAG has paid the Receiver for Ferrum Capital an additional $803,410, for the total paid to Ferrum Capital of $16,900,784.

### COUNTS ONE AND TWO AGAINST CAG— What CAG Owes The Receiver From Collections On The Collateral Consumer Debt Accounts

53. The Receiver repeats here as if stated here verbatim all of paragraphs 3 through 50 above.

54. The difference between the $50,746,773 that CAG should have paid Ferrum Capital as explained in paragraph 44 above and the $16,900,784 CAG has paid Ferrum Capital (and the Receiver) is $33,845,989. Therefore, the Receiver contends CAG

breached its obligations to Ferrum Capital under the promissory notes and owes the Receiver for the Ferrum Capital Receivership Estate $33,845,989 for the Ferrum Capital or recourse share of the collections on or proceeds of the Ferrum Capital collateral debt accounts.

55. The difference between the alternative minimum 50% amount (or $28,081,777) that CAG should have paid Ferrum Capital as explained in paragraphs 45 and 46 above and deducting CAG's payments of $16,900,784 is $11,180,993. Therefore, alternatively and at a minimum, the Receiver contends CAG owes the Receiver for the Ferrum Capital Receivership Estate at least $11,180,993 for the minimum Ferrum Capital or recourse share of the collections on or proceeds of the Ferrum Capital collateral debt accounts.

56. Because the collateral consumer debt accounts securing the Receiver/Ferrum Capital claim are scheduled at $7,853,142, the Receiver **First Count** is secured and is for the $7,853,142 scheduled value of the collateral debt accounts. The Receiver's **Second Count** is unsecured and is for as much as $25,992,847 for the difference between $33,845,989 and the scheduled value of the collateral. Alternatively, and at a minimum, the Receiver's **Second Count** is for a minimum of $3,327,851 for the difference between $11,180,993 and the scheduled value of the collateral.

57. The amounts CAG owes the Receiver under **Counts One and Two** increase as there are collections on or proceeds of the Ferrum Capital collateral debt accounts.

**COUNT THREE AGAINST CAG—**
**CAG'S Failure To Account For And Pay Proceeds Of**
**Oliphant-To-CAG Promissory Notes Securing Payment**
**Of CAG-To-Ferrum Capital Promissory Notes**

58.     The Receiver repeats here as if stated here verbatim all of the paragraphs above.

59.     There was a second kind of collateral securing payment of the CAG-to-Ferrum Capital promissory notes—promissory notes payable by CAG's affiliate, Oliphant Financial, to CAG. Those Oliphant Financial-to-CAG promissory notes are identified in UCC-1 financing statements CAG filed for Ferrum Capital on March 25, 2021, and on June 30, 2021, in filing numbers 20212353085 and 20215095048 in the records of the Delaware Secretary of State.  Copies of those UCC-1's are included in **Receiver's Proof of Claim Exhibit 5**.  CAG confirmed Ferrum Capital's security interest in Oliphant Financial-to-CAG promissory notes as:

> 8. ☑ COLLATERAL CHANGE: Also check one of these four boxes: ☐ ADD collateral ☐ DELETE collateral ☑ RESTATE covered collateral ☐ ASSIGN collatera
> Indicate collateral:
> 1)20.3% of the certain Note Receivable dated 11/28/2018 between Collins Asset Group,LLC(Creditor) and Oliphant Financial, LLC (Obligor) in the sum of One Million, One Hundred Seventy Thousand, One Hundred Forty Seven Dollars and ninety cents (1,170,147.90)  2) 86.7% of that certain Note Receivable dated 12/27/2018 between Collins Asset Group, LLC (Creditor) and Oliphant Financial, LLC (Obligor) in the sum of One Million, Nine Hundred Two Thousand, Six Hundred Ninety-Three Dollars and forty eight cents (1,902,693.48).

UCC Filing No. 20212353085.

> 4. COLLATERAL: This financing statement covers the following collateral:
> See Attached Exhibit A for collateral
> Collateral Description - please see attached

. . .

Exhibit A
Ferrum Capital, LLC UCC Lien
June 30, 2021

The following collateral of Collins Asset Group, LLC, as obligor debtor and Ferrum Capital, LLC as the secured party.

1) Notes Receivable in the Books and Records of Collins Asset Group, LLC as notated on the date of purchase of the portfolio referenced below as follows:

a) 100% of Debtor's interest in the Note Receivable with an effective date of April 1, 2020 between Collins Asset Group, LLC as payee and Oliphant Financial, LLC as borrower in the principal sum of $13,457.29.

b) 100% of Debtor's interest in the Note Receivable with an effective date of April 1, 2020 between Collins Asset Group, LLC as payee and Oliphant Financial, LLC as borrower in the principal sum of $27,675.37.

c) 100% of Debtor's interest in the Note Receivable with an effective date of April 29, 2020 between Collins Asset Group, LLC as payee and Oliphant Financial, LLC as borrower in the principal sum of $13,024.29.

d) 100% of Debtor's interest in the Note Receivable with an effective date of April 29, 2020 between Collins Asset Group, LLC as payee and Oliphant Financial, LLC as borrower in the principal sum of $14,634.48.

e) 100% of Debtor's interest in the Note Receivable with an effective date of May 26, 2020 between Collins Asset Group, LLC as payee and Oliphant Financial, LLC as borrower in the principal sum of $16,679.81.

f) 100% of Debtor's interest in the Note Receivable with an effective date of July1, 2020 between Collins Asset Group, LLC as payee and Oliphant Financial, LLC as borrower in the principal sum of $29,530.78.

g) 100% of Debtor's interest in the Note Receivable with an effective date of July 29, 2020 between Collins Asset Group, LLC as payee and Oliphant Financial, LLC as borrower in the principal sum of $24,252.04

h) 100% of Debtor's interest in the Note Receivable with an effective date of August 26, 2020 between Collins Asset Group, LLC as payee and Oliphant Financial, LLC as borrower in the principal sum of $19,066.95.

i) 100% of Debtor's interest in the Note Receivable with an effective date of September 25, 2020 between Collins Asset Group, LLC as payee and Oliphant Financial, LLC as borrower in the principal sum of $20,657.68.

j) 100% of Debtor's interest in the Note Receivable with an effective date of October 27, 2020 between Collins Asset Group, LLC as payee and Oliphant Financial, LLC as borrower in the principal sum of $10,866.90.

