# EXHIBIT 4

FILED
5/28/2025 5:49 PM
Gloria A. Martinez
Bexar County District Clerk
Accepted By: Lillian Velasquez
Bexar County - 131st District Court

Case 1:26-cv-03467-KPF    Document 9-4    Filed 05/04/26    Page 2 of 81

CASE NO. 2023CI22575

| | | |
|---|---|---|
| JUDY A. MUSGROVE, individually and as beneficiary of the Mainstar Trust, Cust. FBO Judy A. Musgrove IRA, et al., | § § § § | IN THE DISTRICT COURT |
| Plaintiffs, | § § | |
| v. | § § | 438TH JUDICIAL DISTRICT |
| BROOKLYN CHANDLER WILLY, et al., | § § § | |
| Defendants. | § | BEXAR COUNTY, TEXAS |

| | | |
|---|---|---|
| JOHN PATRICK LOWE in his capacity as Court appointed Receiver, | § § § | |
| Plaintiff, | § § | |
| v. | § § | |
| COLLINS ASSET GROUP, LLC et al, | § § § | |
| Defendants. | § | |

## RECEIVER'S MOTION TO ENFORCE RECEIVERSHIP ORDER AND SHOW CAUSE

John Patrick Lowe, Court-appointed Receiver for Ferrum Capital, LLC (below, the "Receiver"), files this Motion to Enforce Receivership Order and Show Cause.

### Introduction

1.     The Receiver has the power and the duty to take control over and manage the assets of Ferrum Capital. The Court's Order Appointing Receiver signed in this case on January 5, 2024 (below, the "Receivership Order"), requires anyone holding "Receivership Assets" (as explained below) belonging to Ferrum Capital to pay the Receivership Assets over to the Receiver. Defendants Collins Asset Group or "CAG"

and/or one or more of its affiliates, the "Oliphant Entities"[1] are holding Receivership Assets—cash proceeds of collections on accounts receivable that are "Collateral" for the loans Ferrum Capital made to Collins Asset Group.

2.      CAG and/or the Oliphant Entities collected the cash in the period shortly before and after the Court appointed the Receiver over the assets of Ferrum Capital. Most of the cash belongs to the Receivership Estate. The Receiver has asked CAG and the Oliphant Entities to pay the cash owed to the Receivership Estate over to the Receiver. To date, CAG and the Oliphant Entities have failed and refuse to do so.

3.      The Court should enforce the Receivership Order by ordering CAG and/or the Oliphant Entities to pay over to the Receiver the money they are holding which belongs to the Receiver but which they will not turn over to the Receiver and to show cause why they should not be held in contempt for violating the Receivership Order.

## The Receiver and His Duties

4.      On January 5, 2024, the Court appointed the Receiver under the Court's Order Appointing Receiver. The Receiver incorporates that "Receivership Order" into this Motion as if the Order were stated here *verbatim*.

5.      The Receivership Order charges the Receiver with the power and duty to take custody of all Receivership Assets:

---

[1] Defendants Oliphant Financial, LLC, Oliphant USA, LLC, Accelerated Inventory Management, LLC, and/or Hollins Holdings, LLC.

12.    Subject to the specific provisions below, the Receiver will have the following general powers and duties:

A. To use reasonable efforts to determine the nature, location, and value of all Receivership Assets, including but not limited to, those Receivership Assets defined in Exhibit A;

B. To take custody, control, and possession of all Receivership Assets and records relevant thereto from the Ferrum Entities;

6.    The Receivership Order includes as a "Receivership Asset"

"Receivership Assets" means all assets owned, controlled, leased, possessed, or held, in whole or in part, by or for the Ferrum Entities that obligate Collins Asset Group, LLC, Ryan Project Funding, LLC, or any other maker or obligor of a note or debt instrument to make payment to the Ferrum Entities and pledged as collateral to secure payments to the Plaintiffs, including those rights giving rise to: (a) a lien or encumbrance over the assets of Collins Asset Group, LLC, Ryan Project Funding, LLC, or any other obligor pledging collateral to secure payments to the Plaintiffs, or (b) a claim, cause of action or right of recovery against Collins Asset Group, LLC, Ryan Project Funding, LLC, or any other obligor pledging collateral to secure payments to the Plaintiffs. The Receivership Assets include but are not limited to those assets defined in the attached Exhibit A.

Thus, the Court explicitly contemplated CAG's collections on the Collateral[2] as a Receivership Asset when the Court signed the Receivership Order.

7.    The Receivership Order requires anyone owing money to Ferrum Capital to pay the money owed to the Receiver:

29.    All persons and entities owing any obligation, debt, or distribution with respect to an ownership interest in any Receivership Asset will, until further ordered by the Court, pay all such obligations in accordance with the terms thereof to the Receiver, and its receipt for such payments will have the same force and effect as if the Ferrum Entities had received such payment.

---

[2] The "Collateral" is explained below in the next section of this Motion.

CAG was a party when the Court signed the Receivership Order and has knowledge of the Receivership Order. Thus, CAG is obligated under the Receivership Order to pay the Receiver the Ferrum Capital share of collections on the Ferrum Capital "Collateral" described below.

8.      The Receivership Order also enjoins and prohibits anyone from interfering with the Receiver's effort to take control of any asset of Ferrum Capital:

32.      The Ferrum Entities, the Ferrum Personnel and all persons receiving notice of this Order are hereby restrained and enjoined from directly or indirectly taking any action or causing any action to be taken, without the express written agreement of the Receiver, which would:

> A. Interfere with the Receiver's efforts to take control, possession, or management of any Receivership Assets; such prohibited actions include but are not limited to, using self-help or executing or issuing or causing the execution or issuance of any court attachment, subpoena, replevin, execution, or other process for the purpose of impounding or taking possession of or interfering with or creating or enforcing a lien upon any Receivership Assets;
>
> . . .
>
> C. Dissipate or otherwise diminish the value of any Receivership Assets; such prohibited actions include but are not limited to, releasing claims or disposing, transferring, exchanging, assigning or in any way conveying any Receivership Assets, enforcing judgments, assessments or claims against any Receivership Assets or the Ferrum Entities, attempting to modify, cancel, terminate, call, extinguish, revoke or accelerate (the due date), of any lease, loan, mortgage, indebtedness, security agreement or other agreement executed by the Ferrum Entities or which otherwise affects any Receivership Assets; or,
>
> D. Transferring any Receivership Assets to anyone other than the Receiver;

**The Receiver is a Secured Creditor of Collins Asset Group**

9.      Ferrum Capital loaned money to CAG under written Promissory Notes. The unpaid principal balance due the Receiver on the loans by Ferrum Capital to CAG under the CAG-to-Ferrum Capital Promissory Notes is approximately $50,000,000. A sample of one of the Promissory Notes is **Exhibit 1** with this Motion. The Promissory Notes CAG

signed reflecting its loans from Ferrum Capital are subject to a Master Loan Agreement between them. That Master Loan Agreement is **Exhibit 2** with this Motion.

10.    CAG's obligation to pay the Receiver on the Promissory Notes is secured by "Collateral" defined in the Master Security Agreement between CAG and Ferrum Capital. That Master Collateral Agreement is **Exhibit 3** with this Motion.

11.    The Collateral securing payment of the debts CAG owes the Receiver is comprised of thousands of distressed consumer debt accounts CAG purchased with the $52 million Ferrum Capital loaned CAG and the proceeds of or cash collected on those accounts. CAG or one of its affiliated Oliphant Entities collects the payments from the consumer obligors on those accounts.

12.    Thus, the Receiver, standing in the shoes of Ferrum Capital, is a secured creditor of Collins in the accounts CAG purchased with the money it borrowed from Ferrum Capital.

### The Receiver's Share of Collections on the Collateral is At Least 50% and Probably as much as 70%

13.    Standing in the shoes of Ferrum Capital, the Receiver is entitled to **at least 50% of what is collected on the Collateral accounts**.

14.    The Collateral securing the CAG-to Ferrum Promissory Notes is made up of a number of "packages" of consumer debts and within those packages there are different kinds of consumer debts. Some of the consumer debt accounts are easier to collect than others.

15.    The CAG-to-Ferrum Promissory Notes say CAG is entitled to take portion or percentage of what it collects from the collateral accounts for the costs of the "Collins Efforts" in collecting the accounts.

16.    As demonstrated by the deposition testimony of Walt Collins, the CAG share or percentage of collections ranges from approximately 30% for accounts that are easier to collect to 50% for most of the accounts that are typical in ease of collection. An excerpt of Walt Collins' deposition testimony demonstrating the split of collections between CAG and Ferrum Capital is included with this Motion as **Exhibit 4**. There is one miniscule category of accounts—accounts outside the statute of limitations for a lawsuit on the accounts--for which the CAG share of collections is 65%. Those accounts must be turned over to specialized third party collectors who are specially licensed to perform the collections. Walt Collins, the founder of CAG and person who made the deal with Ferrum Capital, has testified that those out-of-statute accounts make up only a miniscule portion of all of the Collateral accounts.  Motion Exhibit 4, depo. p. 60-61.

17.    Because the CAG percentage of collections on the overwhelming majority of the Collateral accounts securing the CAG debts to Ferrum Capital range from 30% to 50% Walt Collins promised Ferrum Capital when he made the deal with Ferrum Capital that the CAG share of collections would not exceed 50% of gross recovered collections. Walt Collins said:

Regarding CAG Fees: CAG's fees will not exceed 50% of the gross recovered revenue, i.e., $1,000 recovered, no more than $500 paid to CAG in recovery fees. In the unusual event that a greater recovery fee is required CAG will contact the lender with an explanation and seek approval.

That Walt Collins e-mail is **Exhibit 5** with this Motion.

18.    The Receiver now asks the Court to order Collins Asset Group and the Oliphant Entities to pay over to the Receiver (or alternatively into the Registry of the Court) the share of the cash collections that belong to the Receivership Estate from the collections on the Collateral in the period since October 2023.

**Collins Has Collected Money on the Collateral But
Has Not Paid The Receiver the Ferrum Capital Share**

19.    In the period from October 2023 shortly before the Court appointed the Receiver through December 2024, CAG collected approximately $5,400,000.[3]   From those collections, CAG has paid the Receiver only $803,410, or only about 14.8%. For the portion of that period from October 2023 through April 2024, CAG says it collected $2,636,114 but paid the Receiver only $266,649, or only about 10% of what was collected.

20.    CAG is holding at least $1,997,000 in money that belongs to the Receiver for the Receivership Estate, and probably as much as $2,977,000.

21.    The Receiver has asked CAG to pay over to the Receiver the Ferrum Capital share of the more than $5,400,000 that CAG has collected in the period since October 2023. Copies of the Receiver's recent requests to CAG to pay over to the Receiver the Ferrum Capital share of the collections are included in **Exhibit 6** with this Motion. To date, CAG has failed and refuses to turn the funds over to the Receiver.

22.    The Court has tasked the Receiver with obtaining and managing the assets of Ferrum Capital. The money CAG is withholding from the Receiver is an asset subject to the task with which the Court has charged the Receiver. The Court should aid the Receiver in his task by ordering CAG to turn over to the Receiver the the Receivership Estate's money for the period since October 2023 that CAG is holding.

---

[3] CAG has only provided an accounting for the period after December 2024 under TRE 408. CAG has refused the provide the Receiver with a report on its collection s on the collateral for the period since December 2024 without marking the report "subject to TRE 408." The Receiver disputes the CAG claims that TRE 408 applies. But if CAG is correct that TRE 408 does apply and the Reports are not admissible, then CAG will have effectively prevented the Receiver from showing the Court the money CAG and the Oliphant Entities have collected on the Receiver's Collateral.

23.     The Receiver believes CAG and the Oliphant Entities owe the Receiver substantially more than the $1,997,000 because, as Walt Collins testified, the CAG share on many of the collections is less than 50%.  On some accounts, the CAG share is as low as 30%. At a minimum, though, they are holding $1,997,000 of Receivership funds.

24.     Accordingly, the Court should require CAG (and any of the Oliphant Entities holding any of the collections) to pay over to the Receiver all of the Receivership's money, which is at least $1,997,000 and probably as much as $2,977,000.

25.     The Receiver believes CAG and the Oliphant Entities owe the Receiver substantially more than the $1,997,000 because, as Walt Collins testified, the CAG share on many of the collections is less than 50%.  On many accounts, the CAG share is as low as 30%.

### CAG is Insolvent

26.     CAG is insolvent. The Receiver will present evidence of CAG's insolvency at the hearing on this Motion. The Receivership's money, which CAG or the Oliphant Entities hold, is in danger of being lost, removed, or dissipated.

### Legal Grounds

27.     The Court can and should grant this Motion based on the Receivership Order and Chapter 64 of the Texas Civil Practice and Remedies Code.

28.     Under section 64.031(1) of the Texas Civil Practice and Remedies Code, the Receiver "may take charge and keep possession of the property…" of the Receivership.  And under the Receivership Order, the Receiver has the power and duty to "take custody, control, and possession of all Receivership Assets." The Court has already ordered persons like CAG and the Oliphant Entities to turn over to the Receiver

assets of the Receivership Estate.  This Motion simply asks for enforcement of what the Court has already ordered.

29.     If another order is needed, the Receivership Order contemplates the Court will provide such an order.  The Receivership Order says:

15.     The Receiver may seek further Orders of the Court regarding standing powers of the Receiver, and administration of Receivership Assets as may be deemed necessary to preserve, rehabilitate, and maximize the value of the Receivership Assets, secure the best interests of creditors, investors, and other stakeholders of the Ferrum Entities, and protect the interests of the Receiver.

30.     The Court has the authority to enforce the Receivership Assets and to protect the Receivership Estate.

31.     The Receivership Order was an appealable order under section 51.014 of the Texas Civil Practice and Remedies Code. CAG was holding money belonging to the Receivership Estate when the Court signed the Receivership Order. CAG chose not to appeal from the Receivership Order. *CAG is bound by the Receivership Order*.

32.     Section 64.001 of the Civil Practice and Remedies Code authorizes the Court to appoint a receiver for a secured creditor like the Receivership Estate of Ferrum Capital to subject property or money to the secured creditor's claim when the secured creditor has an interest in the property or fund and the property or fund is in danger of being lost, removed, or dissipated. That was one ground for the Receivership Order in the first place. Enforcing the Receivership Order as requested in this Motion simply does what section 64.001 and the Receivership Order already provide. The Receivership Order and section 64.031 of the Civil Practice and Remedies Code entitles the Receiver to take

charge of and keep possession of property subject to the Receivership Estate. Granting this Motion is consistent with what Section 64.031 prescribes.

33.     Under Texas law, once a receiver is appointed, property subject to the receivership is in custodia legis. *Texas American Bank v. Haven*, 728 S.W.2d 102, 104 (Tex. App.—Fort Worth, writ denied).   One of the Receiver's rules is to protect the Receivership Assets. *In re Midland 1235 Investment Trust*, 2025 Tex. App. LEXIS 691, *18 (Eastland, Feb. 6, 2025, orig. proc.).   When the Court signed the Receivership Order, the Receiver was fully vested with the right to possess and control all Receivership Assets. *Sligh v. Stanley*, 204 S.W.700, 701 (Tex. Civ. App.—Fort Worth 1918, no writ).

34.     The Receiver has the duty to protect all Receivership Assets. *Haven*, 728 S.W.2d at 104.   If anyone interferes with the Receiver's performance of his duties, the Receiver is obligated to inform the Court. *Id*.   The Court has the power to enjoin interference with the Receiver's performance of his duty. *Id.*

35.     The Court has inherent power to use in aid of the Court's jurisdiction, administration of justice, and preservation of the Court's independence and integrity. *In re Powell*, 170 S.W.3d 156, 158 (Tex. App.—Eastland 2005, no pet.).   So the Court has the power and authority to enforce its Receivership Order, and the Receiver is obligated to ask the Court to do so. *In re Midland 1235 Investment Trust*, 2025 Tex. App. LEXIS 691 at *20 (inherent power to sanction for noncompliance with order).

36.     The circumstances described above and the evidence supporting this Motion satisfy each of those grounds for granting this Motion.

**Conclusion and Request for Relief**

37.     CAG and/or the Oliphant Entities are holding cash that belongs to the Receivership Estate. The Court has ordered the Receiver to gather the assets of the Receivership Estate. The Receiver cannot get the Receivership Estate's cash that CAG and the Oliphant Entities are holding without aid from the Court in an order enforcing the Receivership Order and requiring them to turn over to the Receiver the Estate's cash.

38.     Therefore, the Receiver asks the Court to enforce the Receivership Order and to order CAG and the Oliphant Entities to turn over to the Receiver the cash described above. Alternatively, the Receiver asks the Court to order CAG and the Oliphant Entities to pay that cash into the Registry of the Court.  The receiver asks the Court to order CAG and/or the Oliphant Entities to show cause why they should not be held in contempt for violating the Receivership Order.  The Receiver asks for the other relief to which the Receivership Estate is entitled.

Respectfully submitted,

ROYAL LEA LAW OFFICE PLLC
1901 NW Military Hwy, Ste. 218
San Antonio, Texas 78213
(210) 202-2395 Telephone
royal@royallealaw.com

By: /s/ Royal B. Lea, III
ROYAL B. LEA, III
State Bar No. 12069680

*COUNSEL FOR JOHN PATRICK LOWE, in his capacity as Court Appointed Receiver*

## CERTIFICATE OF SERVICE

I hereby certify that on May 28, 2025, a true and correct copy of the above and foregoing has been served on the following by e-mail through the Filetime Texas e-filing system:

Randall A. Pulman
rpulman@pulmanlaw.com
Shari P. Pulman
spulman@pulmanlaw.com
Kerry S. Alleyne-Simmons
kalleyne@pulmanlaw.com
*Counsel for Plaintiffs*

John Patrick Lowe
pat.lowe.law@gmail.com
*Court Appointed Receiver*

Eugene Xerxes Martin, IV
xmartin@mgl.law
Jacob Michael Bach
jbach@mgl.law
*Patrick A. Watts*
*pwatts@mgl.law*
*Counsel for Collins Asset Group, LLC, and Oliphant Financial LLC*

Joshua Dean Frost
jfrost@lubbocklawfirm.com
*Counsel for Joshua L. Allen*

Ryan Project Funding, LLC
c/o Robert Ryan
robert@ryanprojectfunding.com
1050 Connecticut Ave. NW, Ste. 500
Washington, D.C. 20036

Robert Ryan
robert@ryanprojectfunding.com
1050 Connecticut Ave. NW, Ste. 500
Washington, D.C. 20036

Yousuf Bajwa
ybajwa@sandersbajwa.com
Lad Stricker
lstricker@sandersbajwa.com
*and*
Jonathan M. Robbin
Jonathan.robbin@jrobbinlaw.com
*Counsel for Walt Collins*

Emma Cano
ecano@jeffersoncano.com
William S. Davidson
wdavidson@jeffersoncano.com
*Counsel for MLC Financial, Inc. d/b/a MLC Financial Services, Inc., MCKC Services LLC, and MKMH Interest, LLC*

Brooklynn Chandler Willy
Brooklynn_chandler@icloud.com
84 Sendero Ridge
Boerne, Texas 78006

Queen B Advisors, LLC
c/o Brooklynn Chandler Willy
Brooklynn_chandler@icloud.com
84 Sendero Ridge
Boerne, Texas 78006

Yvette Barrera
y.villanuevabarrera@gmail.com
185 Kerlick Lane
New Braunfels, Texas 78130

/s/ Royal B. Lea, III
Royal B. Lea, III

## Verification

On the date below, John Patrick Lowe appeared before me, the notary whose name appears below, and after he was duly sworn to tell the truth, he testified as follows:

"My name is John Patrick Lowe, I am over twenty-one (21) years of age and I am competent to make this Verification. I am the Court-Appointed Receiver in the above styled and titled case. I have read paragraphs 1, 2, 4-12, and 21 of the foregoing Motion, and what is stated therein is within my personal knowledge and is true and correct to the best of my knowledge, information, and belief.

