# EXHIBIT 7

Page 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:              ) Chapter 7
                    )
COLLINS ASSET GROUP, LLC   ) Case No. 25-10994-LSS
                    )
    Debtor.         )
                    )
In re:              ) Chapter 7
                    )
HOLLINS HOLDINGS, INC.     ) Case No. 25-10995-LSS
                    )
    Debtor.         )
_____

RULE 30(B)(6) ORAL DEPOSITION OF DANIEL LAUX
DESIGNATED REPRESENTATIVE FOR
ACCELERATED INVENTORY MANAGEMENT LLC,
OLIPHANT FINANCIAL LLC, OLIPHANT USA LLC,
AND OLIPHANT INC.
JULY 14, 2025
(Reported Remotely)
_____

RULE 30(B)(6) ORAL DEPOSITION OF DANIEL LAUX, produced as a witness at the instance of the Movants, and duly sworn, was taken in the above-styled and numbered cause on the 14th of July, 2025, from 4:00 P.M. to 4:49 P.M., before Shelly M. Tucker, CSR in and for the State of Texas, reported remotely by machine shorthand from Hays County, Texas, with the witness appearing remotely from Austin, Texas, pursuant to the Federal Rules of Civil Procedure.

Page 2

**A P P E A R A N C E S**

FOR JUDY A. MUSGROVE AND RANDY SPARKS ET AL.:

Byron L. LeFlore Jr.
Shari P. Pulman
Kerry S. Alleyne
PULMAN LEFLORE PULLEN & REED LLP
2161 NW Military Highway, Suite 400
San Antonio, Texas 78213
Tel: 210-222-9494
Fax: 210-892-1610
bleflore@pulmanlaw.com
spulman@pulmanlaw.com
kalleyne@pulmanlaw.com

- AND -

Robert J. Dehney Sr.
MORRIS NICHOLS ARSHT & TUNNELL LLP
1201 North Market Street, 16th Floor
Post Office Box 1347
Wilmington, Delaware 19899-1347
Tel: 302-351-9200
Fax: 302-658-3989
rdehney@morrisnichols.com

FOR JOHN PATRICK LOWE IN HIS CAPACITY AS THE
COURT-APPOINTED RECEIVER FOR FERRUM CAPITAL LLC AND
FERRUM IV LLC:

Royal B. Lea, III
ROYAL LEA LAW OFFICE PLLC
1901 Northwest Military Highway, Suite 218
San Antonio, Texas 78213
Tel: 210-202-2395
royal@royallealaw.com

FOR COLLINS ASSET GROUP LLC:

Alyssa M. Radovanovich
KLEHR HARRISON HARVEY BRANZBURG LLP
919 Market Street, Suite 1000
Wilmington, Delaware 19801
Tel: 302-552-5512
Fax: 302-426-9193
aradovanovich@klehr.com

Page 3

**A P P E A R A N C E S (cont'd)**

**FOR ACCELERATED INVENTORY MANAGEMENT LLC, OLIPHANT FINANCIAL LLC, OLIPHANT USA LLC, AND OLIPHANT INC.:**

Michael P. Ridulfo
KANE RUSSELL COLEMAN LOGAN
5151 San Felipe Street, Suite 800
Houston, Texas 77056
Tel: 713-425-7400
Fax: 713-425-7700
mridulfo@krcl.com

- AND -

Christopher M. Donnelly
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Tel: 302-888-6800
Fax: 302-571-1750
cdonnelly@morrisjames.com

FOR GEORGE L. MILLER:

Evan T. Miller
SAUL EWING LLP
1201 North Market Street, Suite 2300
Wilmington, Delaware 19801
Tel: 302-421-6864
Fax: 302-421-6813
evan.miller@saul.com

Page 4

I N D E X

                                        PAGE
Appearances....................................    2
DANIEL LAUX
    Examination by Mr. Lea......................    6
    Examination by Mr. LeFlore..................   10
    Further Examination by Mr. Lea.............    30
    Examination by Mr. Ridulfo.................    33
    Further Examination by Mr. Lea.............    34
Changes and Signature...........................   38
Reporter's Certificate...........................   39

E X H I B I T S

(NO EXHIBITS MARKED)

Page 5

P R O C E E D I N G S

(Oath administered)

THE REPORTER:  Counsel, please state your appearances for the record.