k) 100% of Debtor's interest in the Note Receivable with an effective date of November 25, 2020 between Collins Asset Group, LLC as payee and Oliphant Financial, LLC as borrower in the principal sum of $13,058.42

l) 100% of Debtor's interest in the Note Receivable with an effective date of December 30, 2020 between Collins Asset Group, LLC as payee and Oliphant Financial, LLC as borrower in the principal sum of $18,753.43

m) 100% of Debtor's interest in the Note Receivable with an effective date of January 27, 2021 between Collins Asset Group, LLC as payee and Oliphant Financial, LLC as borrower in the principal sum of $15,600.20.

n) 100% of Debtor's interest in the Note Receivable with an effective date of February 21, 2021 between Collins Asset Group, LLC as payee and Oliphant Financial, LLC as borrower in the principal sum of $19,963.75.

o) 100% of Debtor's interest in the Note Receivable with an effective date of March 31, 2021 between Collins Asset Group, LLC as payee and Oliphant Financial, LLC as borrower in the principal sum of $17,571.01

p) 100% of Debtor's interest in the Note Receivable with an effective date of April 28, 2021 between Collins Asset Group, LLC as payee and Oliphant Financial, LLC as borrower in the principal sum of $15,534.88.

UCC Filing No. 20215095048.

60.    CAG was obligated under the CAG-to-Ferrum Capital promissory notes, Master Loan Agreement, and Master Security Agreement to account to Ferrum Capital for payments by Oliphant Financial to CAG on the Oliphant Financial-to-CAG promissory notes.  CAG failed to do so and breached its obligations to Ferrum Capital and the Receiver.

61.    The aggregate principal balance of Ferrum Capital's interest in the Oliphant Financial-to-CAG promissory notes was $2,177,502.

62.    CAG entirely failed to provide any accounting or report to Ferrum Capital (or the Receiver) of any payments by Oliphant on any of the Oliphant-to-CAG promissory notes. CAG paid Ferrum Capital and the Receiver nothing from what CAG received from Oliphant Financial on the Oliphant Financial-to-CAG promissory notes. There is no mention in the CAG schedules of any of the Oliphant Financial-to-CAG promissory notes or any debt by Oliphant Financial to CAG as an asset of CAG.

63.    There was no cost or charge for "Maker's Efforts" in CAG receiving payment from its affiliate, Oliphant Financial, on the Oliphant Financial-to-CAG promissory notes. All of the $2,177,502 in aggregate principal balance of the Oliphant Financial-to-CAG

promissory notes securing payment of the CAG-to-Ferrum Capital promissory notes should have been paid to Ferrum Capital but was not.

64. The Receiver's Claim under **Count Three** is **secured** and is for $2,177,502 from the Oliphant Financial-to-CAG promissory notes or the proceeds of any payments on those promissory notes not paid to Ferrum Capital or the Receiver.

## COUNT FOUR AGAINST CAG—
### CAG'S TUFTA Liability As A Net Winner
### From The Ferrum Capital Ponzi Scheme

65. The Receiver repeats here as if stated here verbatim all of the paragraphs above

66. The business of Ferrum Capital under the management and control of Josh Allen and Michael Cox (and perhaps others) was the operation of a Ponzi scheme. Ferrum Capital issued and sold high yield promissory notes to many retail investors. Many of the investors were retired or soon to be retired and unsophisticated about investments and securities. The Ferrum insiders represented the Ferrum promissory notes to the retail investors as being "guaranteed" even though the promised return on the Ferrum promissory notes to investors substantially exceeded the yield on publicly traded investment grade bonds or debt issued at the same time. The Receiver refers to those promissory notes issued by Ferrum Capital to the defrauded investors as the "Ferrum Capital-to-Investor promissory notes."

67. The Ferrum Capital-to-Investor promissory notes were securities under the Texas Securities Act. Sales of the Ferrum Capital-to-Investor promissory notes were not registered with the Texas Securities Board; the Commissioner of the Texas Securities Board never issued any permit qualifying Ferrum Capital-to-Investor promissory notes for

sale in Texas. Ferrum Capital was not registered as a dealer to sell securities in Texas. The persons marketing or selling Ferrum Capital-to-Investor promissory notes were not registered as dealers or agents of dealers to sell securities in Texas.

68. In short, the sales of the Ferrum Capital-to-Investor promissory notes were illegal. The Ferrum Capital insiders who have been called on to testify about the sale of the Ferrum Capital-to-Investor promissory notes to date have invoked the Fifth Amendment and declined to answer questions under oath about the sales.

69. The Ferrum insiders paid some of the proceeds of the sales of Ferrum Capital-to-Investor promissory notes to themselves and some to the biggest beneficiary of the Ponzi scheme, CAG. The Ferrum Ponzi scheme could not have worked without CAG. Indeed, in economic reality, CAG was a co-issuer of the Ferrum Capital-to-Investors promissory notes.

70. Ferrum Capital did not build or produce any product other than its bogus Ferrum-to-Investor promissory notes. Ferrum Capital provided no legitimate service or benefit to anyone. Ferrum Capital did not use the tens of millions of dollars it took in from selling its bogus Ferrum Capital-to-Investor promissory notes to retail investors to finance the acquisition, construction, or production of anything Ferrum Capital created or sold other than its Ponzi scheme Ferrum Capital-to-Investor promissory notes. And, to date, no one from Ferrum Capital has turned over to the Receiver anything like an organized, legitimate, or regularly kept set of bookkeeping records from the business of Ferrum Capital.

71. Ferrum Capital, however, did provide tens of millions of dollars of illegitimate benefits to the Ferrum Capital insiders, to CAG, and the Oliphant Parties. Ferrum Capital

took in approximately $67.7 million from retail investors selling its bogus Ferrum-to-Investor promissory notes to retail investors from which the Ferrum insiders took approximately $13.6 million for themselves and delivered $47,025,622 to CAG. CAG returned only $16,900,784 to Ferrum for its return to the retail investors, leaving CAG a "net winner" out of the Ferrum Ponzi scheme of $30,124,838.

72.     The transfers of money from Ferrum Capital to CAG were fraudulent transfers under TUFTA sections 24.005 and 24.006.

73.     The Ferrum Capital-to-Investor promissory notes had a minimum term to maturity of four years. Ferrum Capital insiders persuaded many of the investors to allow interest to accrue on the Ferrum Capital-to-Investor promissory notes rather than to be paid as accrued. And Ferrum Capital insiders persuaded many of the investors to "rollover" their notes at maturity into new promissory notes rather than having Ferrum Capital repay the amounts due at maturity.