_____

John Patrick Lowe, Court-Appointed Receiver"

STATE OF TEXAS                    §

COUNTY OF ___Uvalde___    §

SUBSCRIBED and SWORN TO before me, the undersigned notary public, on May 28, 2025, by John Patrick Lowe.

_Veronica B. Hinojosa_

Notary Public, State of Texas

VERONICA B. HINOJOSA
Notary Public, State of Texas
Comm. Expires 03-13-2029
Notary ID 3251224

---

Receiver's Motion to Enforce
Receivership Order

Page 13 | 13

# EXHIBIT 1

Loan # Fe26-410-1041

## PROMISSORY NOTE

$ 1,349,401.63          Austin, Travis County, Texas          07/01/2019

          (Effective Date)

FOR VALUE RECEIVED, the undersigned, Collins Asset Group, LLC, a Delaware limited liability company, whose address is 5725 Highway 290 West #103, Suite 103, Austin, Texas, 78735 (the "Maker"), hereby promises to pay to the order of Ferrum Capital, LLC, a Texas limited liability company ("Lender"), whose address is 4415 66th St #101. Lubbock County, Texas 79414, Lubbock County, Texas (the "Payee"), the principal sum of One Million, Three Hundred Forty-Nine Thousand, Four Hundred One Dollars and Sixty-Three Cents ($ 1,349,401.63          ) ("Principal Sum"), as provided in this promissory note (this "Note"). This Note is executed and delivered by Maker pursuant to that certain Loan Agreement between Maker and Payee dated November 15, 2017, (collectively hereinafter, the "Loan Agreement"), and any capitalized terms used herein that are not otherwise defined herein shall have the meaning given such terms in the Loan Agreement (Payee and Maker together herein, the "Parties").

1.  Interest.    The outstanding average daily principal balance of this Note shall accrue simple interest, beginning on the Effective Date hereof at the rate per annum of Ten percent (10.00%). Accrued interest shall be payable in arrears on the Maturity Date and as necessitated on the date of any Voluntary Prepayments as elected by the Maker pursuant to Section 2(b) of this Note. Interest shall not compound on accrued and unpaid interest.

2.  Payments.    (a) Maturity Date. All unpaid principal, interest, and other amounts owing under this Note shall be due and payable in full on the date that is four (4) years from the date of this Note (the "Maturity Date") and the Parties understand and agree that the Collateral for this Note may be sold prior to the Maturity Date unless the Parties otherwise mutually agree in writing.

    (b) Voluntary Prepayments.    Maker, at its election, may prepay the principal of this Note, in whole or any part hereof, without penalty or premium; provided, that all accrued and unpaid interest on the principal balance of this Note, if any owing under this Note at the time of prepayment, shall be paid at the time of any prepayment of principal (the "Voluntary Prepayment").

CONFIDENTIAL                                                      FER_CAP000632

(c) Origination Fee. The Note shall bear an Origination Fee of ten percent (10.00%) of the Principal Sum (the "Origination Fee"). The Origination Fee is due and payable by the Maker on the Effective Date of this Note.

(d) Service Fee. The Note shall bear a service fee of three-fourths of one percent (0.75%) of the original Principal Sum (the "Service Fee"). The Service Fee is due and payable by the Borrower to Lender on the Effective Date of this Note and on the first anniversary of the Effective Date. At no time shall the cumulative total of annual Service Fees exceed one and one-half percent (1.50%) of the original Principal Sum.

(e) Place of Payment. All payments by the Maker shall be made to the Payee by deposit of such payments in a demand deposit account as from time to time Payee shall designate to Maker

3. Default; Remedies. Upon the occurrence and during the continuance of (a) a default in the Maker's obligations under this note, which default has not been cured within sixty (60) days following written notice of such default from Payee to the Maker, or (b) an Event of Default shall occur under the Loan Agreement or the Security Agreement (collectively, the "Note Documents"), but after the passage of any cure period provided in any such Note Documents (each, an "Event of Default"), the Payee may declare the entire unpaid principal of and unpaid interest on this Note immediately due and payable, without notice, demand, or presentment, all of which are hereby waived, foreclose any liens or security interests securing all or any part hereof, offset against this Note any sum or sums owed by the Payee to the Maker, or exercise any other right or remedy to which the Payee may be entitled by agreement, at law, or in equity. All of the Rights of the holder hereof provided for in this Note and in any other Note Document are cumulative of each other and of any and all other Rights at law or in equity.

4. Costs of Collection. If this Note is placed in the hands of an attorney for collection, or if it is collected through any legal proceedings, the Maker agrees to pay court costs, reasonable attorneys' fees, and other reasonable costs of collection of the Payee.

5. Maximum Interest Rate. Regardless of any provision contained herein or in any Note Document, the Payee shall never be entitled to contract for, charge, take, reserve, receive, or apply, as interest on this Note, any amount in excess of the Highest Lawful Rate. If the Payee ever contracts for, charges, takes, reserves, receives, or applies as interest any such excess, it shall be deemed a partial prepayment of principal and treated hereunder as such; and, if the principal hereof is paid in full, any remaining excess shall promptly be paid to the Maker. In determining whether interest paid or payable exceeds the Highest Lawful Rate, the Maker and the Payee shall, to the maximum extent permitted under

{00101951}                           2 | P a g e

CONFIDENTIAL                           FER_CAP000633

applicable law, (a) treat any Term Loan Proceeds as but a single extension of credit, (b) characterize any non- principal payment as an expense, fee, or premium rather than as interest, (c) exclude voluntary prepayments and the effects thereof, and (d) "spread" the total amount of interest throughout the entire contemplated term hereof; provided that, if the principal hereof is paid in full prior to the end of the full contemplated term hereof, and if the interest received for the actual period of existence exceeds the Highest Lawful Rate, the Payee shall refund the excess, and, in such event, the Payee shall not be subject to any penalties provided by any laws for contracting for, charging, taking, reserving, or receiving interest in excess of the Highest Lawful Rate. As used herein, the term "Highest Lawful Rate" means the maximum rate of interest from time to time permitted under federal or state laws now or hereafter applicable to this Note, including as to Article 5069-1.04, Vernon's Texas Civil Statutes (the "Act"), that rate based upon the "indicated rate ceiling" from time to time in effect as such rate is limited by the Act, in any case after taking into account, to the extent required by applicable law, any and all relevant payments, charges, and calculations.

6. Definitions.

   a. Net Proceeds is defined as the Net Revenue attributable and received by Maker relating to the usage of the proceeds of the principal sum of this Note utilized by Maker ("Maker's Efforts") during the Note term less Net Court Costs.

   b. Collateral Proceeds is defined as an amount no less than thirty five percent (35%) of the Net Proceeds.

   c. Net Court Costs is defined as the sum of court costs expended by Maker on an individual asset by asset basis during the Note Term pursuant to the Maker's Efforts less the sum of court costs recovered on an individual asset by asset basis during the Note Term.

   d. Net Revenue is defined as the gross revenue received pursuant to the Maker's Efforts less fees and expenses due Maker's agents, representatives and attorneys relating to the Maker's Efforts.

   e. Collins Proceeds is defined as an amount no greater than sixty five percent (65%) of the Net Proceeds.

7. Supplemental. Maker, may at its sole and absolute discretion, utilize other sources of its funds to satisfy any obligation of Maker pursuant to this Note and the Loan Documents (said other fund sources hereinafter "Alternative funds"). Notwithstanding anything to

{00101951}                               3 | P a g e

the contrary contained in the Note or the Loan Documents, the sum of Alternative Funds utilized by Maker to satisfy any of its periodic obligations pursuant to this Note or the Loan Documents, in whole or part, shall be available to Maker as an offset or future credit, in whole or in part, which may be applied to any obligation of Maker herein. Maker shall have the right to retain and keep up to and no greater than the remaining Sixty-Five Percent (65.00%) of Collateral Proceeds from any such Maker's Efforts as part of the Collins Proceeds, and such Collins Proceeds from any such efforts shall not be part of the Collateral securing this Note and shall instead be retained by and belong to Maker under all circumstances.

8.  Certain Waivers. The Maker and each surety, endorser, guarantor, and other party ever liable for payment of any part hereof jointly and severally waive presentment and demand for payment, protest, notice of intention to accelerate, notice of acceleration, and notice of protest and nonpayment, and agree that their liability on this Note shall not be affected by, and hereby consent to, any renewal or extension in the time of payment hereof, any indulgences, or any release or change in any security for the payment of this Note.

9.  ENTIRETY; GOVERNING LAW.    THIS NOTE AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS BY THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES. THE VALIDITY, CONSTRUCTION, AND ENFORCEABILITY OF THIS NOTE SHALL BE GOVERNED BY THE LAWS OF THE STATE OF TEXAS AND THE UNITED STATES OF AMERICA. VENUE FOR ANY ACTION ARISING FROM OR RELATED TO THIS AGREEMENT SHALL BE EXCLUSIVELY IN THE STATE OR FEDERAL COURTS LOCATED IN TRAVIS COUNTY, TEXAS. **THE PARTIES WAIVE THEIR RIGHT TO A TRIAL BY JURY AND THE RIGHT TO ASSERT THE DEFENSE OF INCONVENIENCE OF FORUM OR VENUE**

10. Parties Bound.  This Note is binding upon and shall inure to the benefit of the Maker, the Payee, and their respective successors and assigns.  The Payee, upon prior written notice to the Maker, shall be entitled to assign its rights and duties hereunder to any subsequent holder of this Note who shall for all purposes hereof thereafter be the "Payee" hereunder the same as if originally named as the "Payee" herein.

11. Certain Provisions Regarding Payments.  Whenever any payment shall be due under this Note on a day which is not a Business Day, the date on which such payment is due shall

CONFIDENTIAL

FER_CAP000635

be extended to the next succeeding Business Day. "Business Day" means a day other than a Saturday, Sunday or other day on which national banks in Austin, Texas are authorized or required to be closed.    Acceptance by the holder hereof of any payment in an amount less than the amount then due on any indebtedness shall be deemed an acceptance on account only and shall not in any way excuse the existence of a Default.

12. Security. The obligations, indebtedness   and liabilities of Maker to Payee, under this Note shall be secured by a first priority pledge and security interest in the Collateral pursuant to the terms of the Security Agreement and the Loan Documents. The Parties understand and agree that the Collateral for this Note may be substituted for other Collateral of similar market value at Maker's sole discretion prior to the Maturity Date.

13. Nonrecourse Note.    The indebtedness under this Note shall be satisfied and enforced only against the Collateral, and no recourse of any kind shall be had against Maker or its Affiliates, or against the Collins Proceeds or any other assets of Maker or its Affiliates, with respect to the amounts owing under this Note, including, without limitation, for money damages of any kind whatsoever or for any deficiency following any sale or other disposition of the Collateral. Payee will look solely to the Collateral for payment of this Note, and Maker shall have no personal liability for the payment of this Note. Unless explicitly stated otherwise elsewhere in this Note or the Loan Documents, no Person other than the Parties themselves has any rights or remedies under this agreement

14. Severability. If any provision of any of the Loan Documents or this Note is held to be illegal, invalid, or unenforceable under present or future Laws effective during the term thereof, such provision shall be fully severable, the appropriate Loan Document shall be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part thereof; and the remaining provisions thereof shall remain in  full force and effect and shall not be effected by the illegal, invalid, or unenforceable provision or by its severance therefrom. Furthermore, in lieu of such illegal, invalid, or unenforceable provision, there shall be added automatically as a part of such Loan Document a provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible and be legal, valid, and enforceable.

15. Headings.    The clause headings in this Note are for convenience only and do not constitute any part of the Note.

[Signature page follows]

{00101951}                                   5 | P a g e

CONFIDENTIAL

FER_CAP000636

EXECUTED to be effective as of the date set forth above.

MAKER: COLLINS ASSET GROUP, LLC

BY: _____

Name: Walt Collins

Title: Authorized Signatory for Hollins Holdings, LLC, managing and sole member of Collins Asset Group, LLC

{00101951}                                    6 | Page

CONFIDENTIAL

FER_CAP000637

# EXHIBIT 2

## MASTER LOAN AGREEMENT

This Loan Agreement ("Agreement") is made and entered into as of _11/15/17_ with an effective date of _11/15/17_ by Ferrum Capital, LLC, a Texas limited liability company ("Lender"), 4415 66th St #101, Lubbock County, Texas 79414, Lubbock County, Texas, and Collins Asset Group, LLC, a Delaware limited liability company ("Borrower"), 5725 Highway 290 West #103, Suite 103, Austin, Travis County, Texas, 78735 (Lender and Borrower together, the "Parties").

### RECITALS:

A. Lender has offered to make Loans to Borrower as described in this Agreement. Lender is willing to make such Loans available to Borrower and Borrower is willing to accept such Loans upon and subject to the provisions, terms and conditions hereinafter set forth herein.

B. Subject to and upon the terms and conditions of this Agreement, Lender has agreed to hereinafter the effective date above, lend to Borrower the Loans herein described for the purposes set forth below.

NOW, THEREFORE, in consideration of the premises, the covenants, representations, warranties and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto covenant and agree as follows:

### ARTICLE ONE
### CERTAIN DEFINITIONS

1.1 Definitions. As used in this Agreement, all exhibits and schedules hereto and in any note, certificate, report or other Loan Documents made or delivered pursuant to this Agreement, the following terms will have the meanings given such terms in this Article One.

"Term Loan Proceeds" means any disbursement of an amount or amounts to be loaned by Lender to Borrower hereunder.

"Affiliate" means, as to any Person, any other Person (a) that directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, such Person, (b) that directly or indirectly beneficially owns or holds ten percent (10%) or more of any class of voting stock of such Person, or (c) ten percent (10%) or more of the voting stock of which is directly or indirectly beneficially owned or held by the Person in question. The term "control" means the possession, directly or indirectly, of the power to direct or cause direction of the management and policies of a Person, whether through the ownership of voting

{00101950}        Master Loan Agreement – Page 1

CONFIDENTIAL                                                                 FER_CAP000278

securities, by control, or otherwise; provided however, in no event shall Lender be deemed an Affiliate of Borrower.

"Agreement" means this Loan Agreement, as the same may, from time to time, be amended, supplemented, or replaced.

"Approved Purpose" or "Covered Activities" means, with respect to the Term Loan Proceeds, providing capital for utilization by Borrower for any of the following activities (1) purchasing secured or unsecured commercial or consumer receivables, promissory notes, bonds; installment loans, leases, accounts and negotiable instruments ('all the aforesaid collectively for the purpose of this definition "loans"); or (2) funding to lending originators for the purpose of allowing said originators to originate loans; or (3) providing funding for the formation or acquisition, in whole or part, of lending originators; or (4) providing funding for the formation or acquisition, in whole or part, of receivable servicing organizations, including third party collection agencies that service loans; (5) providing funding for the historically profitable activities of CAG; or (6) to utilize funding to deploy capital in the ever changing marketplace of the Accounts Receivable Marketplace or its related or allied peripheral segments; (7) or acquisition of professional negligence claims for purposes of financing litigation thereof and/or liquidating same via litigation; or (8) acquisition, resale, disposition and collection efforts related to the activities 1-7, inclusive, aforesaid which include but not limited to, expenses relating to analyzing, scoring, screening, lettering and performing reasonable efforts, including, but not limited to personnel expenses to purchase, collect and/or resell such loans as the case may be, and funding loan origination and servicing expenses, which include but are not limited to, lead generation expenses, processing payments, sending statements, providing delinquent collection services on loans, handling pay-offs and assumptions, as well as various other related services as customary and necessary related to the acquisition, origination, servicing, collection and disposition of loans; and (9) operating costs, defined herein as Borrower's overhead that is attributable to any of the foregoing activities.

"Article" and "Articles" have the meanings set forth in Section 11.2

"Borrower" means the Person identified as such in the introductory paragraph hereof, and its successors and assigns.

"Code" shall mean the Texas Business and Commerce Code as in effect in the State of Texas on the date of this Agreement or as such laws may hereafter be amended from time to time.

"Collateral" means all of the consumer debts, accounts, instruments, and other property specifically purchased or originated via any legal entity or otherwise by Borrower using the proceeds of each Term Loan in compliance with the Approved Purpose or as otherwise agreed to in writing by Borrower and Lender. The term Collateral, as used herein, shall also include (i) all renewals, replacements and substitutions of all of the foregoing at Borrower's election, and (ii)

{00101950}                    Master Loan Agreement – Page 2

CONFIDENTIAL

all products and proceeds of the foregoing other than the Collins Proceeds (as defined in the Note or elsewhere in the Loan Documents). The Collateral also does not include any accounts debts, or other property of Borrower that were purchased with other funds, proceeds from other loans or sources, including, but not limited to, the Collins Proceeds. Borrower shall maintain records sufficient to determine which consumer debts, accounts, instruments, and other property constitutes Collateral for each Term Loan, to determine the Collins Proceeds, and to determine the consumer debts, accounts, instruments, and other property that were not purchased with each Term Loan Proceeds under this Loan Agreement and are not Collateral for the Promissory Notes or other Obligations under these Loan Documents.

"Debtor Relief Laws" means the Bankruptcy Code of the United States and all other applicable liquidation, conservatorship, bankruptcy, moratorium, rearrangement, insolvency, reorganization, or similar debtor relief Laws affecting the rights of creditors generally from time to time in effect.