MR. LEA:  Royal Lea for the receiver.

MR. LEFLORE:  Byron LeFlore for Plaintiffs.

MR. RIDULFO:  And this is Mike Ridulfo. My -- I'm here representing Oliphant Inc., Oliphant Financial LLC, Accelerated Inventory Management LLC, and Oliphant USA LLC.

I want to state for the record that we have the same agreement with Counsel that was announced by Mr. Beck.  The 30(b)(6) is limited to venue issues, it's for 90 minutes, and it remains subject to the objections we served in response to the notice.

MS. ALLEYNE:  Kerry Alleyne, appearing with Byron LeFlore for the plaintiffs.

MS. PULMAN:  Shari Pulman, appearing with Byron LeFlore for the plaintiffs.

MR. MILLER:  This is Evan Miller of Saul Ewing on behalf of George Miller, the Chapter 7 Trustee for the Estates for Collins Asset Group and Hollins Holdings.

MS. RADOVANOVICH:  This is Alyssa Radovanovich for Collins Asset Group and Hollins

Page 6

Holdings.

MR. LEA:  Anyone else?

EXAMINATION

BY MR. LEA:

Q.  Mr. Laux, you ready to proceed?

A.  I am.

Q.  You understand that you're testifying again for your deposition?

A.  I do.

Q.  You understand again that you're sworn to tell the truth under oath and subject to the penalty of perjury?

A.  I do.

Q.  We took your deposition just a few minutes ago, didn't we, Mr. Laux, as a representative of the debtors?

A.  That's correct.

Q.  When we did that, you were seated at your office in the offices of the debtor Collins Asset Group and Oliphant in Austin, Texas.  Are you still seated there?

A.  Yes, I'm still seated in the same place.

Q.  A few minutes ago there was no one else in the room with you in the deposition for the debtors.  Is that still true?  No one else with you in the room now that you're testifying as the designated representative of the

Page 7

Oliphant parties?

A.  That's correct.

Q.  You do understand, don't you, Mr. Laux, that you're testifying now as the representative of the Oliphant parties?

A.  Yes, that's correct.

Q.  As the designated representative of the Oliphant parties, Mr. Laux, was everything you said as the designated representatives of the debtors correct and truthful?

A.  Based on information and belief, yes, that's correct.

Q.  Have you traveled ever for any reason to Delaware as a representative of any of the Oliphant parties?

A.  Possibly, but I don't recall.

Q.  Is it truthful and correct to say that you don't recall ever traveling to Delaware for any business of the Oliphant parties?

A.  I think that's accurate, yeah.  I don't remember.

Q.  Do you know of any business the Oliphant parties have in Delaware other than involvement in the proceeding that brings us here today?

A.  We collect debt in Delaware.

Page 8

Q.  I'm sorry?

A.  We collect debt in -- in Delaware.

Q.  Any other business besides that?

A.  Not -- not to my knowledge.

Q.  The Oliphant parties, as far as you know, don't have offices in Delaware?

A.  That's correct.

Q.  Do the Oliphant parties, as far as you know, Mr. Laux, have employees in Delaware?

A.  We may.  We have employees all over the nation, and I don't know where each of them are situated.

Q.  So just tell me the names of the ones you know who are in Delaware.

A.  I -- I don't know.  I don't know where each of the remote employees are situated.

Q.  So -- so am I correct that today you're unable to identify a single employee of any of the Oliphant parties in Delaware?

A.  At this time, I -- I don't know.

Q.  Have people who are employees of the Oliphant parties provided documents to the trustee in this case?

A.  I believe we've been cooperating with the trustee.

MR. LEA:  Objection.  Nonresponsive.