74.     CAG was a junk debt portfolio buyer that received the bulk of the proceeds of the Ferrum Capital Ponzi scheme. CAG itself was a second level of fraud on the retail investors who invested in Ferrum Capital-to-Investor promissory notes. After taking millions of dollars for themselves, the Ferrum Capital insiders delivered $47,025,622 to CAG, which was and is affiliated with the Oliphant Parties.

75.     CAG only paid back to Ferrum Capital only $16,900,754 of the $47,025,622 that Ferrum Capital delivered to CAG.

76.     CAG was a substantial "net winner" from the Ferrum Capital Ponzi scheme. CAG received $30,124,838 more than it paid Ferrum Capital. As to that difference, CAG is a transferee for the purposes of TUFTA. Under TUFTA §§ 24.008 and 24.009, the

Receiver is entitled to recover the $30,124,838 net win from CAG. The Receiver's claim under **Count Four** is **unsecured** and is under TUFTA for that $30,124,838 transferred to CAG.

**COUNT FIVE AGAINST CAG—**
**Proceeds of Collections On Additional Collateral Debt Accounts**
**CAG Purchased With Proceeds of Initial Collections And**
**Collateral Debts From The Oliphant Parties To CAG**

77. The Receiver incorporates here as if stated here verbatim all of the paragraphs above.

78. As shown above, Ferrum Capital has a security interest in collateral consumer debt accounts CAG purchased with the money Ferrum Capital loaned CAG and in the proceeds of those accounts. Walt Collins has testified that CAG sometimes used the collections on or proceeds of the initial collateral consumer debt accounts to purchase later or additional consumer debt accounts. His testimony to that effect is included in **Receiver's Proof of Claim Exhibit 11** (at deposition pages 102-103 & 147). An excerpt of a portion of that testimony is reproduced here:

> Q   Okay. So if we really get down in the nitty-gritty, in the weeds, when money comes in, it's collections. Let's say it's $100 gets collected and roughly 50 percent of it is Collins money and roughly 50 percent of it is Ferrum Capital money.
>
>     The 50 percent of it that was Ferrum Capital money, did it get paid into just the general operating account for Collins Asset Group?
>
> A   No.
>
> Q   Where did it go?
>
> A   Purchase other assets.

. . .

Q And so when you were talking earlier with
Mr. Lea about building the portfolios, that's one of the
reasons why you would use some of the -- some of the
money that you collected from a particular Ferrum loan
to go purchase additional receivables?
A Absolutely.
Q So in the end, not only was the collateral for
a particular -- like Mr. Royal's example -- a
million-dollar loan, it wasn't just what was being
collected from that one piece of collateral that was
purchased, but it also then included what you were able
to buy with the lender portion of that to add to it.
A Sure.
Q Is that correct?
A Yes.

79.	In addition, CAG loaned cash Ferrum Capital loaned to CAG or cash proceeds of Ferrum Capital collateral to CAG's affiliate, AIM, or to one of the other Oliphant Parties in transactions in which the the other borrowing Oliphant Party gave CAG security interests in accounts purchased. At least some of the security interests are reflected by UCC-1 financing statements recorded in favor of CAG.  The Receiver believes and alleges that the borrowing Oliphant Party receiving the Ferrum Capital cash or cash proceeds purchased consumer debt accounts with CAG's funds which, in equity, should be collateral for the loans Ferrum Capital made to CAG.

80.	Thus, Ferrum Capital and the Receiver have a security interest and rights in a second tier or portfolio of consumer debt accounts and Oliphant-to-CAG debts beyond those referenced in **Receiver's Proof of Claim Exhibits 5 and 12**. The accounts AIM purchased with proceeds of earlier accounts CAG purchased with money Ferrum loaned to AG are proceeds of Ferrum Capital collateral.

81.	CAG, AIM, and the other affiliated Oliphant Parties have not provided the Receiver with any identification or accounting of collections on or proceeds of this second

tier of collateral debt accounts.  So the Receiver cannot quantify his claim under this **Count Five** at this time and cannot identify the collateral. Nevertheless, the Receiver asserts this **Fifth Count** against CAG and contends it **is secured**.  The Receiver asks the Court to require CAG, AIM, and the other Oliphant Parties to account fully for this second tier of collateral and the proceeds of this collateral so the Receiver can quantify the amount due the Receivership Estate on this **Fifth Count**.

**COUNT SIX—**
**Against the Oliphant Parties to Recover the Collections**
**on or Proceeds of the Ferrum Capital Collateral**

82.     The Receiver incorporates here all of the paragraphs above as if stated here verbatim.

83.     For some time before 2018, Walt Collins was an owner and principal control person of CAG.  Oliphant Financial was a competitor of CAG.  Around 2018, Walt Collins and the owner of Oliphant Financial, Robert Morris, combined their business under the umbrella of Oliphant United.  AIM was formed as a debt-buying company under Oliphant United.

84.     In 2021, the original owners of CAG, Walt Collins and Michael Crossan, sold their equity in CAG and the CAG/Oliphant enterprise, to a new investor group that included Colin Conway, Mike Pope, David Scanlan, and others.

85.     The Oliphant Parties are affiliates of CAG, insiders to CAG, and claim to be creditors of CAG.  The owners of the Oliphant Parties own and control Hollins Holdings, Inc., which is the sole owner of CAG.  Before the Petition in this case, the Oliphant Parties, Hollins Holdings, and CAG were controlled by Colin Conway, Mike Pope, and David Scanlan.  CAG has said that since 2021 or 2022, it has no employees of its own to conduct

its business (although at other times when it has suited CAG and the Oliphant Parties, they have said CAG does have employees). CAG has said that since 2021 or 2022 employees of one or more of the Oliphant Parties conduct the business and keep the books and records of the Oliphant Parties. After Conway, Pope, and Scanlan took control of the Oliphant Parties and CAG in 2021, CAG and the Oliphant Parties became a common or joint enterprise with the Oliphant Parties using and controlling CAG for their benefit. After the 2021 Walt Collins and Michael Crossan sale to Conway, Pope, and Scanlan, they used their control of CAG to loot its cash for the benefit of AIM and the other Oliphant Parties.

86. The Receiver on behalf of the Receivership Estate has the right to receive and possess the share due Ferrum Capital from collections on or proceeds of the accounts securing payment of the CAG-to-Ferrum Capital promissory notes.