"Event of Default" has the meaning set forth in Article Nine and in any other provision hereto using the term.

"GAAP" means generally accepted accounting principles, applied on a consistent basis, set forth in Opinions of the Accounting Principles Board of the American Institute of Certified Public Accountants and/or in statements of the Financial Accounting Standards Board which are applicable in the circumstances as of the date in question.

"Inchoate Lien" means any Tax Lien for Taxes not yet due and payable and any mechanic's Lien and material man's Lien for services or materials for which payment is not yet due.

"Indebtedness" means all present and future indebtedness of Borrower to Lender under the Term Loans and the Loan Documents.

"Laws" means all statutes, laws, ordinances, regulations, orders, writs, injunctions, or decrees of the United States, any city or municipality, state, commonwealth, nation, country, territory, possession, or any Tribunal.

"Lender" means the Person identified as such in the introductory paragraph hereof, and its successors and assigns.

"Lien" means any lien, security interest, Tax lien, mechanic's lien, material man's lien, or other encumbrance, whether arising by contract or under Law.

"Loan Account" has the meaning given such term in Section 2.3.

"Loan Documents" mean this Agreement, the Promissory Note, the Master Security Agreement and any and all other agreements, documents, and instruments executed and

{00101950}                    Master Loan Agreement – Page 3

CONFIDENTIAL

delivered pursuant to the terms of this Agreement, and any future amendments hereto, or restatements hereof, or pursuant to the terms of any of the other Loan Documents, together with any and all renewals, extensions, and restatements of, and amendments and modifications to, any such agreements, documents, and instruments. Loan Documents may also be referred to as Note Documents.

"Material Adverse Effect" means any set of circumstances or event which (a) is likely to have a material adverse effect upon the validity, performance, or enforceability of any Loan Document, (b) is material and adverse to the financial condition, properties, or business operations of the Person in question, (c) is likely to materially impair the ability of the Person in question to fulfill its obligations under the terms and conditions of the Loan Documents, or (d) causes an Event of Default.

"Maximum Rate" means the maximum non-usurious rate of interest (or, if the context so requires, an amount calculated at such rate) which Lender is allowed to contract for, charge, take, reserve, or receive in this transaction under applicable federal or state (whichever is higher) Law from time to time in effect after taking into account, to the extent required by applicable federal or state (whichever is higher) Law from time to time in effect, any and all relevant payments or charges under the Loan Documents .

"Obligations" means any and all of the covenants, conditions, warranties, representations and other obligations (other than to repay the Indebtedness) made or undertaken by Borrower to Lender as set forth in the Loan Documents.

"Organizational Documents" means (a) in the case of a corporation, its articles or certificate of incorporation and bylaws, (b) in the case of a general partnership, its partnership agreement, (c) in the case of a limited partnership, its certificate of limited partnership and partnership agreement, (d) in the case of a limited liability company, its articles of organization and operating agreement or regulations, and (e) in the case of any other entity, its organizational and governance documents and agreements.

"Proceeds" has the meaning given such term in Section 3 of each Promissory Note.

"Permitted Liens" means all (a) Inchoate Liens, (b) Liens created by or pursuant to the Loan Documents in favor of Lender, (c) Liens for taxes, assessments, or other governmental charges which are being contested in good faith and for which adequate reserves have been established, and (d) Liens resulting from good faith deposits to secure payments of workers compensation or other social security programs or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, or contracts, or leases made in the ordinary course of business.

"Person" means any individual, firm, corporation, limited liability company, association, partnership, joint venture, trust, other entity, or a Tribunal.

{00101950}                    Master Loan Agreement – Page 4

CONFIDENTIAL

"Promissory Note" means the Promissory Note in the form attached hereto as Exhibit A.

"Rights" mean any remedies, powers, and privileges exercisable by Lender under the Loan Documents, at Law, equity, or otherwise.

"Section" and "Sections" have the meanings set forth in Section 11.2.

"Security Agreement" means the Security Agreement dated the Closing Date, and as amended, supplemented or modified from time to time, executed by Borrower in favor of Lender, in the form attached hereto as Exhibit B.

"Taxes" means all taxes (including withholding), assessments, fees, levies, imposts, duties, deductions, withholdings, or other charges of any nature whatsoever from time to time or at any time imposed by any Laws or by any Tribunal, excluding state and local sales and use taxes.

"Term Loan(s)" has the meaning set forth in Section 2.1.

## ARTICLE TWO
### COMMITMENT TO LEND, TERMS OF PAYMENT

2.1    Term Loan. Subject to and upon the terms, covenants, and conditions of this Agreement, Lender agrees to enter into this transaction in which it agrees to make Term Loans available to Borrower in an amount as agreed upon by Lender and Borrower as agreed upon in each Promissory Note, a copy of which is attached hereto, marked "Exhibit A", and such Promissory Notes are (the proceeds thereof referred to as a ""Term Loan") subject to the satisfaction of the terms and conditions of this Agreement by Borrower and each Term Loan provided by Lender are to be used for Approved Purposes. Borrower shall have the option to prepay or make a Voluntary Prepayment (as defined in the Promissory Notes) of the Term Loans or any portion of each Promissory Note thereof, including any Borrower obligation of any kind or nature contained within each Promissory Note without prepayment fee, premium or penalty. Unless otherwise stated to the contrary in the Loan Documents, if, by virtue of payments made on a specific Promissory Note, the principal amount owed on any specific Promissory Note during its term reaches zero at any point, Borrower and Lender agree that all of the Loan Documents shall remain in full force and effect, if necessary, to commit to and secure any Indebtedness still owed to Lender by Borrower, if any, pursuant to the Loan Documents as attributable to such Promissory Note to the extent allowed by law. If no further Indebtedness is due to Lender on a specific Promissory Note, then UCC liens associated with the Collateral may be released by Borrower, unless such Collateral secures other Promissory Notes.

2.2    Promissory Note. The Term Loans shall be evidenced by, and be repayable in accordance with the terms of the Promissory Note associated with each Term Loan.

{00101950}                    Master Loan Agreement – Page 5

CONFIDENTIAL

FER_CAP000282

2.3    Borrowing Procedure. The Term Loans shall be made available to Borrower on the Closing Date by depositing the same, in immediately available funds, in an account of Borrower designated by Borrower (the "Deposit Account").

2.4    Payments. Each Term Loan shall be repaid in accordance with the provisions set forth in the Promissory Note.

## ARTICLE THREE
### COLLATERAL

3.1    Security Interests.    In order to secure payment and performance of the Indebtedness and Obligations, Borrower has granted to Lender a security interest in the Collateral by executing and delivering to Lender the Security Agreement. Borrower further agrees to execute and deliver to Lender from time to time such other Security Agreements and similar documents covering the Collateral and further authorizes Lender to prepare and file such Financing Statements as Lender may reasonably require to perfect and maintain its perfected interest in the Collateral. Lender and Borrower agree that Borrower will file a UCC-1 financing statement covering the Collateral and any amendments, continuances, modifications or terminations as necessary thereto. Lender acknowledges that the Original Value of the Collateral may lose or increase in its value over the time period of any applicable Note.

## ARTICLE FOUR
### CONDITIONS PRECEDENT TO LENDING

4.1    Conditions Precedent. The obligation of Lender to make the Term Loans under Promissory Note is subject to the condition precedent that Lender shall have in effect on or before the day of such Term Loan origination, all of the following, each dated (unless otherwise indicated) as agreed by the Lender and Borrower:

      (a)    Promissory Note. The Promissory Note executed by Borrower;

      (b)    Security Agreement. The Security Agreement executed by Borrower;

      (c)    Representations and Warranties. The representations and warranties made in Article Five of this Agreement are true and correct at and as of the time of the making of the Term Loan by Borrower.

{00101950}                Master Loan Agreement – Page 6

CONFIDENTIAL

FER_CAP000283

## ARTICLE FIVE
### REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants to Lender as follows:

5.1    Existence.    Borrower is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware, and is duly qualified to transact business as a foreign corporation in each jurisdiction where the nature and extent of its business and property requires the same.

5.2    Authorization.    Borrower possesses all requisite authority, power, licenses, permits, and franchises to conduct its business and execute, deliver, and comply with the terms of the Loan Documents. The execution and delivery of this Agreement, the consummation of the transactions herein contemplated and compliance with the terms and provisions hereof, and the execution, issuance, and delivery of the Loan Documents have been duly authorized and approved by all necessary entity action on the part of Borrower.

5.3    Compliance with Laws and Documents.    Borrower is not, nor will the execution, delivery, and performance of and compliance with the terms of the Loan Documents cause Borrower to be, in violation of any Laws in any respect which could have a Material Adverse Effect.

5.4    Enforceability of Loan Documents.    All Loan Documents when duly executed and delivered by Borrower will constitute legal, valid, and binding obligations of Borrower enforceable in accordance with their terms subject to Debtor Relief Laws and except that the availability of equitable remedies may be limited.

5.5    Litigation.    Borrower is involved on a regular basis in litigation arising from its efforts to collect consumer debts and accounts. Borrower will not report such litigation to Lender unless it is likely to have a Material Adverse Effect on the specific Collateral of Lender.

## ARTICLE SIX
### CERTAIN AFFIRMATIVE COVENANTS

In consideration of Lender of entering into this Loan Agreement and other Loan Documents, until payment and performance in full of the Indebtedness and Obligations, Borrower covenants and agrees that:

6.1    Reporting Requirements.    Borrower shall provide to Lender:

(a)    Periodic Financial Statements.    Borrower shall provide regular periodic reports to Lender in such form and containing such reasonable information as Borrower and Lender may mutually agree upon in good faith, if necessary.

{00101950}                    Master Loan Agreement -- Page 7

CONFIDENTIAL

6.2    Maintenance of Entity Existence, Assets and Business; Continuance or Present Business.    Borrower will preserve and maintain its existence and all of its leases, licenses, permits, franchises, qualifications, and rights that are necessary or desirable in the ordinary conduct of its business. Borrower will conduct its business in an orderly and efficient manner in accordance with good business practices. Borrower will carry on and conduct its business in substantially the same fields as such business is now and has heretofore been carried on and/or pursuant to such businesses as contemplated between Borrower and Lender as described within the Approved Purpose definition in this Loan Agreement.

6.3    Books and Records.    Borrower will maintain proper books of record and account in which full, true, and correct entries shall be made of all dealings and transactions in relation to its business and activities. Lender may review such books and records at Lender's expense during regular office hours at Borrower's location upon at least three days written notice to Borrower of such review unless Borrower and Lender agree otherwise.

## ARTICLE SEVEN
### CERTAIN NEGATIVE COVENANTS

So long as Lender commits to make the Term Loans hereunder, and thereafter until payment and performance in full of the Indebtedness and Obligations, Borrower covenants and agrees that, without the prior written consent of Lender, which consent will not be unreasonably withheld or delayed:

7.1    Limitation on Liens.    Borrower will not incur, create, assume, or permit to exist any Lien upon the Collateral except for Permitted Liens.

7.2    Approved Purpose.    Borrower will not use the Proceeds of the Term Loan for purposes other than the Approved Purpose.

## ARTICLE EIGHT
### LENDER FEES

**8.1    Origination Fee.    If a Term Loan evidenced by a Promissory Note is subject to an origination fee, such fee shall be deducted from the loan proceeds and paid to the Lender. A partial pre-payment will not result in the refund of any origination fee amount. Borrower acknowledges that the origination fee is considered part of the principal of Borrower's loan and is subject to the accrual of interest.**

**8.2    Service Fee(s).    If a Term Loan shall bear an annual Service Fee, such fee shall be stated in the applicable Promissory Note. (the "Service Fee"). Any such Service Fee is due and payable by the Borrower on the Effective Date of the applicable Promissory**

{00101950}                    Master Loan Agreement – Page 8

CONFIDENTIAL

Note and on subsequent anniversary(ies) of the Effective Date of the applicable Promissory Note to the extent provided for in each Promissory Note.

## ARTICLE NINE
### EVENTS OF DEFAULT

The term "Event of Default" as used herein shall mean the occurrence of any one or more of the following events (subject to all applicable grace and cure periods):

9.1     Payment of Indebtedness. The failure of Borrower to punctually pay the Indebtedness, or any part thereof, as the same become due in accordance with the terms of the Loan Documents, including, without limitation, the failure or refusal of Borrower to punctually pay the principal of or the interest on such Term Loan, to the extent any such failure continues and remains uncured for more than thirty (30) days after receiving written notice thereof from Lender.

9.2     Misrepresentation.   Any statement, representation, or warranty heretofore or hereafter made by Borrower in the Loan Documents or in any writing, or any statement or representation made in any certificate, report, or opinion delivered to Lender pursuant to the Loan Documents, is false, calculated to mislead, misleading, or erroneous in any material respect at the time made.

9.3     Covenants. The failure or refusal of Borrower to properly perform, observe, and comply with any covenant or agreement contained in any of the Loan Documents, and such failure or refusal continues for a period of sixty (60) days after Lender has given Borrower written notice thereof.

9.4     Voluntary Debtor Relief.   Borrower shall (a) become or be adjudicated as bankrupt or insolvent, or (b) admit in writing its inability to pay its debts generally as they become due, or (c) apply for or consent to the appointment of a conservator, receiver, trustee, or liquidator of it or all or a substantial part of its assets, or (d) file a voluntary petition seeking reorganization or an arrangement with creditors or to take advantage or seek any other relief under any Debtor Relief Law now or hereafter existing.

9.5     Involuntary Proceedings.   Borrower shall involuntarily (a) have an order, judgment, or decree entered against it by any Tribunal pursuant to any Debtor Relief Law that could suspend or otherwise affect any of the Rights granted to Lender in any of the Loan Documents, and such order, judgment, or decree is not permanently stayed, vacated, or reversed within ninety (90) days after the entry thereto or (b) have a petition filed against it or any of its property seeking the benefit or benefits provided for by any Debtor Relief Law that would suspend or otherwise affect any of the Rights granted to Lender in any of the Loan Documents, and such petition is not discharged within ninety (90) days after the filing thereof.

{00101950}              Master Loan Agreement – Page 9

CONFIDENTIAL

FER_CAP000286

9.6    No Cross Default.    Notwithstanding any language contained in the Loan Documents, any Event of Default relating to a particular Promissory Note as delineated in Sections 9.1-9.3 inclusive shall not be considered an Event of Default for all other Promissory Notes, if any, then existing between Lender and Borrower.

## ARTICLE TEN
### CERTAIN RIGHTS AND REMEDIES OF LENDER

10.1    Rights upon Event of Default.    If any Event of Default shall occur and be continuing, Lender may after the expiration of any applicable grace period, by providing written notice to Borrower, declare the Indebtedness or any part thereof to be immediately due and payable, and the same shall thereupon become immediately due and payable, without notice, demand, presentment, notice of dishonor, notice of acceleration, notice of intent to accelerate, notice of intent to demand, protest, or other formalities of any kind, all of which are hereby expressly waived by Borrower.    If any Event of Default shall occur and be continuing, Lender may exercise all rights and remedies available to it in law or in equity, under the Loan Documents, or otherwise.

10.2    Waivers. No waiver by Lender of any of its rights hereunder, in the other Loan Documents, or otherwise shall be considered a waiver of any other or subsequent Right of Lender. No delay or omission by Lender in exercising any Right under the Loan Documents shall impair such Right or be construed as a waiver thereof or any acquiescence therein.

10.3    Cumulative Rights. All Rights available to Lender under the Loan Documents shall be cumulative of and in addition to all other Rights granted to Lender at Law or in equity, whether or not the Obligations be due and payable and whether or not Lender shall have instituted any suit for collection, foreclosure, or other action under or in connection with the Loan Documents.

## ARTICLE ELEVEN
### MISCELLANEOUS

11.1    Headings. The headings, captions, and arrangements used in any of the Loan Documents are, unless specified otherwise, for convenience only and shall not be deemed to limit, amplify, or modify the terms of the Loan Documents, nor affect the meaning thereof.

11.2    Articles, Sections, and Exhibits.    All references    to "Article," "Articles," "Section, "Sections," "Subsection," or "Subsections" contained herein are, unless specifically indicated otherwise, references to articles, sections, and subsections of this Agreement. The words "herein" "hereof," "hereunder" and other similar compounds of the word "here" when used in this Agreement shall refer to the entire Agreement and not to any particular provision or section.    All references    to    "Exhibits" contained    herein    are references    to exhibits attached hereto, all of which are made a part hereof for all purposes, the same as if set forth

{00101950}                    Master Loan Agreement – Page 10

CONFIDENTIAL

FER_CAP000287

herein verbatim, it being understood that if any exhibit attached hereto, which is to be executed and delivered, contains blanks, the same shall be completed correctly and in accordance with the terms and provisions contained and as contemplated herein prior to or at the time of the execution and delivery thereof.

11.3   Number and Gender of Words. Whenever herein the singular number is used, the same shall include the plural where appropriate, and vice versa; and words of any gender shall include each other gender where appropriate.

11.4   Notices. Unless otherwise expressly provided herein, all notices and other communications provided for hereunder shall be in writing and mailed by USPO certified mail, faxed, or delivered, to the address, facsimile number to the address specified for notices on the signature page below or to such other address as shall be designated by such party in a notice to the other parties. All such other notices and other communications shall be deemed to have been given or made upon the earliest to occur of (a) actual receipt by the intended recipient or (b) if delivered by certified mail, return receipt requested with signature or the intended recipient, postage prepaid; or (c) if delivered by a nationally known overnight delivery service, upon receipt and signature of the recipient. Electronic mail and internet websites may be used to distribute routine communications, financial reports, and other information, and to distribute Loan Documents for execution by the parties thereto.

11.5   GOVERNING LAW; PLACE OF PERFORMANCE. THE LOAN DOCUMENTS ARE BEING EXECUTED AND DELIVERED, AND ARE INTENDED TO BE PERFORMED, IN THE STATE OF TEXAS, AND THE LAWS OF SUCH STATE AND OF THE UNITED STATES SHALL GOVERN THE RIGHTS AND DUTIES OF THE PARTIES HERETO AND THE VALIDITY, CONSTRUCTION, ENFORCEMENT, AND INTERPRETATION OF THE LOAN DOCUMENTS. THIS AGREEMENT, ALL OF THE OTHER LOAN DOCUMENTS, AND ALL OF THE OBLIGATIONS OF BORROWER UNDER ANY OF THE LOAN DOCUMENTS ARE PERFORMABLE IN TRAVIS COUNTY, TEXAS. VENUE OF ANY LITIGATION INVOLVING OR RELATING TO THIS AGREEMENT OR ANY LOAN DOCUMENT SHALL BE MAINTAINED IN AN APPROPRIATE STATE OR FEDERAL COURT LOCATED IN TRAVIS COUNTY, TEXAS, TO THE EXCLUSION OF ALL OTHER VENUES. THE PARTIES HEREIN WAIVE THEIR RIGHT TO A TRIAL BY JURY.