Q.  I think that means, Mr. Laux, that you didn't

Page 9

answer the question I asked.

The question I was trying to get to was have people who are employees of the Oliphant parties provided documents to the trustee?

A. Yes.

Q. Who?

A. Myself, our -- well, so my -- myself. Our counsel's obviously not an employee of -- of Oliphant. But Damien Alfalla is a contract worker, so he's not technically an employee either. We may -- I don't -- again, I don't recall if Tom Pawelek has pulled data together to provide to the trustee. He probably would have been the -- the IT resource we utilized to -- him or Nick Swinea to pull the list of accounts and essentially assets that Collins Asset Group owns that Oliphant USA is servicing and provide that to the trustee.

Q. Did those documents come from the Oliphant server in Austin, Texas?

A. Yes, that's correct.

Q. Do the Oliphant parties have a contention -- never mind.

Mr. Laux, I'm going to pass the witness now. Those are the questions I have for you at this time.

///

Page 10

EXAMINATION

BY MR. LEFLORE:

Q. Mr. Laux, Byron LeFlore. We're acquainted with each other through the proceedings. Correct?

A. I'm sorry. You sound a little muffled. I'm having trouble hearing you.

Q. Sorry. I hate to be muffled. Am I -- am I -- am I more -- more unmuffled now?

A. Yes. I can hear you better.

Q. Okay.

A. Can you please restate?

Q. So you understand I'm the -- I'm the attorney for the plaintiff, and we've -- we've -- we've discussed this matter with you under oath in the past, have we not?

A. Yes. Under different capacities, yes.

Q. Okay. So in your capacity as the representative for the Oliphant entities, who do you take instructions from to act in this capacity?

A. I mean, I -- I consult with Colin Conway. I'm not -- I'm trying to think of a time where he instructed me to do something in this capacity. But, I mean, I -- I can't think of a specific instance, but I -- if I was to need instruction, I would probably speak to Colin Conway.

Q. Okay. Was it Colin Conway's decision to have you appointed as the representative of the Oliphant

Page 11

entities in this bankruptcy?

A. I don't recall. I mean, I was -- again, I was -- you know, this -- we were defending ourselves in the Ferrum litigation, and I was managing that. And I think, you know, that I was kind of a logical choice since I was already involved in that and handling that litigation. I mean, I had a conversation with Colin, and I think it was assumed that I would take this role.

Q. You didn't decide to do this on your own, did you?

A. No. I mean, I -- I spoke to Colin about it and...

Q. You wouldn't have done this without Colin Conway your CEO's permission, would you?

A. Probably not.

Q. You're not aware of any authority that you have in your role as vice president of legal outsourcing that would give you the authority within any of the Oliphant entities to designate yourself as the representative of the Oliphant entities in this bankruptcy?

MR. RIDULFO: I'm going to object to the form. And I also object it's beyond the scope of the deposition of the 30(b)(6). There's nothing in there about his authority.

You may answer.

Page 12

A. Can you state the question one more time?

Q. (BY MR. LEFLORE) You wouldn't be the designated representative of the Oliphant entities unless you were given that authority by someone else at the Oliphant entities other than yourself?

MR. RIDULFO: Same objection.

A. Yeah, I think that's accurate.

Q. (BY MR. LEFLORE) Did Colin Conway give you the authority to be the debtor's representative?

MR. RIDULFO: Objection. He's not answering with respect to the debtor.

MR. LEFLORE: Strike that.

Q. (BY MR. LEFLORE) With respect to the Oliphant entities, do you have permission from Mr. Colin Conway to be the debtor's representative?

A. Yes.

Q. Okay. And Mr. Colin Conway is the ultimate -- your ultimate boss at Oliphant USA?

A. Yes, that's correct.

Q. Do you have any factual information about why resolution of claims relating to Ferrum or my clients, the plaintiffs in the bankruptcy, would be more economic in Delaware versus Texas?