87. CAG had a sophisticated database and digital tools in which CAG kept digital records of the collections on the collateral accounts, the costs of the collections, and the allocations of the collected money between the share for CAG's "Maker's Efforts" and the share due Ferrum Capital. While Walt Collins owned and controlled CAG through at least some time in 2021, the records or ledgers of the share of collected money for CAG for "Maker's Efforts" referred to that money as "My Money" because Walt Collins controlled the company and he viewed that share as his money. The records or ledgers referred to the share of the collected money due Ferrum Capital (and several other secured lenders who loaned money to CAG on terms similar to the terms of the Ferrum Capital loans to CAG) as the "Lender Money" because Walt Collins viewed that share as the money CAG owed Ferrum Capital (and the other secured lenders).

88.     Since the takeover of the Oliphant/CAG enterprise in 2021, one or more of the Oliphant Parties have possessed, controlled, and collected the collateral accounts securing payment of the CAG-to-Ferrum promissory notes. One or more of the Oliphant Parties has collected and received the collections on accounts securing payment of the CAG-to-Ferrum promissory notes—*i.e.*, one or more of the Oliphant Parties has received and holds (or has used) cash proceeds of the Receiver's collateral to which the Receiver is entitled.

89.     Not only did the Oliphant Parties possess and collect the CAG accounts, they also controlled and kept the books and records of the cash they collected on the Receiver's collateral. One or more of the Oliphant Parties controlled the use of and access to the collections and allocation database described above in this Amended Complaint. One or more of the Oliphant Parties controlled the books and records used to keep track of collections on the collateral accounts and to allocate the shares for "Maker's Efforts" and for Ferrum Capital.  They also received, held, and used the money collected on the collateral accounts.

90.     The Oliphant Parties refuse to provide a proper accounting to the Receiver of his collateral and the collections on or proceeds of the collateral.

91.     After the Oliphant Parties took over control of CAG, they disregarded the agreement Walt Collins made with Ferrum Capital in 2017 that the portion of collections on the collateral accounts would never exceed 50% without consent.  And they disregarded the course of dealing that for the vast majority of the collateral accounts the cost of "Maker's Efforts" was 30% or 40% of amounts collected.  The Oliphant Parties

used their control over CAG's servicing and record keeping for the collateral accounts to claim 65% to 89% of collections for themselves.

92.     The Receiver disputed the Oliphant Parties' claims to take 65% or more of the collections on the accounts for themselves and sued CAG and Oliphant in state court to recover the correct share of the collected money due the Receivership Estate.  During the course of that litigation in state court in Bexar County, Texas, the owners of the Oliphant Parties used their control over Hollins Holdings and CAG to cause Hollins Holdings and CAG to file their Chapter 7 bankruptcy petitions in Delaware.

93.     Even after the CAG bankruptcy petition, the Oliphant Parties continued to receive, collect and hold payments from the account debtors on the collateral accounts securing payment of the CAG-to-Ferrum promissory notes.   The Receiver has asked the Oliphant Parties to account for the Receiver's cash proceeds the Oliphant Parties have collected on the Ferrum Capital accounts and to pay over to the Receiver for the Receivership Estate all of the money due the Receivership Estate from those collections. That amount is at least 50% of the collections and for some of the collections on some of the collateral accounts is higher. The Oliphant Parties have failed and refuse to do so.

94.     The Oliphant Parties accounted to the interim Trustee in the CAG Chapter 7 case in Delaware for what the Oliphant Parties said they collected on the collateral accounts in the first quarter of 2025 and they paid the interim Trustee what they said was the appropriate share for the Ferrum Capital loans. But the Oliphant Parties have not candidly accounted for collections on the collateral accounts before the first quarter of 2025 and have not paid the Receiver what is due for the Ferrum Capital share of

collections before the first quarter of 2025, causing the Receivership Estate damages or entitling the Receivership Estate to restitution for which the Receiver sues.

95.     The Oliphant Parties have wrongfully exercised dominion and control over some or all of the Ferrum Capital share of the collections or proceeds of the Ferrum Capital collateral due the Receiver. And they have done so willfully and maliciously, intending to harm Ferrum Capital and the Receivership Estate and/or with reckless disregard for the likely harm that would result to Ferrum Capital and the investor constituents of the Receivership Estate.

96.     The Oliphant Parties also have kept and taken for themselves the money Ferrum Capital loaned CAG for which CAG secured its debt to Ferrum Capital with promissory notes Oliphant Financial made payable to CAG described in **Count Three** above.  And the Oliphant Parties have kept and taken for themselves the consumer debt accounts they purchased using money that Ferrum Capital loaned to CAG and CAG transferred to one or more of the Oliphant Parties as described in **Count Five** above.

97.     The Receiver asserts against all of the Oliphant Parties on behalf of the Receivership Estate the right to recover the amount of the cash proceeds of Ferrum Capital's collateral securing payment of the CAG-to-Ferrum promissory notes due Ferrum Capital or the Receiver for the period from 2017 through the present.  The Receiver includes in this claim request for recovery of the proceeds of the Oliphant Parties have kept and taken for themselves on consumer debt accounts subject to a UCC-1 lien in favor of Ferrum Capital described in **Count Five**, the proceeds of loans CAG made to the Oliphant Parties secured by UCC-1's in favor of CAG as described in **Count Five**, and the proceeds of consumer debt accounts the Oliphant Parties purchased with cash

Ferrum Capital loaned to CAG as described in **Count Five**. The Receiver invokes and asserts the common law right or action of conversion against the Oliphant Parties. In addition, and/or alternatively, the Receiver invokes and asserts the rights under of a secured creditor to collateral and proceeds section 9.315 of the Texas Business and Commerce Code.

## COUNT SEVEN AGAINST OLIPHANT PARTIES—
### TUFTA Claims Against Oliphant Parties

98.     The Receiver repeats here all of the paragraphs above as if stated here verbatim.

99.     The Receiver asserts **Count Seven** against the Oliphant Parties on behalf of the creditors of Ferrum Capital in the Receivership Estate under the Texas Uniform Fraudulent Transfer Act or "TUFTA" in Chapter 24 of the Texas Business & Commerce Code. The creditors of Ferrum Capital include the many defrauded investors who lost money in the Ferrum Capital Ponzi scheme.

100.     The business of Ferrum Capital under the management and control of Josh Allen and Michael Cox (and perhaps others) was the operation of a Ponzi scheme. Ferrum Capital issued and sold high yield promissory notes to many retail investors. Many of the investors were retired or soon to be retired and unsophisticated about investments and securities. The Ferrum insiders represented the Ferrum promissory notes to the retail investors as being "guaranteed" even though the promised return on the Ferrum promissory notes to investors substantially exceeded the yield on publicly traded investment grade bonds or debt issued at the same time. The Receiver refers to those promissory notes issued by Ferrum Capital to the defrauded investors as the "Ferrum-to-Investor promissory notes."