11.6   Maximum Interest. It is expressly stipulated and agreed to be the intent of Borrower and Lender at all times to comply strictly with the applicable Texas law governing the maximum rate or amount of interest payable on the indebtedness evidenced by the Promissory Notes or any Loan Document, and the Related Indebtedness (or applicable United States federal law to the extent that it permits Lender to contract for, charge, take, reserve or receive a greater amount of interest than under Texas law). If the applicable law is ever judicially interpreted so as to render usurious any amount:

{00101950}                     Master Loan Agreement – Page 11

CONFIDENTIAL

FER_CAP000288

(a)    contracted for, charged, taken, reserved or received pursuant to the Promissory Notes, any of the other Loan Documents,

(b) contracted for, charged, taken, reserved or received by reason of Lender's exercise of the option to accelerate the maturity of the Promissory Notes, if any or

(c)    Borrower will have paid or Lender will have received by reason of any voluntary prepayment by Borrower of any Promissory Note, then it is Borrower's and Lender's express intent that all amounts charged in excess of the Maximum Rate shall be automatically canceled, *ab initio*, and all amounts in excess of the Maximum Rate theretofore collected by Lender shall be credited on the principal balance of the Promissory Note and (or, if the Promissory Note has been or would thereby be paid in full, refunded to Borrower), and the provisions of the Promissory Note and the other Loan Documents shall immediately be deemed reformed and the amounts thereafter collectible hereunder and there under reduced, without the necessity of the execution of any new document, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder and there under; provided, however, if the Promissory Note has been paid in full before the end of the stated term of the Promissory Note, then Borrower and Lender agree that Lender shall, with reasonable promptness after Lender discovers or is advised by Borrower that interest was received in an amount in excess of the Maximum Rate, either refund such excess interest to Borrower and/or credit such excess interest against such Promissory Note. All sums contracted for, charged, taken, reserved or received by Lender for the use, forbearance or detention of any debt evidenced by the Promissory Note shall, to the extent permitted by applicable law, be amortized or spread, using the actuarial method, throughout the stated term of the Promissory Note (including any and all renewal and extension periods) until payment in full so that the rate or amount of interest on account of the Promissory Note does not exceed the Maximum Rate from time to time in effect and applicable to the Promissory Note for so long as debt is outstanding.

11.7    Invalid Provisions. If any provision of any of the Loan Documents is held to be illegal, invalid, or unenforceable under present or future Laws effective during the term thereof, such provision shall be fully severable, the appropriate Loan Document shall be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part thereof; and the remaining provisions thereof shall remain in full force and effect and shall not be effected by the illegal, invalid, or unenforceable provision or by its severance therefrom. Furthermore, in lieu of such illegal, invalid, or unenforceable provision, there shall be added automatically as a part of such Loan Document a provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible and be legal, valid, and enforceable.

11.8    Entirety and Amendments. This instrument embodies the entire agreement between the Parties relating to the subject matter hereof (except documents, agreements and

{00101950}                              Master Loan Agreement – Page 12

CONFIDENTIAL

FER_CAP000289

instruments delivered or to be delivered in accordance with the express terms hereof), supersedes all prior agreements and understandings, if any, relating to the subject matter hereof, and may be amended only by an instrument in writing executed jointly by Borrower and Lender and supplemented only by documents delivered or to be delivered in accordance with the express terms hereof or as otherwise agreed between the Parties.

11.9    Multiple Counterparts.    This Agreement has been executed in a number of identical counterparts, each of which constitutes an original and all of which constitute, collectively, one agreement; but in making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart. The exchange of copies of this Agreement and of signature pages by facsimile transmission, by electronic mail in "portable document format" (".pdf") form, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, or by combination of such means, shall constitute effective execution and delivery of this Agreement as to the Parties and may be used in lieu of the original Agreement for all purposes. Signatures of the Parties transmitted by facsimile shall be deemed to be their original signatures for all purposes.

11.10    Parties Bound. This Agreement shall be binding upon and inure to the benefit of Borrower, Lender and their respective successors and assigns. No term or provision of this Agreement shall inure to the benefit of any Person other than Borrower and Lender and their respective successors and assigns; consequently, no Person other than Borrower and Lender and their respective successors and assigns, shall be entitled to rely upon, or to raise as a defense, in any manner whatsoever, the failure of Borrower or Lender to perform, observe, or comply with any such term or provision.

11.11    Loan Agreement Governs. In the event of any conflict between the terms of this Agreement and any terms of any other Loan Document, the terms of this Agreement shall govern. All of the Loan Documents are by this reference incorporated into this Agreement as if fully rewritten.

11.12    Non-Recourse. The Indebtedness and Obligations under the Loan Documents shall be satisfied and enforced only against the Collateral, and no recourse of any kind shall be had against Borrower or its Affiliates, or against the Collins Proceeds or any other assets of Borrower or its Affiliates, with respect to the Indebtedness or Obligations, including, without limitation, for money damages of any kind whatsoever or for any deficiency following any sale or other disposition of the Collateral. Lender will look solely to the Collateral for the Indebtedness and Obligations, and Borrower shall have no personal liability for the payment of the Indebtedness or performance of the Obligations. Unless explicitly stated otherwise elsewhere in this Agreement or the Loan Documents, no Person other than the Parties themselves has any rights or remedies under this agreement.

{00101950}                    Master Loan Agreement -- Page 13

CONFIDENTIAL

FER_CAP000290

11.13 STATUTE OF FRAUDS NOTICE. THIS WRITTEN LOAN AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

11.14 Confidentiality. Lender agrees to hold all reports, books and records (and the information they contain) that are received or reviewed by Lender confidential and will not disclose them to any third party or use them for any purpose without the prior written consent of Borrower.

**(SIGNATURES ON NEXT PAGE)**

{00101950}    Master Loan Agreement – Page 14

CONFIDENTIAL

FER_CAP000291

EXECUTED by the Lender and the Borrower to be effective as of the date set forth above.

**LENDER:**

Ferrum Capital, LLC

By: _____

Name: JOSHUA L. ALLEN

Title: Manager

Address for Notices:

    4415-66th Street, Ste. 101
    LUBBOCK, TX 79414

Fax No.: 806-792-8645

Email Address:


**BORROWER:**

Collins Asset Group, LLC

By: _____

Name: Michael Crossan

Title: Authorized Signatory for Hollins Holdings, LLC, Managing Member of Collins Asset Group, LLC

Address for Notices:

5725 Highway 290 West #103
Austin, TX 78735
Fax No.: 512-765-9535
Email: mcrossan@collinsassetgroup.com

{00101950}          Master Loan Agreement – Page 15

CONFIDENTIAL           FER_CAP000292

# EXHIBIT A

## PROMISSORY NOTE

CONFIDENTIAL                                                           FER_CAP000293

# EXHIBIT B

## MASTER SECURITY AGREEMENT

CONFIDENTIAL                    FER_CAP000294

# EXHIBIT 3

## MASTER SECURITY AGREEMENT

THIS SECURITY AGREEMENT ("Agreement") is made as of November 15, 2017 with an effective date of November 15, 2017 (the "Effective Date"), by Collins Asset Group, LLC, a Delaware limited liability company ("Debtor"), whose address is 5725 HWY 290 West #103, Austin, TX 78735, in favor of Ferrum Capital, LLC,("Secured Party") a Limited Liability Company, whose address is 4415 66th St., #101, Lubbock, Texas 79414 . This Agreement is executed and delivered by Debtor and Secured Party pursuant to the various Loan Agreements and Notes between Debtor and Secured Party made from the Effective Date and thereafter and as the aforestated Loan Agreements and Notes may be amended, supplemented, or modified and any capitalized terms used herein that are not otherwise defined herein shall have the meaning given such terms in the Loan Agreement(s). This Agreement supplements any other agreement or understanding between the Debtor and Secured Party contained in the Loan Agreement(s) and Note(s), as listed on the Collateral Schedule (as defined below), attached hereto, marked Exhibits A and Exhibit 1 respectively, and incorporated herein by reference as if fully rewritten. Debtor hereby agrees with Secured Party as follows:

1.  Definitions. As used in this Agreement, the following terms shall have the meanings indicated below:

    a)    The term "Code" shall mean the Texas Business and Commerce Code as in effect in the State of Texas on the date of this Agreement or as it may hereafter be amended from time to time.

    b)    The term "Collateral" shall have the meaning given such term in the Loan Agreement and Section 2 below.

    c)    The term "Indebtedness" shall mean (i) all obligations due without limitation relating to the Loan Agreement(s) and Promissory Note(s) between the Debtor and the Secured Party all accrued but unpaid obligations on any of the indebtedness described aforesaid, (ii) all costs and expenses incurred by Secured Party in connection with the collection and administration of all or any part of the indebtedness and obligations described aforesaid or the protection or preservation of, or realization upon, the Collateral securing all or any part of such indebtedness and obligations, including without limitation all reasonable attorneys' fees, and (iv) all renewals, extensions, modifications and rearrangements of the indebtedness and obligations described in aforesaid above.

    d)    The term "Loan Documents" shall mean all instruments and documents evidencing, securing, governing, guaranteeing and/or pertaining to the Indebtedness.

    e)    The term "Obligated Party" shall mean any party other than Debtor who secures, guarantees and/or is otherwise obligated to pay all or any portion of the Indebtedness.

1 | P a g e

CONFIDENTIAL

FER_CAP000295

2.  Security Interest. Debtor grants to Secured Party, its successors and assigns, a security interest in and against all property listed on any collateral schedule and additional schedules now or in the future annexed to or made a part of this Agreement ("Collateral Schedule"), and in and against all additions, attachments, accessories and accessions to such property, all substitutions, replacements or exchanges therefore, and all insurance and/or other proceeds thereof (all such property is individually and collectively called the "Collateral") except as otherwise excluded in this Agreement or the Loan Agreement(s). This security interest is given to secure the payment and performance of all debts, obligations and liabilities of any kind whatsoever of Debtor to Secured Party, existing from the Effective Date or arising in the future, including but not limited to the payment and performance of certain Promissory Notes from time to time identified on any Collateral Schedule and notated on Exhibit 1(collectively "Notes" and each a "Note"), and any renewals, extensions and modifications of such debts, obligations and liabilities (such Notes, debts, obligations and liabilities are called the "Indebtedness")existing since the Effective Date and thereafter. Notwithstanding any of the foregoing language in this Agreement, or the Loan Documents or Loan Agreement(s), Collateral shall not include the Collins Proceeds. Collins Proceeds is defined herein as fees , expenses and other funds retained by the Debtor as remuneration for performing the Covered Activities as such term is defined in the Notes, Loan Documents and/or Loan Agreements, as the case may be.

3.  As security for the Indebtedness, Debtor, for value received, hereby grants to Secured Party a continuing security interest in the Collateral, but not in any other assets or property of Debtor, including the Collins Proceeds.

4.  Maintenance of Collateral. Other than the exercise of reasonable care to assure the safe custody of any Collateral in Secured Party's possession from time to time, Secured Party does not have any obligation, duty or responsibility with respect to the Collateral.

5.  Representations and Warranties. Debtor hereby represents and warrants the following to Secured Party:
    a)  Authority. The execution, delivery and performance by Debtor of this Agreement and all of the other Loan Documents to which Debtor is a party have been duly authorized by all necessary corporate action of Debtor.

    b)  Accuracy of Information. All information heretofore, herein or hereafter supplied to Secured Party by or on behalf of Debtor with respect to the Collateral is true and correct.

    c)  Enforceability. This Agreement and the other Loan Documents constitute legal, valid and binding obligations of Debtor, enforceable in accordance with their respective terms, except as limited by bankruptcy, insolvency or similar laws of general application relating to the enforcement of creditors' rights and except to the extent specific remedies may generally be limited by equitable principles.

2 | P a g e

CONFIDENTIAL

d) Ownership and Liens. Debtor has good and marketable title to the Collateral free and clear of all liens, security interests, encumbrances or adverse claims, except for the security interest created by this Agreement. Debtor has not executed any other security agreement currently affecting the Collateral and no financing statement or other instrument similar in effect covering all or any part of the Collateral is on file in any recording office except as may have been executed or filed in favor of Secured Party.

e) Security Interest. This Agreement creates a legal, valid and binding security interest in favor of Secured Party in the Collateral.

f) Location/Identity. Debtor's principal place of business and chief executive office (as those terms are used in the Code), as the case may be is located at the address set forth on the first page hereof. Except as specified elsewhere herein, all Collateral and records concerning the Collateral shall be kept at such address. Debtor's organizational structure and state of formation (the "Organizational Information") are as set forth on the first page hereof. Except as specified herein, the Organizational Information shall not change.

6. Affirmative Covenants. Debtor will comply with the covenants contained in this Section at all times during the period of time this Agreement is effective unless Secured Party shall otherwise consent in writing.

a) Ownership and Liens. Debtor will maintain good and marketable title to all Collateral free and clear of all liens, security interests, encumbrances or adverse claims, except for the security interest created by this Agreement. Debtor will defend at its expense Secured Party's right, title and security interest in and to the Collateral against the claims of any third party, if any.

b) Inspection of Books and Records. Debtor will keep adequate records concerning the Collateral and will permit Secured Party and all representatives and agents appointed by Secured Party to inspect Debtor's books and records of or relating to the Collateral at reasonable times during normal business hours, to make and take away photocopies, photographs and printouts thereof and to write down and record any such information.

c) Adverse Claim. Debtor covenants .and agrees to promptly notify Secured Party of any claim, action or proceeding affecting title to the Collateral, or any part thereof, or the security interest created hereunder and, at Debtor's expense, defend Secured Party's security interest in the Collateral against the claims of any third Party, if any.

d) Further Assurances. Debtor will contemporaneously with the execution hereof and from time to time thereafter at its expense promptly execute and deliver further instruments and documents and take further action reasonably necessary or

3 | Page

CONFIDENTIAL

FER_CAP000297

appropriate or that Secured Party may reasonably request in order (i) to perfect and protect the security interest created or purported to be created hereby and the first priority of such security interest, (ii) to enable Secured Party to exercise and enforce its rights and remedies hereunder in respect of the Collateral, and (iii) to otherwise effect the purposes of this Agreement.

7. **Negative Covenants.** Debtor will comply with the covenants contained in this Section at all times during the period of time this Agreement is effective, unless Secured Party shall otherwise consent in writing.

    a)    Transfer or Encumbrance. Debtor will not (i) sell, assign (by operation of law or otherwise) or transfer Debtor's rights in any of the Collateral, or (ii) grant a lien or security interest in or execute, authorize, file or record any financing statement or other security instrument with respect to the Collateral to any party other than Secured-Party except as allowed pursuant to the Loan Agreement.

    b)    Impairment of Security Interest. Debtor will not take or fail to take any action which would in any manner impair the value or enforceability of Secured Party's security interest in any Collateral.

8. **Rights of Secured Party.** Secured Party shall have the rights contained in this Section at all times during the period of time this Agreement is effective.

    a)    Power of Attorney. Debtor hereby irrevocably appoints Secured Party as Debtor's attorney-in-fact, such power of attorney being coupled with an interest, with full authority in the place and stead of Debtor and in the name of Debtor or otherwise, to take any action and to execute any instrument which Secured Party may from time to time in Secured Party's discretion deem necessary or appropriate to accomplish the purposes of this Agreement.

    b)    Performance by Secured Party. If Debtor fails to perform any agreement or obligation provided herein, Secured Party may itself perform, or cause performance of, such agreement or obligation, and the expenses of Secured Party incurred in connection therewith shall be a part of the Indebtedness, secured by the Collateral and payable by Debtor on demand.

Notwithstanding any other provision herein to the contrary, Secured Party does not have any duty to exercise or continue to exercise any of the foregoing rights and shall not be responsible for any failure to do so or for any delay in doing so.

9. **Events of Default.** Each of the following constitutes an "Event of Default" under this Agreement:

    a)    Default in Payment. The failure, refusal or neglect of Debtor to make any payment on the Indebtedness, or any portion thereof, as the same shall become due and payable; or

4 | P a g e

CONFIDENTIAL

FER_CAP000298

b) Non-Performance of Covenants. The failure of Debtor or any Obligated Party to timely and properly observe, keep or perform any covenant, agreement, warranty or condition required herein or in any of the other Loan Documents; or

c) Default Under other Loan Documents. The occurrence of a default or "Event of Default" under any of the other Loan Documents; or

d) False Representation. Any representation contained herein or in any of the other Loan Documents made by Debtor or any Obligated Party is false or misleading in any material respect; or

e) Debtor's Bankruptcy or Insolvency. If Debtor or any Obligated Party: (i) makes a transfer in fraud of creditors, or makes an assignment for the benefit of creditors, or admits in writing its inability to pay its debts as they become due; (ii) generally is not paying its debts as such debts become due; (iii) has a receiver, trustee or custodian appointed for, or take possession of, all or substantially all of the assets of such party or any of the Collateral, either in a proceeding brought by such party or in a proceeding brought against such party and such appointment is not discharged or such possession is not terminated within sixty (60) days after the effective date thereof or such party consents to or acquiesces in such appointment or possession; (iv) files a petition for relief under the United States Secured Bankruptcy Code or any other present or future federal or state insolvency, bankruptcy or similar laws (all of the foregoing hereinafter collectively called "Applicable Secured Bankruptcy") or an involuntary petition for relief is filed against such party under any Applicable Secured Bankruptcy Law and such involuntary petition is not dismissed within sixty (60) days after the filing thereof, or an order for relief naming such party is entered under any Applicable Secured Bankruptcy Law, or any composition, rearrangement, extension, reorganization or other relief of debtors now or hereafter existing is requested or consented to by such party; (v) fails to have discharged within a period of sixty (60) days any attachment, sequestration or similar writ levied upon any property of such party; or (vi) fails to pay within thirty (30) days any final money judgment against such party; or

f) Execution on Collateral. The Collateral or any portion thereof is taken on execution or other process of law in any action against Debtor; or

g) Abandonment. Debtor abandons the Collateral or any portion thereof; or

h) Liquidation, Death and Related Events. If Debtor or any Obligated Party is an entity, the liquidation, dissolution, merger or consolidation of any such entity or, if Debtor or any Obligated Party is an individual, the death or legal incapacity of any such individual.