A. I'm not sure I understand the question. I'm sorry. Can you rephrase it or --

LEXITAS

Page 17

responding to your objection, sir. You have two lawyers there that are more than capable of talking to me about that.

MR. LEA: And this one of those two lawyers adopts Rob Dehney's comments. Rob -- Mike, please stop obstructing --

MR. RIDULFO: I said I will take them question by question. Let's see what we've got. I've already instructed him not to answer the last question. Let's move on.

Q. (BY MR. LEFLORE) Mr. Laux, what expenses of Collins Asset Group are the Oliphant entities paying for today?

A. I have to review the ledger. I know that there were some service providers that Oliphant was paying on behalf of Collins Asset Group, and I believe we listed them on one of the schedules or -- I believe it was the statement of financial affairs or the schedule of assets and liabilities. I can't remember which form.

But there -- there were some service providers that Oliphant USA was paying on behalf of Collins Asset Group, even though the -- the contract that was signed by Collins Asset Group, you know, was signed on behalf -- sorry -- the contract was signed by Collins Asset Group, but Oliphant USA was paying that bill for at

Page 18

least some period of time. I don't -- I don't know. I'd have to look at the ledger.

Q. And what do those -- what do those services relate to that Oliphant is paying for CAG, that you recall?

A. I'd have to pull up those schedules. I believe that the -- there's a Sentinel Solutions, I think is the vendor, and that is -- that original contract was signed by Collins Asset Group, and that's basically the collections software, if you will, that the accounts are stored in.

Q. Are there any other items?

A. There may be. There -- there may be. I'd have to look at the schedules again. I don't -- I don't recall off the top of my head.

Q. Okay. Who -- who pays the rent for the lease in Austin, Texas for the office that you're in right now?

A. I believe that's Oliphant USA.

Q. Okay. What does CAG pay Collins Asset Group for the use of those offices to Oliphant USA?

A. I don't know.

Q. Are you aware that anything is owed by Collins Asset Group to Oliphant for use of that office and its services?

A. I don't know. I don't recall.

Page 19

Q. Well, you said that a person -- a lady that works in the Austin office opens all of CAG's mail and scans it in. Is that right?

A. That's correct.

Q. Okay. Who pays that lady to open CAG's mail?

A. Oliphant USA.

Q. Okay. How does Oliphant USA get reimbursed for providing that employee to open CAG's mail?

A. I don't know. They're an employee of Oliphant USA. I'm not sure if I understand the question.

Q. Okay. So what's -- what's the lady's name?

A. Jennifer Charles.

Q. Jennifer Charles. Jennifer Charles -- what's her position with Oliphant USA?

A. I don't -- I don't recall her official title. I'm sorry.

Q. Okay. One of her jobs for Oliphant USA is to open CAG's mail?

MR. RIDULFO: Objection. Asked and answered.

You may answer it one more time.

A. That's correct.

Q. (BY MR. LEFLORE) Who instructs her to open CAG's mail?

A. I'm not sure who her boss is, to be quite

Page 20

honest. I don't know who she reports to.

Q. Do you know of anybody that -- at -- that she might report to that would have authority to have -- to open -- to instruct an Oliphant entity employee to open CAG's mail?

A. I don't know.

Q. When a check gets sent to Collins Asset Group, where does it go, the physical check?

A. It most likely comes to this office, 6001 West William Cannon Drive, Suite 102.

Q. Okay. Who is authorized to deposit that check once it's received?

MR. RIDULFO: By CAG? I'm going to instruct him not to answer. It's beyond the scope of the deposition. He is not testifying with respect to CAG.

Q. (BY MR. LEFLORE) I'm asking whether Oliphant USA or any of its entities has received authority from CAG to open its mail that contains physical checks and deposit it for CAG.

MR. RIDULFO: You can answer that question.

A. Ultimately, the employees of Oliphant USA report to Colin Conway. So I would imagine he empowers Jennifer Charles to open that mail, being that he is the sole member of the board of directors of Hollins Holdings who has 100 percent ownership of Collins Asset Group.