101. The Ferrum-to-Investor promissory notes were securities under the Texas Securities Act. Sales of the Ferrum-to-Investor promissory notes were not registered with the Texas Securities Board; the Commissioner of the Texas Securities Board never issued any permit qualifying Ferrum-to-Investor promissory notes for sale in Texas. Ferrum was not registered as a dealer to sell securities in Texas. And the persons marketing or selling Ferrum-to-Investor promissory notes were not registered as dealers or agents of dealers to sell securities in Texas.

102. In short, the sales of the Ferrum-to-Investor promissory notes to the investors were illegal. The Ferrum insiders who have been called on to testify about the sale of the Ferrum-to-Investor promissory notes to date have either declined to appear to testify or have invoked the Fifth Amendment and declined to answer questions under oath about the sales.

103. The Ferrum insiders paid some of the proceeds of the sales of Ferrum-to-Investor promissory notes to themselves and some to the biggest beneficiary of the Ponzi scheme, CAG. As explained more below, the Ferrum Ponzi scheme could not have worked without CAG. Indeed, in economic reality, CAG was a co-issuer of the Ferrum-to-Investors promissory notes.

104. Ferrum Capital did not build or produce any product other than its bogus Ferrum-to-Investor promissory notes. Ferrum Capital provided no legitimate service or benefit to anyone. Ferrum Capital did not use the tens of millions of dollars it took in from selling its bogus Ferrum-to-Investor promissory notes to retail investors to finance the acquisition, construction, or production of anything Ferrum Capital created or sold other than its Ponzi scheme Ferrum-to-Investor promissory notes. And, to date, no one from

Ferrum Capital has turned over to the Receiver anything like an organized, legitimate, or regularly kept set of bookkeeping records from the business of Ferrum Capital.

105. Ferrum Capital, however, did provide tens of millions of dollars of illegitimate benefits to the Ferrum insiders and to CAG and the Oliphant Parties. Ferrum Capital took in approximately $67.7 million from retail investors selling its bogus Ferrum-to-Investor promissory notes to retail investors from which the Ferrum insiders took approximately $13.6 million for themselves and delivered about $47.6 million to CAG. CAG returned only about $18 million to Ferrum for its return to the retail investors, leaving CAG a "net winner" out of the Ferrum Ponzi scheme of about $29.6 million.

106. The transfers of money from Ferrum Capital to CAG were fraudulent transfers under TUFTA sections 24.005 and 24.006.

107. The Ferrum-to-Investor promissory notes had a minimum term to maturity of four years. Ferrum insiders persuaded many of the investors to allow interest to accrue on the Ferrum-to-Investor promissory notes rather than to be paid as due. And Ferrum insiders persuaded many of the investors to "rollover" their notes at maturity into new promissory notes rather than having Ferrum Capital repay the amounts due at maturity.

108. CAG was a junk debt portfolio buyer that received the bulk of the proceeds of the Ferrum Capital Ponzi scheme. CAG itself was a second level of fraud on the retail investors who invested in Ferrum-to-Investor promissory notes. After taking millions of dollars for the Ferrum insiders, Ferrum Capital delivered tens of millions of dollars to CAG, which was and is affiliated with the Oliphant Parties.

109. Ferrum insiders (and sometimes CAG) told the investors that payment of the Ferrum-to-Investor promissory notes was to come from the proceeds of or collections

on portfolios (or what CAG calls "packages") of old, distressed debt which CAG purchased with some of the investors' money and in which CAG pledged a partial security interest to Ferrum. Ferrum (and sometimes CAG) touted to many of the investors the security of CAG junk debt collateral as a feature and benefit for the retail investors who purchased Ferrum-to-Investor promissory notes. There would not have been sales of Ferrum-to-Investor promissory notes without CAG.

110. CAG only paid back to Ferrum Capital approximately $18 million of the $47.6 million in retail investor savings that Ferrum Capital delivered to CAG. CAG kept the balance of the $29.6 million net "win" it received from Ferrum Capital Ponzi scheme.

111. The Ponzi scheme sale of Ferrum-to-Investor promissory notes to the investors was destined to fail and it did. Ferrum Capital and its sales force sold the retail promissory notes by touting their connection to and backing by CAG. CAG regularly participated in what it called "dog and pony shows" with the insiders at Ferrum Capital to help the Ferrum insiders sell the Ferrum-to-Investor promissory notes.

112. The Ferrum insiders or CAG tricked many of the investors to "rollover" or "renew" their Ferrum-to Investor promissory notes when the Ferrum-to-Investor promissory notes matured. The Ferrum insiders benefitted from the "rollovers" in two ways. First, CAG and the Ferrum insiders treated "rollovers" as if they were sales of new Ferrum-to-Investor promissory notes and CAG paid commissions on the rollovers to the Ferrum insiders. Second, the rollovers meant that the Ponzi scheme would continue longer because the investors who rolled over their initial investments would not receive the return of their capital for at least another four years. Persuading many of the investors

to rollover the Ferrum-to Investor promissory notes allowed CAG to use the investors' money for four more years.

113.   CAG was a substantial "net winner" from the Ferrum Capital Ponzi scheme. CAG received and kept approximately $29.6 million more than it paid Ferrum. As to that difference, CAG was a transferee for the purposes of the Texas Uniform Fraudulent Transfer Act or "TUFTA" in Chapter 24 of the Texas Business and Commerce Code.

114.   CAG was insolvent for much of the time that it took in money from Ferrum. CAG itself told its auditors in 2023 that it was concerned about its ability to continue in business and pay its creditors in a "going concern" report to the auditors. CAG admitted to its auditors in 2023 that its owners' equity account and income had been negative for at least the previous five years.

115.   CAG transferred a substantial part of its net win from Ferrum Capital to the Oliphant Parties, which are affiliates of CAG. Those transfers are documented in the financial books and records of CAG and the Oliphant Parties as intercompany notes, debts, or transfers. The books and records of CAG and the Oliphant Parties show that AIM, Oliphant Financial, and Oliphant USA together took approximately $40 million in cash out of CAG. AIM, Oliphant Financial, and Oliphant USA are subsequent transferees of the initial fraudulent transfers out of the Ferrum Capital Ponzi scheme to CAG for the purposes of transferee liability under TUFTA.

116.   The Oliphant Parties left off of the initial CAG schedules they filed for CAG when they filed CAG's bankruptcy in Delaware.  After the case was transferred to this Court, the Oliphant Parties filed amended schedules for CAG in which they admitted that the Oliphant Parties owe $42,744,886 to CAG:

| 11b. Over 90 days old: | 42,744,886.69 | - | 0.00 | =.... | $42,744,886.69 |
|---|---|---|---|---|---|
| | face amount | | doubtful or uncollectible accounts | | |

Doc.#131, p. 9 of 30.