10.    Remedies and Related Rights. If an Event of Default shall have occurred, and without limiting any other rights and remedies provided herein, under any of the other

5 | P a g e

FER_CAP000299

Loan Documents or otherwise available to Secured Party, Secured Party may exercise one or more of the rights and remedies provided in this Section.

a) Remedies. Secured Party may from time to time at its discretion, without limitation and without notice except as expressly provided in any of the Loan Documents:

    i. exercise in respect of the Collateral all the rights and remedies of a secured party under the Code (whether or not the Code applies to the affected Collateral);

    ii. reduce its claim to judgment or foreclose or otherwise enforce, in whole or in part, the security interest granted hereunder by any available judicial procedure;

    iii. sell or otherwise dispose of, at its office, on the premises of Debtor or elsewhere, the Collateral, as a unit or in parcels, by public or private proceedings, and by way of one or more contracts (it being agreed that the sale or other disposition of any part of the Collateral shall not exhaust Secured Party's power of sale, but sales or other dispositions may be made from time to time until all of the Collateral has been sold or disposed of or until the Indebtedness has been paid and performed in full), and at any such sale or other disposition it shall not be necessary to exhibit any of the Collateral;

    iv. collect on the accounts and debts that constitute the Collateral and apply amounts received to the Indebtedness;

    v. buy the Collateral, or any portion thereof, at any public sale, or buy the Collateral, or any portion thereof, at any private sale if the Collateral is of a type customarily sold in a recognized market or is of a type which is the subject of widely distributed standard price quotations;

    vi. apply for the appointment of a receiver for the Collateral, and Debtor hereby consents to any such appointment; and

    vii. at its option, retain the Collateral in satisfaction of the Indebtedness whenever the circumstances are such that Secured Party is entitled to do so under the Code or otherwise, to the full extent permitted by the Code, Secured Party shall be permitted to elect whether such retention shall be in full or partial satisfaction of the Indebtedness.

In the event Secured Party shall elect to sell the Collateral on credit, Debtor will be credited only with payments actually made by the purchaser, received by Secured Party and applied to the Indebtedness. In the event the purchaser fails to pay for the Collateral, Secured

6 | P a g e

FER_CAP000300

Party may resell the Collateral and Debtor shall be credited with the proceeds of the sale. Debtor agrees that in the event Debtor or any Debtor is entitled to receive any notice under the Code, as it exists in the state governing any such notice, of the sale or other disposition of any Collateral, reasonable notice shall be deemed given when such notice is deposited in a depository receptacle under the care and custody of the United States Postal Service, postage prepaid, at such party's address set forth on the first page hereof, ten (10) days prior to the date of any public sale, or after which a private sale, of any of such Collateral is to be held. Secured Party shall not be obligated to make any sale of Collateral regardless of notice of sale having been given. Secured Party may adjourn any public or private sale from time to time by announcement at the time and place fixed therefore, and such sale may, without further notice, be made at the time and place to which it was so adjourned.

b) Application of Proceeds. If any Event of Default shall have occurred, Secured Party may at its discretion apply or use any cash held by Secured Party as Collateral, and any cash proceeds received by Secured Party in respect of any sale or other disposition of, collection from, or other realization upon, all or any part of the Collateral as follows in such order and manner as Secured Party may elect:

i. to the repayment or reimbursement of the reasonable costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) incurred by Secured Party in connection with (A) the administration of the Loan Documents, (B) the custody, preservation, use or operation of, or the sale of, collection from, or other realization upon, the Collateral, and (C) the exercise or enforcement of any of the rights and remedies of Secured Party hereunder;

ii. to the satisfaction of the Indebtedness;

iii. to the payment of any other amounts required by applicable law; and

iv. by delivery to Debtor or any other party lawfully entitled to receive such cash or proceeds whether by direction of a court of competent jurisdiction or otherwise.

c) Non-Judicial Remedies. In granting to Secured Party the power to enforce its rights hereunder without prior judicial process or judicial hearing, Debtor expressly waives, renounces and knowingly relinquishes any legal right which might otherwise require Secured Party to enforce its rights by judicial process. Debtor recognizes and concedes that non judicial remedies are consistent with the usage of trade, are responsive to commercial necessity and are the result of a bargain at arm's length. Nothing herein is intended to prevent Secured Party or Debtor from resorting to judicial process at either party's option.

11. Miscellaneous.

7 | P a g e

CONFIDENTIAL

FER_CAP000301

a) Entire Agreement. This Agreement and the Loan Documents contain the entire agreement of Secured Party and Debtor with respect to the Collateral.

b) Amendment. No modification, consent or amendment of any provision of this Agreement or any of the other Loan Documents shall be valid or effective unless the same is in writing and authenticated by the party against whom it is sought to be enforced.

c) Actions by Secured Party. The lien, security interest and other security rights of Secured Party hereunder shall not be impaired by (i) any renewal, extension, increase or modification with respect to the Indebtedness, (ii) any surrender, compromise, release, renewal, extension, exchange, or substitution which Secured Party may grant with respect to the Collateral, or (iii) any release or indulgence granted to any endorser, guarantor or surety of the Indebtedness. The taking of additional security by Secured Party shall not release or impair the lien, security interest or other security rights of Secured Party hereunder or affect the obligations of Debtor hereunder.

d) Waiver by Secured Party. Secured Party may waive any Event of Default without waiving any other prior or subsequent Event of Default. Secured Party may remedy any default without waiving the Event of Default remedied.

e) GOVERNING LAW. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS WITHOUT REGARD TO THE CONFLICTOF LAWS PRINCIPLES OF THEREIN AND APPLICABLE FEDERAL LAWS, EXCEPT TO THE EXTENT PERFECTION AND THE EFFECT OF PERFECTION OR NON-PERFECTION OF THE SECURITY INTEREST GRANTED HEREUNDER, IN RESPECT OF ANY PARTICULAR COLLATERAL, ARE GOVERNED BY THE LAWS OF A JURISDICTION OTHER THAN THE STATE OF TEXAS.

f) Venue. This Agreement has been entered into in Travis County, Texas where Secured Party's address for notice purposes is located, and it shall be performable for all purposes in such county. **Federal or State Courts within Travis County, State of Texas shall have jurisdiction over any and all disputes arising under or pertaining to this Agreement and venue for any such disputes shall be in the same county or judicial district as aforesaid. THE PARTIES WAIVE THEIR RIGHT TO A TRIAL BY JURY AND THE RIGHT TO ASSERT THE DEFENSE OF INCONVENIENCE OF FORUM OR VENUE.**

g) Severability. If any provision of any of the Loan Documents is held to be illegal, invalid, or unenforceable under present or future Laws effective during the term thereof, such provision shall be fully severable, the

8 | P a g e

FER_CAP000302

appropriate Loan Document shall be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part thereof; and the remaining provisions thereof shall remain in full force and effect and shall not be effected by the illegal, invalid, or unenforceable provision or by its severance therefrom. Furthermore, in lieu of such illegal, invalid, or unenforceable provision, there shall be added automatically as a part of such Loan Document a provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible and be legal, valid, and enforceable.

h) No Obligation. Nothing contained herein shall be construed as an obligation on the part of Secured Party to extend or continue to extend credit to Debtor.

i) Notices. All notices, requests, demands or other communications required or permitted to be given pursuant to this Agreement shall be in writing and given by (i) personal delivery, (ii) expedited delivery service with proof of delivery, or (iii) United States certified mail, postage prepaid, registered or certified mail, return receipt requested, sent to the intended addressee at the address set forth on the first page hereof or to such different address as the addressee shall have designated by written notice sent pursuant to the terms hereof and shall be deemed to have been received either, in the case of personal delivery, at the time of personal delivery, in the case of expedited delivery service, as of the date of first attempted delivery at the address and in the manner provided herein, or in the case of mail, three days after deposit in a depository receptacle under the care and custody of the United States Postal Service. Either party shall have the right to change its address for notice hereunder to any other location within the continental United States by notice to the other party of such new address at least thirty (30) days prior to the effective date of such new address.

j) Binding Effect and Assignment. This Agreement (i) creates a continuing security interest in the Collateral, (ii) shall be binding on Debtor and the heirs, executors, administrators, personal representatives, successors and assigns of Debtor, and (iii) shall inure to the benefit of Secured Party and its successors and assigns.

k) Termination. Upon (i) the satisfaction in full of the Indebtedness, (ii) the termination or expiration of any commitment of Secured Party to extend credit to Debtor, (iii) written request for the termination hereof delivered by Debtor to Secured Party, and (iv) written release delivered by Secured Party to Debtor, this Agreement and the security interests created hereby shall terminate. Upon termination of this Agreement and Debtor's written request, Secured Party will, at Debtor's sole cost and expense, return to Debtor such of the Collateral as shall not have been sold or otherwise disposed of or applied pursuant to the terms hereof and execute

9 | Page

CONFIDENTIAL

FER_CAP000303

and deliver to Debtor such documents as Debtor shall reasonably request to evidence such termination.

l) Cumulative Rights. All rights and remedies of Secured Party hereunder are cumulative of each other and of every other right or remedy which Secured Party may otherwise have at law or in equity or under any of the other Loan Documents, and the exercise of one or more of such rights or remedies shall not prejudice or impair the concurrent or subsequent exercise of any other rights or remedies. Further, except as specifically noted as a waiver herein, no provision of this Agreement is intended by the parties to this Agreement to waive any rights, benefits or protection afforded to Secured Party under the Code. Unless explicitly stated otherwise elsewhere in this Agreement or the Loan Documents, no Person other than the Parties themselves has any rights or remedies under this agreement.

m) Gender and Number. Within this Agreement, words of any gender shall be held and construed to include the other gender, and words in the singular number shall be held and construed to include the plural and words in the plural number shall be held and construed to include the singular, unless in each instance the context requires otherwise.

n) Descriptive Headings. The headings in this agreement are for convenience only and shall in no way enlarge, limit or define the scope or meaning of the various and several provisions hereof.

12. Financing Statement Filings. Debtor recognizes that financing statements pertaining to the Collateral have been or may be filed in one or more of the following jurisdictions: the location of Debtor's state of incorporation or organization, the location of Debtor's place of business, the location of Debtor's chief executive office, or other such place as the Debtor may be "located" under the provisions of the Code. Without limitation of any other covenant herein, Debtor will neither cause or permit any change in the location of (i) any Collateral, (ii) any records concerning any Collateral, or (iii) Debtor's principal residence, the location of Debtor's place of business, or the location of Debtor's chief executive office, as the case may be, to a jurisdiction other than as represented in Subsection 4(f), nor will Debtor change its name or the Organizational Information as represented in Subsection 4(f), unless Debtor shall have notified Secured Party in writing of such change at least thirty (30) days prior to the effective date of such change, and shall have first taken all action required by Secured Party for the purpose of further perfecting or protecting the security interest in favor of Secured Party in the Collateral. In any written notice furnished pursuant to this Subsection, Debtor will expressly state that the notice is required by this Agreement and contains facts that may require additional filings of financing statements, amendments, or other notices for the purpose of continuing perfection of Secured Party's security interest in the Collateral.

10 | P a g e

CONFIDENTIAL

Without limiting Secured Party's rights hereunder, Debtor authorizes Secured Party to file financing statements, amendments, or termination statements thereto under the provisions of the Code as amended from time to time.

IN WITNESS WHEREOF, Debtor and Secured Party, intending to be legally bound hereby, have duly executed this Agreement in one or more counterparts, each of which shall be deemed to be an original.

EXECUTED effective as of the date first written above.


DEBTOR:

Collins Asset Group, LLC

By:_____

Name and Title: Michael Crossan, Authorized Signatory for Hollins Holdings, LLC, Managing and Sole Member of Collins Asset Group, LLC


SECURED PARTY:

Ferrum Capital, LLC

By:_____

Name and Title: JOSHUA L. ALLEN, Manager


11 | P a g e

CONFIDENTIAL

FER_CAP000305

## EXHIBIT A

## COLLATERAL DESCRIPTION

Collateral for _____ regarding Collins Asset Group, LLC  for  the various loans listed on Exhibit 1, attached hereto and incorporated herein by reference as if fully rewritten Accounts Receivable identified in the Books and Records on _____ of the Debtor, Collins Asset Group, LLC as follows:

12 | P a g e

CONFIDENTIAL

FER_CAP000306

EXHIBIT 1

Date Of Loan          Amount of Loan

13 | P a g e

CONFIDENTIAL

FER_CAP000307

14 | P a g e

CONFIDENTIAL

FER_CAP000308

# EXHIBIT 4

Page 1

CAUSE NO. 2023CI22575

JUDY A. MUSGROVE, individually ) IN THE DISTRICT COURT
and as beneficiary of the       )
Mainstar Trust, Cust. FBO Judy  )
A. Musgrove IRA, et al.,        )
                                )
Plaintiffs,                     )
                                )
v.                              ) 438TH JUDICIAL DISTRICT
                                )
BROOKLYN CHANDLER WILLY,        )
et al.,                         )
                                )
Defendants.                     ) BEXAR COUNTY, TEXAS

ORAL VIDEOTAPED DEPOSITION OF

WALTER A. COLLINS

APRIL 24, 2025

        ORAL VIDEOTAPED DEPOSITION OF WALTER A.
COLLINS, produced as a witness at the instance of the
Court Appointed Receiver and duly sworn, was taken in
the above-styled and numbered cause on April 24, 2025,
from 9:59 a.m. to 5:10 p.m., before Autumn J. Cheek,
Certified Shorthand Reporter in and for the State of
Texas, reported by computerized stenotype machine at the
Omni Barton Creek Resort, Fazio Conference Room, 8212
Barton Club Drive, Austin, Texas 78735, pursuant to the
Texas Rules of Civil Procedure and the provisions stated
on the record or attached hereto.

Page 2

A P P E A R A N C E S

FOR PLAINTIFFS:
    Mr. Byron L. LeFlore, Jr.
    Mr. Randall A. Pulman (via videoconference)
    Ms. Shari Pulman (via videoconference)
    PULMAN LEFLORE PULLEN & REED LLP
    2161 NW Military Highway
    Suite 400
    San Antonio, Texas 78213
    Phone: 210.222.9494
    Email: bleflore@pulmanlaw.com
FOR COURT APPOINTED RECEIVER:
    Mr. Royal B. Lea, III
    ROYAL LEA LAW OFFICE, PLLC
    319 Maverick Street
    San Antonio, Texas 78212
    Phone: 210.862.2847
    Email: royal@royallealaw.com

FOR COLLINS ASSET GROUP, LLC, ET AL.:

    Mr. Patrick Watts (via videoconference)
    MARTIN GOLDEN LYONS WATTS MORGAN
    1200 S. Big Ben Boulevard
    St. Louis, Missouri 63117
    Phone: 214.346.2630
    Email: pwatts@mgl.law
FOR WALTER COLLINS:
    Mr. Jonathan Robbin
    J. Robbin Law
    200 Business Park Drive
    Suite 103
    Armonk, New York 10504
    Phone: 914.685.5016
    Email: jonathan.robbin@jrobbinlaw.com

Page 3

A P P E A R A N C E S (Cont'd)

FOR JOSHUA ALLEN:
    Mr. Joshua Dean Frost (via videoconference)
    FIELD MANNING STONE AYCOCK, P.C.
    2112 Indiana Avenue
    Lubbock, Texas 79410
    Phone: 806.796.4000
    Fax:  806.792.9148
    Email: jfrost@lubbocklawfirm.com

ALSO PRESENT IN PERSON:
    Mr. Robert Brill, Videographer

ALSO PRESENT AS LISTED SCREEN NAME VIA VIDEOCONFERENCE:

Tammy Owrey

Kendall Stanaland

Nancy Burnett

Holly Boyd

Paul and Wanda Sheetz

Brent Couch

Tommy York (2)

Art and Laurie Del Negro

Gayle Reese

Alvin and Sharon Zigmond

Cody York

Debra's iPhone

Dan's iPhone 13

Page 4

A P P E A R A N C E S (Cont'd)

ALSO PRESENT AS LISTED SCREEN NAME VIA VIDEOCONFERENCE:

Edward's iPad

Yandee@msn.com

Nicolas

Norm

Nita

Bob

Brook's Notetaker (Otter.ai)

BW

JCR

**Page 5**

INDEX

|  | PAGE |
|---|---|
| APPEARANCES | 2 |
| WALTER A. COLLINS | |
| Examination by Mr. Lea | 9 |
| Examination by Mr. Leflore | 125 |
| CHANGES AND SIGNATURE | 258 |
| COURT REPORTER'S CERTIFICATE | 260 |
| FURTHER CERTIFICATION | 264 |

COLLINS EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Notice of Deposition by Email | 11 |
| Exhibit 2 | Email Chain Regarding Agenda - Ferrum Capital, LLC - April 17 - 18, 2019 with Attachment | 11 |
| Exhibit 3 | Ferrum Capital, LLC Commercial Loan Illustration (FER CAP006089 - 006092) | 46 |
| Exhibit 4 | Email Regarding Memorandum of Understanding (CAG-Oliphant 016510) | 52 |
| Exhibit 5 | Email Chain Regarding Walt Collins - Collins Asset Group - Sill & Associates, LLC - Purchased Assets Pools & Fees (CAG-Oliphant 000602) | 54 |

**Page 6**

COLLINS EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 6 | Email (CE 0126) | 58 |
| Exhibit 7 | Ferrum Spreadsheet 2023 | 61 |
| Exhibit 8 | Oliphant United LLC Investment Opportunity (CAG-Oliphant 017079) | 73 |
| Exhibit 9 | Due Diligence Report Prepared for Victory Park Capital | 79 |
| Exhibit 10 | Email Chain Regarding Note/Terms Summary Sheet with Attachment (CE 00065) | 86 |
| Exhibit 11 | Email Regarding Ferrum Brochure (CE 00115 - 116) | 115 |
| Exhibit 12 | Email Chain Regarding Ferrum Marketing Piece (CE 00068) | 117 |
| Exhibit 13 | Promissory Note (FER CAP016874 - 16879) | 121 |
| Exhibit 14 | Liquidation Forecast (CE 00757) | 135 |
| Exhibit 15 | Cash Flow Model (CE 00757) | 142 |
| Exhibit 16 | Payment Details (CAG-Oliphant 0005537) | 152 |
| Exhibit 17 | Email Chain Regarding Flyer Full With Attachment | 187 |

**Page 7**

COLLINS EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 18 | Email Chain Regarding Responses (CAG 608) | 192 |
| Exhibit 19 | Collins Asset Group, LLC OF Notes Receivable Allocation (CAG-Oliphant 013629) | 205 |
| Exhibit 20 | Servicing Agreement (OEO401) | 209 |
| Exhibit 21 | Email Chain Regarding Diversified and Sonoqui UCC Lien Terminations (CAG-Oliphant 000539) | 222 |
| Exhibit 22 | Collins Outstanding Assets Sheet (CAG-Oliphant 001038) | 225 |
| Exhibit 23 | Oliphant United/CAG/OLF Notes by Portfolio (Oliphant 011745) | 229 |
| Exhibit 24 | Collins Asset Group Ferrum Portfolio 4859-4192-1998 V2 | 239 |

**Page 8**

THE VIDEOGRAPHER: We are on the record on April 24th, 2025 at 9:59 a.m.