Page 25

on a number of -- of things outlined in the -- the promissory notes, and -- and it's also subject to dispute in terms of servicing fees. So we have been trying to work with the receiver to try to come to some understanding as to what those servicing fees should be, and we could not come to an agreement. So it makes it very hard to pay a sum of -- of unknown money to someone when you don't know what that sum should be.

Q. I thought your testimony was that the dispute was with the receiver but that as between CAG and Oliphant there wasn't a dispute.

A. It is unwritten -- we do not have a servicing agreement between Collins Asset Group and Oliphant USA. So if that -- again, I don't know the formal definition of what "dispute" is, but there is no written agreement between Collins Asset Group and Oliphant USA outlining what those servicing fees should be. So in that regard, I -- if you call that a dispute, then call that a dispute.

But I think that Oliphant USA and Collins Asset Group could agree to a servicing fee schedule had it not filed bankruptcy. The problem is what is due is now due to the -- the estate and to the trustee. So it's now out of Collins Asset Group's hands, as I understand it at least. I'm not a bankruptcy expert.

Page 26

Q. So before the bankruptcy was filed, what prevented Oliphant from making a payment to CAG of at least what y'all two agreed on was owed?

A. Well, it involved the -- the Texas receiver and getting the receiver to agree to the -- those terms as well.

Q. Why would the receiver have to agree on -- as between CAG and Oliphant about money that was -- that Oliphant believed was due to CAG? What does that have to do with the receiver?

MR. RIDULFO: Objection. What does this have to do with the venue motion, please?

MR. LEFLORE: Again, the responses -- regardless of whether you think they're well-taken, but the responses of the debtor include the response that it will be an economic burden to the debtor in order -- if the -- if the case were moved to Texas. Now, you -- if you don't think that that's a valid objection, that's fine. It's an objection in the case. I'm going to ask Oliphant about it.

MR. RIDULFO: That's not what you asked Oliphant.

MR. LEFLORE: Yes, I, in fact -- I am asking why Oliphant hasn't paid amounts that Mr. Laux says Oliphant and CAG could agree on from Oliphant to

Page 27

pay.

MR. RIDULFO: You may answer that question. It's been asked and answered, but you can answer it again.

A. I think those entities could agree. They have nothing in writing.

Q. (BY MR. LEFLORE) Why didn't they agree before the bankruptcy, as you understand it?

A. As far as I understand it, it's because the Ferrum receiver -- and maybe -- maybe receiver is not the right party. But as I understand it, the receiver thought that more was due to the receiver than, you know, CAG or the Oliphant entities thought was due.

Q. I understand that.

I believe you testified earlier that you were the one that coordinated or worked on answering discovery in the Texas litigation?

A. Correct.

Q. Or one of the people?

A. Yes, that's correct.

Q. Can you remind me again which Oliphant USA employees you worked with to do that?

A. So Tom Pawelek, I believe, pulled documents and data, pulled emails from the server. I believe Damian Alfalla -- well, he's not an employee of Oliphant. Nick

Page 28

Swinea may have helped; I don't recall. Both of them were -- you know, both Tom and Nick work in IT, so they helped pull, you know, documents and data together and then produced that to myself and our counsel.

Q. Okay. Did OUSA charge back any of its expenses for discovery to Collins -- Collins Asset Group?

A. In defense of itself? Is that what you're asking or --

Q. Well, in answering discovery for -- it was the one doing the work for answering discovery for both entities. Did it charge anything back to Collins Asset Group?

A. Can you say that one more time? I didn't quite hear all of the -- your question. I'm sorry.

Q. Well, the -- let's say there's a discovery request and it goes out to CAG and it goes out to Oliphant, the Oliphant entities, and it's asking for the same information. The people that work on that are Oliphant USA employees. Correct?

A. That's correct.

Q. Does any of their time or expense get charged back to CAG for answering CAG's discovery?

MR. RIDULFO: I'm going to object it's beyond the scope of the 30(b)(6).

But you can answer.