117.   Most of that $42,744,886 that CAG transferred to AIM and the other Oliphant Party affiliates was the CAG net win from Ferrum Capital.

118.   The cash CAG transferred to AIM and the other Oliphant Parties left CAG insolvent, probably as early as 2021.

119.   In and after 2021, Ferrum Capital continued to take in money from retail investors and issue to them CAG-to-Ferrum Capital Promissory Notes. And CAG continued to loan the money taken in from the retail investors to CAG with representations from CAG that it would use the money to purchase loan packages and would secure the loans from Ferrum with security interests in the accounts purchased.

120.   The combined CAG/Oliphant enterprise, however, stopped purchasing debt account packages in CAG's name in 2021. In 2021, the CAG/Oliphant enterprise began using money CAG received from Ferrum Capital along with collections on or proceeds of accounts in which Ferrum Capital had a security interest to purchase packages of accounts in the name of AIM.

121.   AIM and the other Oliphant Parties gave Metropolitan Partners a lien on those accounts that the CAG/Oliphant enterprise had purchased in the name of AIM, contrary to the rights and security interest of Ferrum Capital CAG had given to Ferrum Capital.

122.   AIM and the other Oliphant Parties were insiders to and affiliates of CAG when CAG transferred the $42,744,886 to AIM and the other Oliphant Parties and gave Metropolitan Partners a lien on accounts purchased in AIM's name using money from

Ferrum Capital or proceeds of its collateral. AIM and the other Oliphant Parties did not pay equivalent value to CAG in return for the $42,744,886.

123. The Receiver asserts claims against the Oliphant Parties under TUFTA to recover the return of the amounts of the CAG net winnings from Ferrum Capital transferred from CAG to one or more of the Oliphant Parties.

## COUNT EIGHT AGAINST AIM—
### To Recover Proceeds of Ferrum Capital Collateral

124. The Receiver repeats here as if stated here verbatim all of the paragraphs above.

125. CAG advanced to AIM approximately $27 million, much or all of which was proceeds of loans by Ferrum Capital to CAG or proceeds of collections on accounts CAG pledged as collateral to Ferrum Capital to secure payment of the loans by Ferrum Capital to CAG. The Oliphant Parties used that money to purchase consumer debt accounts in the name of AIM. In fairness and equity, the Receiver has an interest for the Receivership Estate in those accounts the Oliphant Parties purchased in the name of AIM using money from Ferrum Capital or the proceeds of Ferrum Capital collateral.

126. CAG, AIM, and the other Oliphant Parties accounted in the books and records of CAG and AIM for the funds AIM used to purchase consumer debt accounts attributable to CAG and to Ferrum Capital.

127. The Receiver believes that collections on or proceeds of the consumer debt accounts AIM purchased using funds from CAG and Ferrum Capital can be traced in the books and records of CAG, AIM and/or the other Oliphant Parties. On the basis of that belief, the Receiver alleges that AIM has received and converted traceable proceeds of

accounts pledged as collateral to Ferrum Capital, causing it loss and actual damages for which the Receiver sues AIM.

128. The Receiver invokes the common law right or action of conversion for this Count. In addition, or alternatively, the Receiver invokes and asserts the rights of a secured creditor to collateral and proceeds of collateral under Texas Business and Commerce Code section 9.315.

### COUNT NINE AGAINST METROPOLITAN PARTNERS—
### To Recover Proceeds of Ferrum Capital Collateral

129. The Receiver repeats here as if stated here verbatim all of the paragraphs above.

130. Metropolitan Partners is an agent of a secured lender to one or more of the Oliphant Parties. Before September 2023, CAG was an obligor on loans by one or more lending principals of Metropolitan Partners, the agent of the Metropolitan lending entity or entities.

131. By September 2023, CAG was no longer useful to the owners and managers of AIM, the Oliphant Parties, or the Metropolitan Partner entities that had loaned money to them. The Oliphant Parties had taken all of CAG's liquidity (primarily from cash it received from Ferrum Capital) and used it to purchase accounts in the name of AIM. CAG had become a substantial liability with its obligation to repay Ferrum Capital. Having drained all the cash out of CAG, and with its substantial liabilities to Ferrum Capital and its retail investors, the Metropolitan Partners entities realized that if CAG were to remain in its current affiliated relationship with AIM, the other Oliphant Parties, and the Metropolitan Partners group, CAG was a material risk to all of them.

132.   In September 2023, Metropolitan Partners consented to a "spin off" transaction in which AIM and the other Oliphant Parties changed the status of CAG as a subsidiary of Oliphant, Inc., leaving CAG and its immediate parent, Hollins Holdings, as a standalone group outside of the Oliphant structure of entities but under the common control of Conway, Pope, and Scanlan.  Metropolitan Partners even released its rights and claims against its former obligor, CAG, in return for no payment from CAG.

133.   The Receiver also as part of giving up Metropolitan Partners' rights and claims against CAG, Metropolitan Partners and the combined CAG/Oliphant enterprise under the control of Conway agreed that within 60 days of the "spin off" of CAG, Metropolitan Partners would have evidence satisfactory to it that all intercompany receivables among CAG and the Oliphant Parties had been adjusted properly and that any liens on any accounts of any of the Oliphant Parties were subordinate or inferior to the liens CAG and the Oliphant Parties had given Metropolitan Partners on the accounts CAG and the Oliphant Parties owned.

134.   The CAG/Oliphant enterprise also agreed with Metropolitan Partners that

- with the "spin off" of CAG there would be no default in any of the agreements among themselves; and that

- except for certain notes CAG had payable to Ferrum Capital aggregating to a few million dollars in overdue debt, there was no default under any of CAG's debts to Ferrum Capital.

The mutual assurance CAG/Oliphant and Metropolitan Partners gave each other that, except for a few million dollars in overdue debt CAG owed Ferrum Capital, all was well between CAG and Ferrum Capital might have been true but it was trivial at best.  CAG was insolvent and had been since 2021.  CAG owed Ferrum Capital $50 million or more and had no way to pay its debt because AIM, the other Oliphant Parties, and Metropolitan

Partners had consumed CAG's cash.  The assurances in the "spin off" that, except for a few million dollars of overdue debt, all was well and good between CAG and Ferrum Capital was like the owners of the Titanic assuring themselves the passengers of the Titanic would have plenty of deck chairs to cling to as the Titanic sank.