Counsel, please state your name, location, and firm affiliation for the record, please.

MR. LEA: Royal Lea representing Pat Lowe, the receiver, from Royal Lea Law Office.

MR. LEFLORE: I don't think I've got a separate, do I? Do I have a separate microphone?

THE VIDEOGRAPHER: Unfortunately, no. Well, I can take the one --

MR. LEFLORE: No, that's okay. Byron LeFlore from Pulman LeFlore Pullen & Reed representing various plaintiffs in the case. San Antonio.

MR. ROBBIN: Jonathan Robbin, J. Robbin Law, representing Mr. Collins.

Anyone online maybe, you could start now.

MR. FROST: Yeah. Josh Frost on behalf of Joshua Allen. I'm appearing remotely in Lubbock, Texas.

MR. PULMAN: Randy Pulman here representing the plaintiffs. I don't expect to participate, but I'm here online.

THE REPORTER: If that's it, I'll swear the witness.

MS. PULMAN: Shari Pulman representing

Page 9

plaintiffs.

MR. ROBBIN: I think that's all.

MR. FROST: Is Patrick Watts on?

MR. ROBBIN: He will be joining, I know that, but I do not see him on yet.

I guess when you see him join on the Zoom, Randy or Josh, if you could just maybe at a logical time tell him to enter an appearance as well.

MR. FROST: Okay.

WALTER A. COLLINS, having been first duly sworn, testified as follows:

EXAMINATION

BY MR. LEA:

Q   Good morning, Mr. Collins.

A   Good morning, Mr. Lea.

Q   My name is Royal Lea. You and I met for the first time just a few minutes ago, didn't we?

A   Yes.

Q   You understand, Mr. Collins, that we're here today for your deposition?

A   Yes.

Q   You understand that I and some of the other lawyers will be asking you questions?

A   Yes.

Q   You understand that you're under oath and sworn

Page 10

to tell the truth?

A   Yes.

Q   If I ask you something, Mr. Collins, and you don't hear me because my voice has softened, will you tell me so that I can say it again until you do hear me?

A   You're loud and clear at this time.

Q   If I ask you something and it just doesn't make any sense to you because what I said was stupid, will you tell me so that I can try to ask you a better question?

A   Absolutely.

Q   While I'm asking you questions, Mr. Collins, if you want to take a break for any reason, please just tell us and we will.

A   Yeah. I have some health issues that could kick in. I would need a break, but --

Q   Whenever you want a break --

A   -- I'm hoping not.

Q   -- just tell me.

All right. Mr. Collins, your full name is Walt Collins?

A   Walter Anthony.

Q   Okay. And you go by Walt?

A   Yes.

Q   And you know that the circumstances in this

Page 11

case involve a company with the name Collins Asset Group?

A   I do.

Q   Is that company named for you?

A   Yes.

Q   Okay. Mr. Collins, I put a couple of pieces of paper in front of you there, and you'll notice they have little blue stickers on them. One of them says Exhibit 1 and the second one says Exhibit 2.

(Exhibit Number 1 marked)

Q   (BY MR. LEA) I want to ask you just a couple of questions about Exhibit 1.

Let's begin with: Have you seen that email before, Exhibit 1?

MR. WATTS: Royal, before you proceed -- this is Patrick Watts on behalf of Collins Asset Group and other defendants -- I will be objecting to any deposition exhibits presented to the witness that I'm not presented access to during this remote deposition.

Certainly, obviously, you can proceed, but I won't have the opportunity to review the exhibits or cross-examine the witness, so I'm just getting my objection on the record.

To the extent I can be presented with the exhibits in some manner including using the share screen

Page 12

function, I would be happy to withdraw that objection, but at this moment, I have no access to the exhibits and object to the testimony.

MR. LEA: Patrick, was that an objection to the form of the question?

MR. WATTS: It was an objection to the entirety of the testimony.

MR. LEA: So, Patrick, I'm going to ask you to limit your objections to the form of the questions in the way that Rule 199 requires you to do.

MR. WATTS: Okay. I'll object to form, and I'll request a copy of the exhibit as we sit here.

MR. LEA: All right.

Q   (BY MR. LEA) Mr. Collins, you can proceed.

Have you seen Deposition Exhibit 1 before?

A   This one, no.

Q   Okay. Exhibit 1, Mr. Collins, is an email that I sent to many of the lawyers in this case on March 14th scheduling your deposition for today.

A   Oh, okay.

Q   You knew that your deposition was scheduled for today, didn't you?

A   Yes.

Q   Okay. Did you do anything to prepare for your deposition today?

Page 49

borrower?

A   Yes, I see it.

Q   I'm wondering how the loans that Ferrum took in from its investors could have happened without Collins Asset Group?  Can you explain that?

A   If you're saying they designed a program for Collins, could they design a program for another lender?  It's possible.  I'm not -- I don't really get what you're going -- with what you're trying to get to.

Q   I hear you.  Let me see if I can do a better job.

For the Collins -- I'm sorry.  Let me start over.

For the Ferrum Capital program or line of business that involved Ferrum Capital taking in money from investors, bundling the money up and loaning it to Collins, for that program, if you took Collins out of the equation, then that program wouldn't have worked, would it?

MR. ROBBIN:  Objection as to form.

MR. WATTS:  Objection; form.

A   There are other wonderful firms in my industry.  One of them is sister Oliphant that I've got great respect for.

Yeah, they could have done their program

Page 50

through anybody they wanted to.

Q   (BY MR. LEA)  I appreciate you telling me that.  That's not what I meant to ask you.

A   I'm not -- forgive me, then.

Q   Yeah.  For the program that was tailored to Collins Asset Group, if you took Collins Asset Group out of that picture, then a program -- that program wouldn't have worked?  It would have stopped, wouldn't it?

A   Yes, but it wouldn't have ended that opportunity if they wanted to go pursue it.

Q   All right.  I appreciate you telling me that.

I'm not asking you about any other opportunities other than the business that Ferrum Capital had with Collins Asset Group.

If Collins Asset Group had decided not to do business with Ferrum Capital, then the Ferrum Capital loans from investors for business with Collins Asset Group would not have happened, would it?

A   That's right.

Q   All right.  And at Collins Asset Group in the time period between 2017 and 2021, if someone at Collins Asset Group had decided, you know what, we're not doing business with Ferrum Capital any longer, that person would have been you.  Right?

A   No.  It would be a collective.  I had partners.

Page 51

Q   All right.  Who was the senior spokesperson and decider for Collins Asset Group in the period between 2017 and the fall of 2021?

A   I had a partner -- as I have two partners in Oliphant -- and it would be partners' decision with general counsel and teams sitting there.

Q   I want you to tell me, Mr. Collins, what you think would have happened if at any point in 2017 to '21 -- 2021, you had said, you know what, Collins Asset Group, the company with my name on it, is not doing any more business with Ferrum Capital.  What do you think would have happened?

MR. ROBBIN:  Objection as to form.

MR. WATTS:  Objection as to form.

A   That would mean we were abandoning in the middle of doing business, and we would never, never do that -- or find a premier peer in the industry to take that business on.

Q   (BY MR. LEA)  So suppose you didn't abandon it; you just said we're not taking any more loans in from Ferrum Capital, what would have happened?

MR. ROBBIN:  Objection as to form.

Q   (BY MR. LEA)  If you personally, Walt Collins, had said:  I'm not comfortable with Ferrum Capital.  I want us to stop taking in new money from Ferrum Capital,

Page 52

did you have the discretion and the control within Ferrum Capital --

A   I would not -- not individually, no.

Q   If you had said that, what do you think would have happened?

MR. ROBBIN:  Objection as to form.

MR. WATTS:  Objection; form.

A   We would have worked through that portfolio to return their P&I.

Q   (BY MR. LEA)  Okay.  If you had said from the beginning:  I, Walt Collins, don't want to do this business with Ferrum Capital.  I'm not comfortable with it in 2017 at the very beginning, what do you think would have happened?

MR. ROBBIN:  Objection as to form.

MR. WATTS:  Objection as to form.

A   Could I have talked the team into that?  Perhaps.

THE WITNESS:  That's good coffee.

MR. ROBBIN:  I got it.

Q   (BY MR. LEA)  Mr. Collins, I handed you what I marked as Exhibit 4 to your deposition.

(Exhibit Number 4 marked)

Q   (BY MR. LEA)  It was also Exhibit 6 to the deposition of Jack Davis, and it's tagged

Page 53

Oliphant 016510.

It's an email from you to Josh Allen and Mike Cox on October 26th of 2017, isn't it?

A   Yes.

Q   Did you send that email to Allen and Cox that day?

A   I obviously did.

Q   Why?

A   This was the understanding of how we were going exercise what they wanted from a strategy standpoint to protect their clients.

Q   Okay.  This is at about the time the business between Ferrum Capital and Collins Asset Group is beginning?

A   '17 is probably -- I don't know for sure, but yes, it should be.

Q   All right.  There's a -- in the first part of the second paragraph, do you see where it says "regarding CAG fees"?

A   Uh-huh.

Q   (As read) CAG fees will not exceed 50 percent of the gross recovered revenue?

A   That's correct.

Q   Tell me what that means.

A   That means collect $1,000, we can't take more

Page 54

than $500.

Q   And was that the deal that you had with Ferrum Capital?

A   Yes.

Q   Was that the deal from the beginning in 2017 through the time when you left Collins Asset Group?

A   Absolutely.

Q   All right.  Look with me, if you would now, Mr. Collins, at what I've marked as Deposition Exhibit 5, which is a copy of CAG-Oliphant 000602.

(Exhibit Number 5 marked)

MR. LEA:  Patrick, it's an email chain starting at the top with an email from the Sharon Larrabee.

MR. ROBBIN:  Can you repeat those numbers? Because I don't have them.

MR. LEA:  Yeah.  CAG-Oliphant 000602.

MR. ROBBIN:  Thank you.

MR. WATTS:  And just for the record, I'm not being presented a copy of the exhibit for review at this time.

Q   (BY MR. LEA) Mr. Collins, I'm going to ask you a few questions about Exhibit 5, which is an email chain, isn't it?

A   Yes.

Page 55

Q   And like a lot of email chains, it actually begins at the back and works forward, doesn't it?

A   Sure.

Q   I want to begin with the email at the back end of the chain from Sharon Larrabee to AW Smith on October 26 of 2017.

And I want to begin, Mr. Collins, by asking you to tell us who Sharon Larrabee was at the time.

A   Sharon Larrabee was a secretary, an assistant to management.

Q   At your company, Collins Asset Group?

A   Yes.

Q   All right.  Now, you can take as long as you want, Mr. Collins, to compare them.  I suggest to you that the substance of the email you sent Allen and Cox on the same day, October 26th of 2017 in Exhibit 4, is identical to the substance in this email that's at the back of the email chain in Exhibit 5.

Would you take a moment and confirm that for me.

A   Now, what you're looking for is the fees?

Q   The guts of the email between the email at the back of Exhibit 5 to AW Smith and the email that's in Exhibit 4 to Allen and Cox, they're identical, aren't

Page 56

they?

A   Yeah.

MR. WATTS:  And for the record, I still don't have a copy of the exhibit for review.

A   No.  This is a -- this was standard fees unless there was some esoteric asset class.  Yeah.

Q   (BY MR. LEA) Okay.  So how did Sharon Larrabee get the guts of the email in Exhibit 5 to send to AW Smith on the same day that you sent your email to Allen and Cox at Ferrum Capital?

A   How did she get the guts?  She's quite aware of what's going on.  She worked directly with the general counsel as well.

I'm not understanding the point.

Q   I guess what I'm wondering is, is:  The substance or the guts of the two emails was the same, and so you or some other senior person at Collins Asset Group probably instructed Sharon Larrabee to send that standard set of terms to AW Smith, don't you think?

A   Yes.  Absolutely.

Q   All right.  And did I correctly understand you to tell me a moment ago that the terms on all of these programs, unless there was something esoterically different, was the same?  It was that same 50 percent deal, wasn't it?

Walter A. Collins

Pages 57..60

Page 57

A   Yes.

Q   All right.  Did Allen and Cox agree to the 50 percent deal in your email that's Exhibit 4?

A   Well, and, remember, it's not just a 50 percent deal.  There's a schedule, and they have a schedule.  It could be 30, 35.  It could be 40.  It could be 50.  We tended -- we gravitated towards older paper, a couple years, so 50 percent would be -- there would be more of the 50s, but there was a schedule of the -- of the fees.

Q   It could be lower than the 50.  It could go down to about 30.  Right?

A   Right.

Q   But my question, what I'm really wondering is:  Did Allen and Cox agree to that schedule?

A   Oh, sure.

Q   In fact, if we look -- if we work forward in Exhibit 5, we can see their agreement.  Right?

A   Yeah.

Q   Because in the middle on the back of the second page, we see that on November 13th Sharon Larrabee emailed you with an email that refers to pools and fees.  Right?

A   Yeah.  This is just codifying what we had all agreed upon.

Q   And Allen and Cox agreed in writing in their

Page 58

email that's at the bottom of the first page of Exhibit 5 and the top of the second page of Exhibit 5, didn't they?

A   Please forgive me.  What's -- signatures?

Q   They agreed.  They emailed back saying they agreed.

A   Got it.

Q   Didn't they?

A   Yes.

Q   Thank you.

Did -- as far as you know, did Josh Allen and Mike Cox know Brooklynn Willy before you introduced Brooklynn Willy to them?

A   Yeah, that's my -- yes.

Q   Okay.

A   That's my understanding.

Q   Mr. Cox -- Exhibit 6 is an email that you sent Allen and Cox on January 3rd of 2018.

(Exhibit Number 6 marked)

MR. ROBBIN:  Thank you.

Q   (BY MR. LEA)  It's from the Cox --

A   Yeah.  I've seen it.  I've seen it.

Q   Yeah, let me interrupt.  I apologize.  I need to let the other lawyers know what we're doing.

A   Forgive me.

Page 59

Q   This one is labeled -- it's from the Collins-Oliphant document production, and it's labeled CE0126.

And it is an email that you sent Allen and Cox --

A   Yes.

Q   -- on January 3rd of 2018, isn't it?

A   Right.

Q   Tell me, if you remember, what led to this email.

MR. WATTS:  And for the record, I don't have that -- for the record, I don't have access to the document presented to the witness.

Q   (BY MR. LEA)  Go ahead.  You can answer.

A   Either Josh Allen or Mike Cox alerted me that they had a very -- very good possible agent that they could bring into their fold, and that was Brooklynn.

Q   Okay.

A   And so Brooklynn did her due diligence, and they wanted my opinion.  And we all found Brooklynn to be a stellar person, a very bright lady and, if I'm recalling right, an attorney, and she had a very large customer -- client base.

And that was my, hey, this is -- yeah, we see nothing wrong with this lady.

Page 60

Q   So on both sides, you knew her and they knew her, and they were just asking you for your input on whether or not they ought to bring her in?

A   Yes.

Q   All right.

MR. WATTS:  Royal, will you repeat that Bates stamp number one more time?

MR. LEA:  Yeah, it's CE0126.

Q   (BY MR. LEA)  Mr. Collins, in the roughly four years between 2017 when your company's business with Ferrum Capital started through the fall of 2021 when you stepped away from the business, was the Collins Asset Group share of collections on the collateral ever 65 percent?

A   Across the board?

Q   Yes, sir.

A   No.  No.

Q   Was it ever 65 percent on anything?

A   There would be one item that -- in documents that I've gotten, I see the 65 percent.  That was an addendum so that we wouldn't have to call often.  We could just exercise.

This applied to out of statute-of-limitation accounts.  That requires a special -- a -- special legal documents in their

LEXITAS

Page 61

letters. It's a much more expensive collect. You cannot sue these people. They have to be treated with dignity and respect and known that they cannot be sued. It's a completely different collect.

And there are wonderful firms that do it right, do it legally, treat debtors the way they should be treated. And we would outsource at 65 percent, and that would be to squeeze the last possible revenue out of those assets.

Q   And of the total volume of the collateral for the Ferrum Capital loans, can you put a percentage on that?

A   It's minuscule.

Q   Minuscule. Thank you.

Mr. Collins, I've handed you a document that comes out of a document that's been filed in the Court's records of this case.

When the Court appointed the receiver, my client, Pat Lowe, the Court asked Ferrum Capital to provide information on its business, and this document, Exhibit 7, is something that Ferrum Capital provided to the Court.

(Exhibit Number 7 marked)

Q   (BY MR. LEA) But in a deposition in this case, Jack Davis of Collins Asset Group testified that he's

Page 62

the person who made this document.

A   Who is Jack Davis?

Q   I was going ask you: Do you know Jack Davis?

A   No.

Q   All right.

MR. WATTS: And I'm going to object as to form unless you're not finished.

MR. LEA: Your objection is on the record.

Q   (BY MR. LEA) Jack Davis was the chief financial officer of Collins Asset Group and some of the Oliphant companies for -- in a part of 2023 and 2024.

A   Oh, '22 --

Q   Yeah. After you -- after you had stepped away.

A   I have no idea.

Q   All right. Would you take a moment, Mr. Collins --

A   You scared me for a minute.

Q   No, no, no.

A   I thought I'm really losing it.

Q   No, I -- same thing happens to me. I hear you.

Take a moment and look at Exhibit 7 and particularly --

A   This is Exhibit 7?

Q   Yes, sir.

A   Well, I see.

Page 63

Q   I want to ask you -- I'm going to hold up my copy so you can see what I'm talking about.

You see this vertical line?

A   Yes.

MR. ROBBIN: Which?

MR. LEA: Right here. I want to ask him about the part that's like about five-eighths --

MR. ROBBIN: The box?

MR. LEA: The box, yeah. I don't really care about the stuff to the right. I care about the stuff to the left. I don't care if you show him.

MR. ROBBIN: The one right next to where it says "estimation fact"?

MR. LEA: Yeah, that stuff.

MR. ROBBIN: So this stuff next to it?

MR. LEA: Yeah.

MR. ROBBIN: Okay.

MR. LEA: Yeah.

MR. WATTS: And for the record, I don't have a copy of the exhibit presented to me.

A   What am I -- what am I doing?

Q   (BY MR. LEA) I'm going to try to describe it to you and ask you some questions about it.

A   Got you.

Q   So I get out of this, Mr. Collins, that on the

Page 64

collateral for the Ferrum Capital loans...