135.    Metropolitan Partners remained keenly interested and involved in the affairs of the Oliphant Parties and with a step of removal, the affairs of CAG, after the "spin off." The Oliphant Parties kept Metropolitan Partners informed of the status of the state court litigation in Bexar County, Texas Ferrum investors and the Receiver commenced against CAG and the Oliphant Parties in 2023 and 2024.

136.    In May 2025, the Receiver asked the state court in Bexar County to enforce the Receiver's rights against CAG, AIM, and the other Oliphant Parties and to require them to turn over the Receiver money CAG, AIM, and the other Oliphant Parties owed the Receiver for the Ferrum Capital Receivership Estate. The State Court in Bexar County was scheduled on June 4, 2025, to set a hearing date on the Receiver's request for that relief.  CAG filed its Petition in this case on the same day, June 4, 2025.

137.    On the same day that CAG filed this bankruptcy case, Met Partners, AIM, and the other Oliphant Parties made another amendment to the loan agreements among them, acknowledging that despite prior defaults in the obligations of AIM and the other Oliphant Parties to Metropolitan Partners, Metropolitan Partners would forbear from exercising its rights against them.

138.    Metropolitan Partners or an affiliate claims a lien on accounts of AIM or one or more of the Oliphant Parties.  CAG and/or the Oliphant Parties permitted or caused proceeds of loans by Ferrum Capital to CAG or accounts CAG pledged as collateral to

Ferrum Capital to be used to purchase accounts in the name of AIM and then pledged or paid to Metropolitan Partners, contrary to the rights and security interest of Ferrum Capital.

139.    Metropolitan Partners has not accounted to the Receiver for the proceeds of accounts purchased in the name of AIM using Ferrum Capital money paid to Metropolitan Partners.

140.    The Receiver has the right to receive and hold the Ferrum Capital share of cash collections and proceeds of Ferrum Capital collateral accounts.   Metropolitan Partners taking those collections and proceeds from the accounts purchased in the name of AIM using Ferrum Capital money damages the Receivership Estate of Ferrum Capital for which the Receiver sues Metropolitan Partners for conversion.   The Receiver also invokes against Metropolitan Partners the rights of a secured creditor under section 9.315 of the Texas Business and Commerce Code.

141.    Metropolitan Partners contends in a pending civil action against one or more of the Oliphant Parties and Ferrum Capital in state court in New York that Ferrum Capital received from CAG or CAG's agent, the Oliphant Parties, proceeds of accounts of accounts in which Metropolitan Partners had a lien or right superior to the lien or right of Ferrum Capital.   The Receiver denies and disputes that contention.   There is a present dispute and controversy between Metropolitan Partners and the Receiver on behalf of Ferrum Capital over the validity, existence, or priority of their respective liens and rights in accounts and proceeds of the accounts. The Receiver asks the Court to declare and adjudicate between Metropolitan Partners and the Receiver the existence, validity, and

priority or seniority of the respective claims, rights, and liens in accounts that were, or in fairness and equity should be, the collateral of Ferrum Capital.

## DISCOVERY RULE AND OTHER THEORIES TO TOLL LIMITATIONS

142. The Receiver repeats here as if stated here verbatim all of the paragraphs above.

143. The Receiver invokes the discovery rule to defer the accrual of the Receiver's claims stated in this Amended Complaint. The Receiver and creditors of Ferrum Capital could not have learned with the exercise of reasonable diligence until some time after the Court appointed the Receiver that Ferrum Capital was a Ponzi scheme or that Ferrum insiders, CAG, and the Oliphant Parties were looting the investors' money. Nor could the Receiver or creditors of Ferrum Capital have known that CAG would claim that it could use and keep for itself tens of millions of dollars of money CAG received from Ferrum Capital to pay CAG's overhead, that CAG would not keep proper books and records of its actual costs in collecting on the collateral, or that CAG would transfer its net win from the Ferrum Capital Ponzi scheme to the Oliphant Parties. And the Receiver and creditors of Ferrum Capital could not have known before the meeting of creditors in the CAG Chapter 7 bankruptcy case that the Oliphant Parties controlled all of the affairs of CAG and were receiving and retaining all of the collections on and proceeds of the Ferrum Capital collateral.

144. CAG and the Oliphant Parties did not report to Ferrum Capital or the Receiver until early 2024 that they had collected more than $49 million on the collateral. The Receiver and creditors of Ferrum Capital had no way to know before then that CAG and the Oliphant Parties had kept for themselves approximately $29.6 million of the

collections on the collateral. The Receiver did not learn until the discovery process in this case—and could not have learned before then—that CAG had transferred tens of millions of dollars in its net winnings from the Ponzi scheme to the Oliphant Parties.

145. The Receiver also invokes the principle of adverse domination by hostile, corrupt management of Ferrum Capital to defer to accrual of the Receiver's rights to sue. Josh Allen and Michael Cox, the managers of Ferrum Capital, were dishonest frauds who stole millions of dollars of investor funds in the Ferrum Capital Ponzi scheme together with other Ferrum insiders and transferees. CAG and the Oliphant Parties were substantial beneficiaries of the Ponzi scheme. The Ponzi scheme could not have happened without the participation of CAG, which since some time in 2021 was under the control of the Oliphant Parties. Allen and Cox could not have been expected to assert Ferrum Capital's claims against CAG and the Oliphant Parties while Allen, Cox, CAG, and the Oliphant Parties were enjoying the transfers of tens of millions of dollars of investor money into and then out of Ferrum Capital and on to CAG and the Oliphant Parties. There was no honest manager or custodian of Ferrum Capital to assert its claims against CAG and the Oliphant Parties until the Receiver was appointed. CAG and the Oliphant Parties should not be permitted to rely on events or transactions occurring under the corrupt management by Cox and Allen of Ferrum Capital to trigger accrual of Ferrum Capital's claims because CAG and the Oliphant Parties were participating in and benefiting from the Ferrum Capital Ponzi scheme conducted by the corrupt management.

## REMEDIES AND RELIEF REQUESTED

146. For remedies and relief on his claims against CAG under **Counts One and Two**, the Receiver asks the Court to adjudicate the Receiver's claim for the Receivership

Estate against CAG and to order payment over to the Receiver of any money or assets the CAG Estate has that is collateral (or proceeds of collateral) for the loans Ferrum Capital made to CAG. The Receiver also requests a declaration under 28 USC §§ 2201 and 2202 of his lien rights in the collateral securing the debts CAG owes Ferrum Capital and the Receiver and the proceeds thereof. The Receiver asks the Court to allow the Receiver to exercise any or all of the rights of Ferrum Capital to its collateral.