MR. ROBBIN: I have to object at this point. I don't think he -- I don't think the witness knows what he's looking at.

MR. LEA: I'm going to try to describe it to him.

MR. ROBBIN: I think you need to describe the document to him first as to what it is.

MR. LEA: Sure. Yeah. We can do that.

MR. WATTS: Yeah, and present it to the counsel of record.

MR. ROBBIN: Yeah, because I'm just -- I don't think he knows what he's looking at as he never made the document, you know, as you said --

MR. LEA: Yeah. Yeah.

Q   (BY MR. LEA) So -- so, Mr. Collins?

A   Yes.

Q   Exhibit 7 is a spreadsheet that the CFO of Collins Asset Group created in the fall of 2023 reporting on collections on the collateral for the Ferrum Capital loans. Okay?

A   Uh-huh.

MR. WATTS: I'm going to object to this testimony. If you're trying to use this at a trial, I'm going to object to the form of the testimony being

Page 65

provided subject to that.

MR. LEA: Patrick, do you have an objection to the form of the question? If you do, please tell me what the objection to the form of the question is.

MR. WATTS: You're testifying on the record to facts that are not in evidence. You're testifying about information that's not for this witness. You're testifying information that's disputed so --

MR. LEA: None of those are objections to the form, Patrick. Do you want to take a break and get in front of a judge real quick?

MR. WATTS: You just asked me to explain, so I gave you the courtesy.

MR. LEA: Those are not form objections. Be mindful, Patrick, of Rule 199.

Q    (BY MR. LEA) Mr. Collins --

MR. WATTS: Objection to form.

MR. LEA: Okay.

Q    (BY MR. LEA) Mr. Collins, I'm getting out of this kind of right in the middle of the page that in 2023 -- the fall of 2023, Collins reported that it had collected about $49,297,000 on the collateral for the loans from Ferrum Capital.

Page 66

Do you see that 49?

A    49,297-, yeah.

Q    And then I'm getting out of this that Collins Asset Group deducted 64.5 percent for its efforts, taking 31,796,000 out of the 49 million that had been collected?

MR. ROBBIN: Objection as to form.

But can you -- where do you see the -- oh, okay. So you're looking at -- now you're looking at the left of the document, not the right?

MR. LEA: I'm looking at --

A    You're looking at the estimation factors?

MR. ROBBIN: He's looking over here now, I think.

MR. LEA: I'm asking about --

MR. ROBBIN: Yeah, originally you said you want to be right of this.

MR. LEA: No, no. I don't want the right. I want to ask about the left part of it.

MR. ROBBIN: Oh, okay. I was confused.

A    You're looking at 64.5?

MR. ROBBIN: Here. Here.

Q    (BY MR. LEA) Yes, sir. Yeah.

I'm going to -- all of my questions for you, Mr. Collins, are about that portion of Exhibit 7

Page 67

that's circled in blue ink on the copy that Jonathan just gave you. Okay?

A    Okay.

MR. WATTS: Objection.

MR. ROBBIN: So I --

MR. LEA: No, no worries.

MR. ROBBIN: I just want make sure because --

MR. LEA: I do too.

MR. ROBBIN: Again, I just wanted to make sure that everything looks clear on that.

Q    (BY MR. LEA) So I'm getting out of this, Mr. Collins, that the company collected $49,297,000 and claimed for itself 64.5 percent or $31,796,000.

Is that how the deal worked while you ran the company, Mr. Collins, between 2017 and 2021?

A    No.

Q    The way the deal worked while you ran the company in that roughly four-year period, the charge for Collins Asset Group's maker's efforts would not have exceeded 50 percent. Right?

A    Other than the example we both --

Q    The minuscule example you gave me of the out-of-statute collections?

A    Right.

Page 68

Q    It would not have exceeded 50 percent, and sometimes it would have been as low as 30 percent.

Do I have that right?

A    That's right.

They were all standard collection rates.

Q    So the idea that Collins Asset Group would claim 64.5 percent of the money for itself, where did that idea come from?

MR. ROBBIN: Objection as to form.

A    I have great respect for people in that -- in Collins -- Bob Morris, for example, dear friend of mine. And early on in the industry, we started the trade association together.

Are you sure that these numbers are accurate? And then was all this paper out of statute?

Q    (BY MR. LEA) Mr. Collins, all I can tell you is that that's what I've received from Ferrum Capital, and the recently former CFO of Collins Asset Group says he's the guy who created it. That's all I know.

MR. WATTS: Object --

MR. ROBBIN: Objection.

MR. WATTS: Objection; form.

Q    (BY MR. LEA) While you ran the company, Mr. Collins, did the company keep accounts and ledgers and schedules that showed the percentage of collections

Page 69

that belonged to your company, Collins, and the percentages that belonged to Ferrum Capital?

A   Meticulous.  Our systems are accounting, reporting, management of the pools, technology, our acquisition technology, second to none.

Q   Okay.  And I hear you telling me that they were really good systems, but I want to make sure --

A   I'm sorry.  I've got --

Q   No, no, no.  That's fine.  Don't apologize.

Were there schedules or ledgers that showed to the penny what the Collins share of the money was and what the Ferrum Capital share of the money was?

A   Yeah, I don't mean -- I'm not smirking or making light of, but we had a lady -- there's goes my memory -- working for the CFO, controller.  She -- it had -- it had to get to the penny for her.

Q   Okay.  I hear you telling me that, and I appreciate what you said.  I think I know what you mean, but because we're going to be in court --

A   I'm sorry.

Q   -- and because I got a lot of lawyers nipping at me, am I correct, is it true that while you ran the company, the company had detailed ledgers and reports that showed to the penny how much of the money collected was Collins money and how much was Ferrum Capital money?

Page 70

A   Yes.

Q   In fact, the way y'all kept those ledgers, the column in them that showed how much was Collins money was labeled "My Money," wasn't it?

A   I saw that, and whoever was there, that was cute.

Q   But --

A   But, yes.

Q   -- I thought it was cute too, but because we're in court and we shouldn't joke around at all --

A   I understand.

Q   -- those records actually said my money in quote marks?

A   I saw it.

Q   And when it said "My Money" in all seriousness, that was referring to your company's share of the money, wasn't it?

A   Either -- yes.  Yeah, it would have to be.

Q   And there was a column that was labeled Client Money or Lender Money, and that was the share of the money that was attributable to Ferrum Capital, wasn't it?

A   Yes.

Q   And there was a column labeled Agency, and that was the portion of the money that was attributed to

Page 71

agency costs.  Right?

A   Yeah, I'd have to see it again to...

Q   Okay.

MR. WATTS:  Is there a document the witness is testifying off of?  I'm sorry.

MR. ROBBIN:  No.

MR. LEA:  No.

MR. WATTS:  Okay.  Okay.  So no documents have been presented?

MR. LEA:  I'll agree with that, Patrick.

MR. WATTS:  You're referencing and quoting items from a document that I don't have, and I'm not -- and the witness doesn't have, so I'm just confirming.

MR. LEA:  Actually, I don't have it either, Patrick.

MR. WATTS:  Okay.

Q   (BY MR. LEA) Mr. Collins, if the Collins share of the money had actually been 64.5 percent, do you agree with me that there would never have been enough money to repay the loans from Ferrum Capital?

MR. ROBBIN:  Objection as to form.

A   That's true.

MR. WATTS:  Same objection.

Q   (BY MR. LEA) I'm sorry, sir?

A   That's true.  I don't -- I don't -- I can't see

Page 72

how it could.

Q   Right.  The deal with Ferrum Capital between Ferrum Capital and Collins Asset Group could never work, and by that I mean Ferrum Capital was never going to get repaid if Collins Asset Group kept for itself 64.5 percent of the collections.

Do I have that right?

MR. ROBBIN:  Objection as to form.

A   Yes.

Q   (BY MR. LEA) Thank you.

MR. ROBBIN:  Give me a second to object before you answer.

Q   (BY MR. LEA) Yeah, Mr. Collins, you've probably figured this out by now.  When I ask you a question, one or more of the lawyers is going to object to everything I ask you.  That's just the way it works.

And so if you would, it might be helpful if you paused for a second before answering.  Let them rid themselves of all the objections they want to make, and then unless somebody instructs you not to answer, then you should go ahead and answer.

A   Okay.

Q   Okay.

MR. ROBBIN:  Thank you.  I apologize.

MR. LEA:  No, that -- no, no, no.

# EXHIBIT 5

## Walt Collins

From:        Walt Collins
Sent:        Thursday, October 26, 2017 4:24 PM
To:          joshua@allenfinancialagency; mike@mlcfinancialinc.com
Subject:     Memorandum of Understanding

I am formalizing my understanding of our discussion regarding combining all purchased assets into one overall 'pool' for purposes of maximum diversification. 'Collins Asset Group LLC' (CAG) will borrow from 'Ferrum Capital LLC' on the basis of each of 'Ferrum Capital's' individually agreed upon programs and sign a note accordingly. However, it is understood, again, for diversification purposes, that all assets acquired will be placed in one 'Master Pool' providing the collateral for each of 'Ferrum Capital's' individual programs.

Regarding CAG Fees: CAG's fees will not exceed 50% of the gross recovered revenue, i.e., $1,000 recovered, no more than $500 paid to CAG in recovery fees. In the unusual event that a greater recovery fee is required CAG will contact the lender with an explanation and seek approval.

CAG will frequently 'outsource' accounts to law firms, nationwide, for suit. The law firm will charge, traditionally, in a range of 25% to 35% depending on myriad factors. These fees are not in addition to CAG's fees. Example: CAG has a fee of 50%. CAG outsources to a law firm charging 30%. That 30% comes from CAG's gross fee of 50%; 30% law firm, 20% CAG.

To defray the cost of the asset acquisitions process, and once they are acquired, the cost to prepare the assets for recovery, including the obligatory lettering of all accounts, skip tracing (locating the debtor), and scoring each account's collectibility, CAG will increase the basis of the acquired assets by 10%. Example: Assets purchased for .02 (2 cents) will be increased to .022 (2.2 cents).

CAG will acquire, primarily, consumer assets of all type, certain commercial loans, underwrite consumer and business loans, and participate in any other opportunities for CAG's 'Lender' spelled out in the 'Loan Agreement'.

If you have questions please contact me. If we are in agreement please return this e-mail with your acceptance.

Walt Collins, CEO



Δ π EXHIBIT 4
Deponent Walt Collins
Date 4/24/26 Rptr. A.C.
WWW.DEPOBOOK.COM

Davis Exhibit 6

CAG-diphont 01650

# EXHIBIT 6

**Royal Lea**

| | |
|---|---|
| **From:** | Royal Lea |
| **Sent:** | Tuesday, April 22, 2025 9:14 AM |
| **To:** | Patrick Watts; Jacob Bach |
| **Subject:** | ferrum capital & collins asset group |

Patrick/Jacob, would you please send me a report on collections on the collateral in the period since the last report you provided?  Royal

**Royal Lea**

| | |
|---|---|
| **From:** | Royal Lea |
| **Sent:** | Friday, April 25, 2025 1:59 PM |
| **To:** | Patrick Watts; Jacob Bach |
| **Cc:** | Byron LeFlore; Shari Pulman; rpulman@pulmanlaw.com; Pat Lowe; Jonathan Robbin |
| **Subject:** | RE: ferrum capital & collins asset group |
| **Attachments:** | attachment 1 4.25.25 email to watts.pdf; attachment 2 4.25.25 email to watts.pdf |

Patrick, **this email is not sent pursuant to TRE 408. This is not a settlement communication. This is the Receiver's presentment to CAG and the Oliphant Entities of the Receiver's request for an accounting and for payment for the period described below in paragraph 7.**

1. The Receiver asks CAG and the Oliphant Entities to make a candid and complete accounting for all collections on all collateral on all loans by Ferrum Capital to CAG in the cumulative period since 2017. That report should candidly report all collections and should use the historical values or factors that CAG used in its internal accounting for collections on the collateral for the loans from Ferrum Capital as Walt Collins described in his deposition testimony yesterday. **CAG should do the right thing.**

2. We know from Walt Collins' testimony and exhibit 4 to his testimony that the percentage of gross recovered collections owed to Ferrum Capital and now the Receiver should never exceed (and never should have exceeded) 50% of gross recovered collections. Exhibit 4 is the same as what you emailed yesterday as your exhibit 3, a copy of which is attached here as attachment 1.

3. We also know from Walt's testimony yesterday that for some of the gross recovered collections, the correct percentage to Ferrum Capital and now the Receiver is as much as 70%. We know that CAG and the Oliphant Entities have a deep and rich database with state of the industry art tools for analyzing the data. We know that database and those tools already have loaded in them the actual, correct historical factors that CAG and the Oliphant Entities agreed to use and did use in the course of dealing with Ferrum Capital. We know those factors ranged from 30% to 50% for CAG and the Oliphant Entities and from 50% to 70% for Ferrum Capital, depending on the specific type of collateral account on which there was a collection. CAG and the Oliphant Entities have the database, the tools, and the factors. The Receiver does not. But we know that except for one category which walt Collins described as miniscule in its significance, the shares of collections to Ferrum Capital were from 50% to 70%, depending on the kind of account actually collected. So, again, CAG and the Oliphant Entities should **do the right thing** and use the data, tools, and factors we all now know they have.

4. Attachment 2 to this email is an estimate of the amount due the Receiver from collections by CAG and the Oliphant Entities on the Collateral in the period from May 2024 through December 2024 using a blended rate of 40% as the share to CAG and 60% as the share to the Receiver. Under that method, CAG and the Oliphant Entities owe the Receiver an additional $1,309,024.84 from collections in that period. $1,309,024.84 is the difference the $1,845,756.06 that CAG and the Oliphant Entities should have paid the Receiver in that period using an assumed 40/60 split. Given that we know that the Ferrum Capital share of collections ranges from 50% to 70%, the Receiver

1

currently believes that 60% of gross recovered collections is a reasonable estimate of what CAG and the Oliphant Entities owe the Receiver.

5.  CAG and the Oliphant Entities also owe the Receiver a substantial amount for the prior period between August 2023 and May 2024—the period for which CAG and the Oliphant Entities only paid the Receiver $266,649.11.  A calculation of the Amount due the Receiver using the 40% to CAG & Oliphant and 60% to the Receiver assumption is not included here, but CAG and the Oliphant Entities have everything they need to do the calculation and pay the Receiver what they owe the Receiver from that period.

6.  We also know now that CAG and the Oliphant Entities prepared Exhibit C to the Ferrum Managers' Certification and that the "estimated factors" there totaling to 64.5% were baseless and misleading.  It was a fraud on the Receiver and the Court.  CAG and the Oliphant Entities had the actual data and historical split factors and chose not to use them.  The Receiver asks CAG and the Oliphant Entities to create and provide a new Exhibit C using the correct factors.

7.  **The Receiver asks CAG and the Oliphant Entities to pay over the Receiver within 5 days the difference between the total of $803,410.33 that CAG and the Oliphant Entities have paid the Receiver to date and the total of at least 60% of all gross recovered collections in the period from October 2023 through March 2025.  CAG and the Oliphant Entities have the receiver's wire instructions.  The Receiver makes this Request reserving all rights and without waiving any rights.**

8.  The Receiver also asks CAG and the Oliphant Entities to account for all of the "Lender" or Ferrum Capital share of collections in the period covered by Exhibit C to the Ferrum Capital Managers' Certifications used to purchase new collateral accounts as Walt Collins described in his testimony yesterday.  Please show the dates and amounts of each such purchase, identify the accounts purchased, and identify the UCC-1 perfecting the Ferrum Capital lien in the accounts.  Please account for all collections on those accounts and please account for any sale(s) of any of those accounts.  The Receiver reserves all rights to assert claims for damages for this period but is entitled to an accounting of the collateral.

9.  My understanding of the existing Exhibit C to the Ferrum capital Managers' Certification is that it covers the period from 2017 through August 2023.  And I understand the payment CAG and the Oliphant Entities made in the amount of $266,649.11 was for the period from October 2023.  So, as I understand those reports, there is a gap for September.  If I'm wrong about that and there isn't a gap, please tell me and show me documentation confirming that there isn't a gap.  If there is a gap, please include the gap period.    Royal

Royal Lea
Royal Lea Law office PLLC
1901 NW Military Hwy, Suite 218
San Antonio, Texas 78213
210.862.2847

From: Patrick Watts <pwatts@mgl.law>
Sent: Friday, April 25, 2025 6:38 AM

2

**To:** Royal Lea <royal@royallealaw.com>; Jacob Bach <jbach@mgl.law>
**Subject:** Re: ferrum capital & collins asset group

Royal, please advise on your position as to how the Collateral Proceeds allegedly owed to Ferrum should be calculated including the details of the formula.

Patrick

Get Outlook for iOS

---

**From:** Patrick Watts <pwatts@mgl.law>
**Sent:** Thursday, April 24, 2025 6:58:52 PM
**To:** Royal Lea <royal@royallealaw.com>; Jacob Bach <jbach@mgl.law>
**Subject:** Re: ferrum capital & collins asset group

Yes, client is working on it.

Get Outlook for iOS

---

**From:** Royal Lea <royal@royallealaw.com>
**Sent:** Tuesday, April 22, 2025 9:13:51 AM
**To:** Patrick Watts <pwatts@mgl.law>; Jacob Bach <jbach@mgl.law>
**Subject:** ferrum capital & collins asset group

Patrick/Jacob, would you please send me a report on collections on the collateral in the period since the last report you provided?  Royal

3

Exhibit 3 CAG

## Patrick Watts

| | |
|---|---|
| **From:** | Walt Collins <wcollins@collinsassetgroup.com> |
| **Sent:** | Thursday, October 26, 2017 4:24 PM |
| **To:** | joshua@allenfinancialagency; mike@mlcfinancialinc.com |
| **Subject:** | Memorandum of Understanding |

I am formalizing my understanding of our discussion regarding combining all purchased assets into one overall 'pool' for purposes of maximum diversification. 'Collins Asset Group LLC' (CAG) will borrow from 'Ferrum Capital LLC' on the basis of each of 'Ferrum Capital's' individually agreed upon programs and sign a note accordingly. However, it is understood, again, for diversification purposes, that all assets acquired will be placed in one 'Master Pool' providing the collateral for each of 'Ferrum Capital's' individual programs.

Regarding CAG Fees: CAG's fees will not exceed 50% of the gross recovered revenue, i.e., $1,000 recovered, no more than $500 paid to CAG in recovery fees. In the unusual event that a greater recovery fee is required CAG will contact the lender with an explanation and seek approval.

CAG will frequently 'outsource' accounts to law firms, nationwide, for suit. The law firm will charge, traditionally, in a range of 25% to 35% depending on myriad factors. These fees are not in addition to CAG's fees. Example: CAG has a fee of 50%. CAG outsources to a law firm charging 30%. That 30% comes from CAG's gross fee of 50%; 30% law firm, 20% CAG.