147.   To the extent useful or necessary for the Receiver to obtain full relief on **Counts One and Two**, the Receiver asks the Court to order CAG and/or the Oliphant Parties to account completely and candidly for all Ferrum Capital collateral and all collections on or proceeds of the Collateral.

148.   For remedies and relief on his claim against CAG under **Count Three**, the Receiver asks the Court to adjudicate the Receiver's claim for the Receivership Estate against CAG and to order payment over the Receiver of any money or assets the CAG Estate has that is the Ferrum Capital collateral described in Count Three. The Receiver also requests a declaration of his lien rights in that collateral.

149.   To the extent useful or necessary for the Receiver to obtain full relief on his claim under **Count Three**, the Receiver asks the Court to order CAG and the Oliphant Parties to account completely and candidly for the debts by Oliphant Financial to CAG described in Count Three and for all payments by Oliphant Financial to CAG on those debts. The Receiver asks the Court to allow the Receiver to exercise any or all of the rights of Ferrum Capital under its loan agreements with CAG to the collateral described in **Count Three**.

150. For relief on his claims against CAG under **Count Four**, the Receiver asks the Court to adjudicate the Receiver's claim for the Receivership Estate to recover from CAG its net winnings from the Ferrum Capital Ponzi scheme.

151. For relief on his claim against CAG under **Count Five**, the Receiver asks the Court to order CAG and the Oliphant Parties to account fully to the Receiver for the second tier of collateral described in that Count and to pay over to the Receiver what is due the Ferrum Capital Receivership Estate on or from that collateral. To the extent useful or necessary, the Receiver requests a declaration under 28 USC §§ 2201 and 2202 of the Receiver rights in that collateral and proceeds thereof. The Receiver also asks the Court to allow the Receiver to exercise any or all of the rights of Ferrum Capital against that collateral.

152. For relief on his claims against the Oliphant Parties under **Count Six**, the Receiver asks the Court to award the Receiver for the Ferrum Capital LLC Receivership Estate as damages or restitution from and against the oliphant Parties for the cash collections on or proceeds of Ferrum Capital collateral debt accounts the Oliphant Parties have received in collections on the accounts before the first quarter of 2025 and not paid over to the Trustee.

153. For relief on his claims against the Oliphant Parties under **Count Seven**, the Receiver asks the Court to award the Receiver for the Ferrum Capital LLC Receivership Estate as damages or restitution the amounts CAG received in net winnings from the Ferrum Capital Ponzi scheme and transferred to one of the Oliphant Parties.

154. For relief on his claims against AIM under **Count Eight**, the Receiver asks the Court to award the Receiver for the Ferrum capital Receivership Estate as damages

or restitution from and against AIM the amount of the collections on or proceeds of the Ferrum capital collateral debt accounts AIM has received and has not paid over to the Receiver.  To the extent useful or necessary, the Receiver requests a declaration under 28 USC §§ 2201 and 2202 of the Receiver's rights and interest in the collateral and proceeds thereof.

155.   For relief on his claims against Metropolitan Partners under **Count Nine**, the Receiver asks the Court to award the Receiver for the Ferrum Capital LLC Receivership Estate as damages or restitution the amounts of the Ferrum Capital share of collections or proceeds of Ferrum Capital collateral accounts Metropolitan Partners has received or taken from accounts purchased in the name of AIM using money Ferrum Capital loaned to CAG or proceeds of accounts CAG pledged to Ferrum Capital.  The Receiver also requests a declaration under 28 USC §§ 2201 and 2202 of his rights for the Receivership Estate in the Ferrum Capital share of those collections and proceeds and/or in the priority of the Receiver's rights or interest in the proceeds.

156.   The Receiver requests attorneys fees for the services of his counsel in this Court and in any appeal on any claim for which the Receiver is entitled to recover attorneys fees.

157.   The Receiver requests an award of costs of court.

158.   The Receiver requests an award of interest on any recovery as permitted by law.

159.   The Receiver also requests all other relief to which he is entitled for the Receivership Estate at law or in equity.

Respectfully submitted,

ROYAL LEA LAW OFFICE PLLC
1901 NW Military Hwy, Ste. 218
San Antonio, Texas 78213
(210) 202-2395 Telephone
royal@royallealaw.com

By: /s/ Royal B. Lea, III
ROYAL B. LEA, III
State Bar No. 12069680

*COUNSEL FOR JOHN PATRICK LOWE, in his capacity as Court Appointed Receiver*

## CERTIFICATE OF SERVICE

I hereby certify that on March 26, 2026, a true and correct copy of the above and foregoing has been served on the following through the ECF filing system:

Randall A. Pulman
rpulman@pulmanlaw.com
Shari P. Pulman
spulman@pulmanlaw.com
Kerry S. Alleyne-Simmons
kalleyne@pulmanlaw.com
2161 NW Military Hwy, Ste. 400
San Antonio, Texas 78213
***Counsel for Plaintiffs***

Michael P. Ridulfo
mridulfo@krcl.com
Kane Russell Coleman Logan
Abigail Rogers
arogers@krcl.com
***Counsel for Oliphant United, Inc.***
***Oliphant Financial, LLC,***
***Oliphant USA, LLC and***
***Accelerated Inventory Management***
***LLC***

David Philip Whittlesey
david.whittlesey@aoshearman.com
Allen Overy Shearman Sterlin US LLP
300 W 6th Street, Ste. 2250
Austin, Texas 78701
***Counsel for Walt Collins***

Lynn Hamilton Butler
Lynn.butler@hushblackwell.com
Hush Blackwell LLP
111 Congress Ave., Ste. 1400
Austin, Texas 78701
***Bankruptcy Attorney for Collins Asset Group, LLC and Hollins Holdings, Inc***

Ron Satija
rsatija@haywardfirm.com
PO Box 660208
Austin, Texas 78766
***Chapter 7 Trustee***

Danielle Behrends
dbehrends@dykema.com
Dominique Douglas
ddouglas@dykema.com
Dykema Gossett PLLC
112 E Pecan St., Ste. 1800
San Antonio, Texas 78205
***Counsel for Chapter 7 Trustee***

Alicia M. Bendana
abendana@fishmanhaygood.com
Fishman Haybood LLP
201 St. Charles Avenue, Ste. 4600
New Orleans, Louisiana 70170-4600
***Counsel for Ron Satija***

 */s/ Royal B. Lea, III*
 Royal B. Lea, III