To defray the cost of the asset acquisitions process, and once they are acquired, the cost to prepare the assets for recovery, including the obligatory lettering of all accounts, skip tracing (locating the debtor), and scoring each account's collectibility, CAG will increase the basis of the acquired assets by 10%. Example: Assets purchased for .02 (2 cents) will be increased to .022 (2.2 cents).

CAG will acquire, primarily, consumer assets of all type, certain commercial loans, underwrite consumer and business loans, and participate in any other opportunities for CAG's 'Lender' spelled out in the 'Loan Agreement'.

If you have questions please contact me. If we are in agreement please return this e-mail with your acceptance.

Walt Collins, CEO

1

Estimated Maste: | 0.1

### Collections

| Row Labels | Sum of Document Amount | Sum of Agency Fees | Sum of Services Fee |
|---|---|---|---|
| 202405 | $413,433.33 | $80,066.50 | $49,372.05 |
| 202406 | $334,022.56 | $63,796.42 | $45,687.87 |
| 202407 | $392,498.55 | $81,065.76 | $38,568.06 |
| 202408 | $314,758.66 | $90,761.46 | $44,503.81 |
| 202409 | $334,600.84 | $54,305.85 | $48,428.42 |
| 202410 | $334,815.35 | $73,905.78 | $52,196.83 |
| 202411 | $322,199.01 | $82,435.95 | $44,797.83 |
| 202412 | $292,701.73 | $52,043.89 | $54,192.75 |
| Grand Total | $2,788,827.63 | $538,432.64 | $378,155.22 |

### Court Costs

| Row Labels | Sum of Court Cost |
|---|---|
| 202405 | -$28,849.09 |
| 202406 | -$22,572.21 |
| 202407 | -$24,619.51 |
| 202408 | -$19,358.73 |
| 202409 | -$17,467.65 |
| 202410 | -$20,058.24 |
| 202411 | -$19,910.74 |
| 202412 | -$17,400.63 |
| Grand Total | -$168,238.71 |

### As Proposed by CAO for last month

| | | | | |
|---|---|---|---|---|
| Estimated Interest Fees | 63.90% | mean from range of 45% - 70% | | |
| Master Service Fee | 10% | | | |

| May 2024 - Dec 2024 | Totals | Subtotal Collected | | |
|---|---|---|---|---|
| Gross | $2,788,827.63 | | | |
| Agency Contingency Fee (-) | -$538,432.64 | $2,137,019.25 | 24.51% | actual as % of ext. col. |
| Estimated Oliphant USA Fee (-) | -$378,155.22 | $591,617.58 | 63.90% | per OUSA as % of int. est. |
| Court Cost Incurred | -$168,238.71 | | | actual net |
| Net of Contingency | $1,704,603.86 | | 61.10% | as % of Gross |
| Est. Master Servicing Fee (-) | -$170,460.39 | | 6.11% | per OUSA as 10% of Net |
| Total Cost to Collect | -$1,255,224.06 | | 45.01% | as % of Gross |
| OUSA Fee Portion of Total CTC | -$548,615.61 | | 19.67% | as % of Gross |
| Net Proceeds Due From OUSA | $1,533,603.47 | | 54.99% | as % of Gross |
| 35% Proceeds (Ferrum) | $536,761.22 | | 19.25% | per OUSA as % of Gross |
| 65% Proceeds (CAO) | $996,842.26 | | 35.74% | per OUSA as % of Gross |
| Due Ferrum | $536,761.22 | | | |

←delta→ $318,192.58

←delta→ $1,308,024.84 (circled)

No Second Split

### Adjusted to follow Metgp pricing

| | | |
|---|---|---|
| Internal Service Fee Max | 40% | |
| Master Service Fee if below 60% | 0% | |

| May 2024 - Dec 2024 | Totals | Subtotal Collected | | |
|---|---|---|---|---|
| Gross | $2,788,827.63 | | | |
| Agency Contingency Fee | -$538,432.04 | $2,137,019.25 | 24.51% | actual as % of external collections |
| Oliphant USA Fee | -$236,373.02 | $591,617.58 | 39.94% | metgp recast as 40% of internal collections |
| Court Cost Incurred | -$168,238.71 | | | actual net |
| Net of Contingency | $1,845,766.06 | | 66.15% | as % of Gross |
| Est. Master Servicing Fee (-) | 0 | | 0.00% | metgp recast (net earned < 60% forecast) |
| Total Cost to Collect | -$943,041.77 | | 33.81% | as % of Gross |
| OUSA Fee Portion of Total CTC | -$236,373.02 | 8.48% | | as % of Gross |
| Net Proceeds Due from OUSA | $1,845,766.06 | | 66.15% | as % of Gross |
| Net Proceeds Due Lender | $1,845,766.06 | | 66.15% | metgp recast as % of Gross |
| Due Ferrum | $1,845,766.06 | | | |



May 9, 2025

Royal B. Lea, III
royal@royallealaw.com



Jennifer McLaughlin
jennifer@royallealaw.com
Legal Assistant

Via E-Mail
Eugene Xerxes Martin, IV
xmartin@mgl.law
Patrick Watts
pwatts@mgl.law
Jacob Michael Bach
jbach@mgl.law
Martin Lyons Golden Watts Morgan PLLC
8750 N Central Expressway, Ste. 1850
Dallas, Texas 75231

Re:    Case No. 2023CI22575; *Judy A. Musgrove et al. v. Brooklyn Chandler Willy, et al.*; in the 438th Judicial District Court, Bexar County, Texas

Notice of Default and Acceleration

Dear Patrick, Xerxes, and Jacob:

As you know, John Patrick Lowe is the Court-Appointed Receiver for Ferrum Capital, LLC ("Ferrum Capital"). As Receiver, Lowe holds the rights of Ferrum Capital under its Promissory Notes with CAG, the Master Loan Agreement between Ferrum Capital and CAG, and the Master Security Agreement between Ferrum Capital and CAG.

On behalf of the Receiver, I notify CAG of its material breaches of its obligations under the Promissory Notes, the Master Loan Agreement, and the Master Security Agreement. CAG is in default under its obligations under the Promissory Notes with Loan numbers from FE-26-1041 through FE-26-1101.[1] And there are (and have been) Events of Default under the Master Security Agreement and the Master Loan Agreement.

CAG has failed to pay Ferrum Capital and the Receiver punctually when and as required under the Promissory Notes.

CAG has failed to provide the Receiver with periodic reports and/or financial statements.

---

[1] There may be others. If there are, the Receiver does not waive any rights under any of the others.

R-0030

Eugene Xerxes Martin, IV
Patrick Watts
Jacob Michael Bach
May 9, 2025
Page 2 of 3

CAG has failed to provide the Receiver with adequate records or copies of records concerning the Collateral and appears to have failed to maintain proper books and records that would allow CAG to provide the accountings the Receiver has requested (but which CAG has not provided).

CAG (and Oliphant) have failed to account to Ferrum Capital (and the Receiver since his appointment) properly for collections on the Collateral. And CAG and the Oliphant entities have failed to pay over to Ferrum Capital (and the Receiver since his appointment) the amount due for the Ferrum Capital share of collections.

This is evident because CAG and the Oliphant Entities have reported to the Receiver that they have collected approximately $54,722,000 in the period from 2017 through December 31, 2024, but CAG and the Oliphant Entities have not paid Ferrum Capital and the Receiver at least fifty percent (50%) of those collections as required.

CAG and the Oliphant Entities have reported to the Receiver that they have collected approximately $5,400,000 in the period from October 2023 through December 2024 but have only paid the Receiver $803,410.33 from those collections. For the period from October 2023 through April 2024, CAG reported gross collections of $2,636,114 but paid the Receiver only $266,649—or only about 10% of those collections.

CAG and the Oliphant Entities have failed to provide the Receiver any report on any Collections for any period after December 31, 2024.

And despite my request on April 25, 2025, for CAG and Oliphant to provide a complete accounting, CAG and the Oliphant Entities have failed to do so, even though CAG is obligated to maintain proper books and records that would allow it to provide such an accounting.

CAG's breaches of and defaults under the contract documents have been material and persistent for months. Ferrum Capital delivered written notice to CAG of its failure to make payments when due in the letter to CAG dated October 26, 2023, from Ferrum Capital.  That letter is discovery product FER_CAP000002-8 in this case. The material and persistent breaches entitled the Receiver to sue CAG for enforcement of the Receiver's contractual rights against CAG, as the Receiver has done in his First Amended Petition.

For avoidance of any doubt, however, on behalf of the Receiver, I notify you for CAG and the Oliphant Entities again of the breaches and defaults on all of the Promissory

**R-0031**

Eugene Xerxes Martin, IV
Patrick Watts
Jacob Michael Bach
May 9, 2025
Page 3 of 3

Notes identified above and of the breaches and defaults on the Master Loan Agreement and the Master Security Agreement.

I also notify you that, to the extent the unpaid amounts due under the Promissory Notes were not previously accelerated by virtue of the earlier material defaults, the Receiver now accelerates and declares immediately due and payable the entire unpaid principal balance of all of the Promissory Notes referred to above along with all interest accrued and unpaid on those Promissory Notes.

The Receiver asks CAG and/or the Oliphant Entities to pay promptly what CAG and/or the Oliphant Entities owe the Receiver.

Without waiving the Receiver's rights and claims for earlier periods, the Receiver asks CAG and the Oliphant Entities again to account candidly for all collections on the Collateral in the period since October 2023 and to pay over to the Receiver at least 50% of those collections.

The Receiver reserves all rights and remedies against CAG and the Oliphant Entities under the Promissory Notes, the Master Loan Agreement, and the Master Security Agreement. The Receiver also reserves all other rights under any applicable statute and under common law.

The Receiver includes this letter as a disclosure item under TRCP 194.2(b)(6).

Sincerely,

ROYAL LEA LAW OFFICE PLLC

By: _____
Royal B. Lea, III

R-0032

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Jennifer McLaughlin on behalf of Royal Lea
Bar No. 12069680
jennifer@royallealaw.com
Envelope ID: 101356710
Filing Code Description: MOTION TO
Filing Description: (Receiver's) to Enforce Receivership Order and Show Cause
Status as of 6/3/2025 3:46 PM CST

Associated Case Party: MLC Financial Inc.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Emma Cano | | ecano@jeffersoncano.com | 5/28/2025 5:49:29 PM | SENT |
| Celeste Banda | | cbanda@jeffersoncano.com | 5/28/2025 5:49:29 PM | SENT |
| Terry Grimmett | | tgrimmett@jeffersoncano.com | 5/28/2025 5:49:29 PM | SENT |
| Illiana Perez | | iperez@jeffersoncano.com | 5/28/2025 5:49:29 PM | SENT |
| Alicia Lyons | | ALyons@jeffersoncano.com | 5/28/2025 5:49:29 PM | SENT |
| Will Davidson | | WDavidson@jeffersoncano.com | 5/28/2025 5:49:29 PM | SENT |

Associated Case Party: WALT COLLINS

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Yusuf A.Bajwa | | ybajwa@sandersbajwa.com | 5/28/2025 5:49:29 PM | SENT |
| Lad Z.Stricker | | lstricker@sandersbajwa.com | 5/28/2025 5:49:29 PM | SENT |
| Polly Ryan | | pryan@sandersbajwa.com | 5/28/2025 5:49:29 PM | SENT |
| Jonathan M.Robbin | | jonathan.robbin@jrobbinlaw.com | 5/28/2025 5:49:29 PM | SENT |

Associated Case Party: Ferrum Capital, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Joshua Frost | 24097711 | jfrost@lubbocklawfirm.com | 5/28/2025 5:49:29 PM | SENT |
| Samuel Davison | | davisons@gtlaw.com | 5/28/2025 5:49:29 PM | SENT |
| Chelsea Lusk | | clusk@lubbocklawfirm.com | 5/28/2025 5:49:29 PM | SENT |

Associated Case Party: JoshuaLAllen

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Jennifer McLaughlin on behalf of Royal Lea
Bar No. 12069680
jennifer@royallealaw.com
Envelope ID: 101356710
Filing Code Description: MOTION TO
Filing Description: (Receiver's) to Enforce Receivership Order and Show Cause
Status as of 6/3/2025 3:46 PM CST

Associated Case Party: JoshuaLAllen

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Samuel Davison | | davisons@gtlaw.com | 5/28/2025 5:49:29 PM | SENT |

Associated Case Party: Collins Asset Group, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jacob MichaelBach | | jbach@mgl.law | 5/28/2025 5:49:29 PM | SENT |
| Xerxes Martin | | xmartin@mgl.law | 5/28/2025 5:49:29 PM | SENT |
| ECF FILINGS | | ecf@mgl.law | 5/28/2025 5:49:29 PM | ERROR |
| Tiffany SWallace | | twallace@mgl.law | 5/28/2025 5:49:29 PM | SENT |
| Patrick Watts | | pwatts@mgl.law | 5/28/2025 5:49:29 PM | SENT |
| Regina Watts | | rwatts@mgl.law | 5/28/2025 5:49:29 PM | SENT |

Associated Case Party: Oliphant Financial, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jacob MichaelBach | | jbach@mgl.law | 5/28/2025 5:49:29 PM | SENT |
| Xerxes Martin | | xmartin@mgl.law | 5/28/2025 5:49:29 PM | SENT |
| Regina Watts | | rwatts@mgl.law | 5/28/2025 5:49:29 PM | SENT |
| Patrick Watts | | pwatts@mgl.law | 5/28/2025 5:49:29 PM | SENT |
| Tiffany SWallace | | twallace@mgl.law | 5/28/2025 5:49:29 PM | SENT |
| ECF FILINGS | | ecf@mgl.law | 5/28/2025 5:49:29 PM | ERROR |

Associated Case Party: Oliphant USA, LLC

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Jennifer McLaughlin on behalf of Royal Lea
Bar No. 12069680
jennifer@royallealaw.com
Envelope ID: 101356710
Filing Code Description: MOTION TO
Filing Description: (Receiver's) to Enforce Receivership Order and Show Cause
Status as of 6/3/2025 3:46 PM CST

Associated Case Party: Oliphant USA, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Jacob MichaelBach | | jbach@mgl.law | 5/28/2025 5:49:29 PM | SENT |
| Xerxes Martin | | xmartin@mgl.law | 5/28/2025 5:49:29 PM | SENT |
| Patrick Watts | | pwatts@mgl.law | 5/28/2025 5:49:29 PM | SENT |
| ECF FILINGS | | ecf@mgl.law | 5/28/2025 5:49:29 PM | ERROR |
| Tiffany SWallace | | twallace@mgl.law | 5/28/2025 5:49:29 PM | SENT |
| Regina Watts | | rwatts@mgl.law | 5/28/2025 5:49:29 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Audreana Motley | | motleya@gtlaw.com | 5/28/2025 5:49:29 PM | SENT |
| Royal Lea | | royal@royallealaw.com | 5/28/2025 5:49:29 PM | SENT |
| Jennifer McLaughlin | | jennifer@royallealaw.com | 5/28/2025 5:49:29 PM | SENT |
| Jamie Gonzales | | jgonzales@pulmanlaw.com | 5/28/2025 5:49:29 PM | SENT |
| J PatrickLowe | | pat.lowe.law@gmail.com | 5/28/2025 5:49:29 PM | SENT |
| Gladys Simone Brown | | browngl@gtlaw.com | 5/28/2025 5:49:29 PM | SENT |

Associated Case Party: MikeLCox

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Donald R.Littlefield | | dlittlefield@bressler.com | 5/28/2025 5:49:29 PM | SENT |
| Ronak Patel | | rpatel@bressler.com | 5/28/2025 5:49:29 PM | SENT |

Associated Case Party: Ryan Project Funding, LLC

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Jennifer McLaughlin on behalf of Royal Lea
Bar No. 12069680
jennifer@royallealaw.com
Envelope ID: 101356710
Filing Code Description: MOTION TO
Filing Description: (Receiver's) to Enforce Receivership Order and Show Cause
Status as of 6/3/2025 3:46 PM CST

Associated Case Party: Ryan Project Funding, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Bronte C.Staugaard | | Bronte@bigbeecurtislaw.com | 5/28/2025 5:49:29 PM | SENT |
| Andrew B.Curtis | | andrew@bigbeecurtislaw.com | 5/28/2025 5:49:29 PM | SENT |
| Thomas DeFranco | | TomDeFranco@dwt.com | 5/28/2025 5:49:29 PM | SENT |
| Grant Underwood | | grant@bigbeecurtislaw.com | 5/28/2025 5:49:29 PM | SENT |
| Robert Ryan | | robert@ryanprojectfunding.com | 5/28/2025 5:49:29 PM | SENT |
| Christi Graham | | christi@bigbeecurtislaw.com | 5/28/2025 5:49:29 PM | SENT |

Associated Case Party: GOLDSTAR TRUST COMPANY (GTC)

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Reuben L.Hancock | | rlh@rlhancock.com | 5/28/2025 5:49:29 PM | SENT |
| Rusty Lewis | | ralewis@rlhancock.com | 5/28/2025 5:49:29 PM | SENT |

Associated Case Party: JudyAMusgrove

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Shari Pulman | | spulman@pulmanlaw.com | 5/28/2025 5:49:29 PM | SENT |
| Kerry Alleyne | | kalleyne@pulmanlaw.com | 5/28/2025 5:49:29 PM | SENT |
| Randall Pulman | | rpulman@pulmanlaw.com | 5/28/2025 5:49:29 PM | SENT |

Associated Case Party: BrooklynChandlerWilly

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Jennifer McLaughlin on behalf of Royal Lea
Bar No. 12069680
jennifer@royallealaw.com
Envelope ID: 101356710
Filing Code Description: MOTION TO
Filing Description: (Receiver's) to Enforce Receivership Order and Show Cause
Status as of 6/3/2025 3:46 PM CST

Associated Case Party: BrooklynChandlerWilly

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Brooklynn Willy | | brooklynn_chandler@icould.com | 5/28/2025 5:49:29 PM | ERROR |
| Brooklynn Willy | | brooklynn_chandler@hotmail.com | 5/28/2025 5:49:29 PM | SENT |
| Mark JBarrera | | mark@thebarrerafirm.com | 5/28/2025 5:49:29 PM | SENT |

Associated Case Party: Queen B Advisors, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Mark JBarrera | | mark@thebarrerafirm.com | 5/28/2025 5:49:29 PM | SENT |

Associated Case Party: Yvette Barrera

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Yvette Barrera | | y.villanuevabarrera@gmail.com | 5/28/2025 5:49:29 PM | SENT |