# EXHIBIT 8

Page 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:          ) Chapter 7
                )
COLLINS ASSET GROUP, LLC   ) Case No. 25-10994-LSS
                )
   Debtor.      )
                )
In re:          ) Chapter 7
                )
HOLLINS HOLDINGS, INC.    ) Case No. 25-10995-LSS
                )
   Debtor.      )
_____

RULE 30(B)(6) ORAL DEPOSITION OF
DANIEL LAUX
DESIGNATED REPRESENTATIVE FOR
COLLINS ASSET GROUP LLC AND HOLLINS HOLDINGS INC.
JULY 14, 2025
(Reported Remotely)
_____

RULE 30(B)(6) ORAL DEPOSITION OF DANIEL LAUX, produced as a witness at the instance of the Movants, and duly sworn, was taken in the above-styled and numbered cause on the 14th of July, 2025, from 2:18 P.M. to 3:42 P.M., before Shelly M. Tucker, CSR in and for the State of Texas, reported remotely by machine shorthand from Hays County, Texas, with the witness appearing remotely from Austin, Texas, pursuant to the Federal Rules of Civil Procedure and any provisions stated on the record.

Page 2

A P P E A R A N C E S

FOR JUDY A. MUSGROVE AND RANDY SPARKS ET AL.:

Byron L. LeFlore Jr.
Shari P. Pulman
Kerry S. Alleyne
PULMAN LEFLORE PULLEN & REED LLP
2161 NW Military Highway, Suite 400
San Antonio, Texas 78213
Tel: 210-222-9494
Fax: 210-892-1610
bleflore@pulmanlaw.com
spulman@pulmanlaw.com
kalleyne@pulmanlaw.com

- AND -

Robert J. Dehney Sr.
MORRIS NICHOLS ARSHT & TUNNELL LLP
1201 North Market Street, 16th Floor
Post Office Box 1347
Wilmington, Delaware 19899-1347
Tel: 302-351-9200
Fax: 302-658-3989
rdehney@morrisnichols.com

FOR JOHN PATRICK LOWE IN HIS CAPACITY AS THE COURT-APPOINTED RECEIVER FOR FERRUM CAPITAL LLC AND FERRUM IV LLC:

Royal B. Lea, III
ROYAL LEA LAW OFFICE PLLC
1901 Northwest Military Highway, Suite 218
San Antonio, Texas 78213
Tel: 210-202-2395
royal@royallealaw.com

FOR COLLINS ASSET GROUP LLC:

Richard Michael Beck
KLEHR HARRISON HARVEY BRANZBURG LLP
919 Market Street, Suite 1000
Wilmington, Delaware 19801
Tel: 302-552-5501
Fax: 302-426-9193
rbeck@klehr.com

Page 3

A P P E A R A N C E S (cont'd)

FOR ACCELERATED INVENTORY MANAGEMENT LLC, OLIPHANT FINANCIAL LLC, OLIPHANT USA LLC, AND OLIPHANT INC.:

Michael P. Ridulfo
KANE RUSSELL COLEMAN LOGAN
5151 San Felipe Street, Suite 800
Houston, Texas 77056
Tel: 713-425-7400
Fax: 713-425-7700
mridulfo@krcl.com

- AND -

Christopher M. Donnelly
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Tel: 302-888-6800
Fax: 302-571-1750
cdonnelly@morrisjames.com

FOR GEORGE L. MILLER:

Evan T. Miller
SAUL EWING LLP
1201 North Market Street, Suite 2300
Wilmington, Delaware 19801
Tel: 302-421-6864
Fax: 302-421-6813
evan.miller@saul.com

Page 4

I N D E X

                                              PAGE
Appearances.....................................    2
DANIEL LAUX
    Examination by Mr. Lea......................    6
    Examination by Mr. LeFlore.................   47
    Further Examination by Mr. Lea.............   61
Changes and Signature...........................   63
Reporter's Certificate..........................   64

E X H I B I T S

NUMBER          DESCRIPTION                     PAGE

Exhibit 1      2025 Notice of Appraised Value     16

Exhibit 2      List of Plaintiffs          24

Exhibit 3      Indictment                  34

Exhibit 4      Collins Asset Group petition     37

Exhibit 5      Collins Asset Group licenses     41

Exhibit 6      Collins Asset Group accounts     44



Page 5

P R O C E E D I N G S

(Oath administered)

THE REPORTER:  Counsel, please state your appearances.

MR. LEA:  Royal Lea for the receiver.

MR. LEFLORE:  Byron LeFlore for Plaintiffs.

MR. BECK:  Richard Beck for the debtors and the witness.

MR. RIDULFO:  Mike Ridulfo -- last name is R-i-d-u-l-f-o -- representing what we are calling the Oliphant parties.  That's O-l-i-p-h-a-n-t.

MR. MILLER:  Evan Miller of Saul Ewing on behalf of George Miller, the Chapter 7 Trustee for the Estates of Collins Asset Group and Hollins Holdings.

MS. ALLEYNE:  Kerry Alleyne with Byron LeFlore for the plaintiff.

MS. PULMAN:  Shari Pulman with Byron LeFlore for the plaintiff.

THE REPORTER:  Anybody else?  Jonathan?

MR. DEHNEY:  This is Rob Dehney.  I think Jonathan's going to drop.  Local counsel for the movants.

THE REPORTER:  Is that everybody?  Okay. You may begin questioning.

MR. BECK:  Before we begin, I just want to put on the record our agreement on the scope of the

Page 6

deposition, if that's okay.

We have agreed that the deposition will be limited to questioning that is related to the pending motion to change venue and that the debtors reserve their right to object to questions on the basis that they exceed the scope of that agreed -- the agreed scope of the deposition, and we've also agreed to limit the duration of the deposition to no more than 90 minutes.

MR. LEA:  The receiver agrees.

MR. LEFLORE:  Plaintiff agrees.

MR. BECK:  Fire away.

MR. LEA:  Are we ready?

MR. BECK:  Yes.

DANIEL LAUX, having been first duly sworn, testified as follows:

EXAMINATION

BY MR. LEA:

Q.  Mr. Laux, good afternoon.  Your name is Daniel Lux [sic]?

A.  That's correct.  Daniel Laux.

Q.  Laux?

A.  Laux.  Like a door locks.

Q.  Like l-o-c-k-s?

A.  Yes, sir.

Q.  Okay.  You understand you're under oath,

Page 7

Mr. Laux, sworn to --

A.  Uh-huh.

Q.  -- tell the truth and subject to the penalties of perjury?

A.  I do.

Q.  You understand that we're here for your deposition this afternoon?

A.  I do.

Q.  You understand you're appearing as the designated representative of Collins Asset Group and Hollins Holdings?

A.  I do.

Q.  You understand we're going to talk about the question of the motion to -- issues relating to the motions to transfer venue and where --

A.  Yes.

Q.  -- where the debtors' bankruptcy should take place.  You understand that?

A.  Yes.

Q.  Where are you right now, Mr. Laux?

A.  I'm in Austin, Texas.

Q.  Where in Austin, Texas are you right now, Mr. Laux?

A.  I'm at -- the physical address is 6001 West William Cannon Drive, Suite 102.

Page 8

Q.  What's at that address, Mr. Laux?

A.  I'm sorry.  We are speaking over each other. Say that again.

Q.  You're at an address on William Cannon Drive in Austin, Texas.  Yes?

A.  That's correct.

Q.  What's -- what is -- what are the premises at that address?

A.  What are the premises?  What are you --

Q.  Yes, sir.  Are you at your home?  Is that where your home is?

A.  No.

Q.  But you're inside a building?

A.  Yes.

Q.  Yes?

What's at that building?

A.  This is the location of Oliphant USA LLC.

Q.  And in that building, in the offices or facilities of Oliphant USA, do you have an office?

A.  Yes, I do.

Q.  Are you seated in that office?

A.  I am.

Q.  Are you alone in that office?

A.  I am.

Q.  No one else -- no one else is in the room with

Page 9

you?

A. That's correct.

Q. Do you separately have an office there or anywhere else, Mr. Laux, for your work or business or whatever it is you do on behalf of debtors?

A. No.

Q. The work or business that you conduct on behalf of the debtors you do from your same office as you use for your business for Oliphant. Is that right?

A. Correct.

Q. Do you have a separate phone number for the business you conduct for the debtors, separate from the phone number you use for business for the Oliphant companies?

A. Yes. Collins Asset Group does have a separate phone number, yes. I don't know it off the top of my head, though.

Q. I was asking, though, Mr. Laux, about the phone number you use yourself for conducting the business of the debtors. Do you -- when you conduct the business of the debtors, do you use the same telephone that you use for conducting the business of the Oliphant parties?

A. It's the same phone.

Q. You use the same phone number both for the business of the debtors and for the business of the

Page 10

Oliphant parties. Yes?

A. Yes.

Q. When you testified last week at the 341 meetings for the debtors, were you in that same room you're in now, your office at the Oliphant parties' place of business on William Cannon Drive in Austin, Texas?

A. Yes.

Q. Why did the debtors choose you, Mr. Laux, to be the representative to talk about the subject of our deposition today?

A. I mean, I've been appointed by Colin Conway to handle and manage this bankruptcy with my counsel.

Q. And so that's the same reason why you were the person appointed and designated to appear on behalf of the debtors at the 341, seated at your desk at the Oliphant companies in Austin, Texas. Yes?

A. Correct.

Q. Why are you in Austin today to testify for the depositions, Mr. Laux?

A. Because this is where my office is.

Q. But the bankruptcy case is in Delaware. So why are you at your office in Austin and not in Delaware to testify at the deposition today, Mr. Laux?

A. I mean, we're conducting this over Zoom, so I don't think it really matters.

Page 11

MR. LEA: Objection. Nonresponsive.

Q. (BY MR. LEA) I need you to answer the question.

A. Could you repeat it, please?

Q. Yes, sir. Why are you testifying today in Austin as opposed to being in Delaware?

A. I'm not really sure how to answer that. I just -- this is where my office is. This is where I come every Monday through Friday.

Q. You live in the Austin, Texas area?

A. No. I live outside of Austin.

Q. How far outside of Austin?

A. 30, 45 minutes' drive, about.

Q. But in the Austin metropolitan area. Yes?

A. I live in San Marcos.

Q. Okay. Is it true, Mr. Laux, that when you conduct the business of the debtors, you're generally in Austin, Texas when you do that?

A. Generally, yes. Sometimes I do work from home in San Marcos.

Q. Okay. But the reason you conduct the business of the debtors either in Austin or San Marcos -- which is Hays County, Texas, isn't it?

A. That's correct.

Q. The reason you conduct the business of the

Page 12

debtors in either Travis or Hays County, Texas is because those are the counties where you live and work. Right?

A. That's correct.

Q. And because the books and records of the debtor -- the debtors, both of them, are on a server in Austin or Travis County, Texas. Right?

A. That's correct.

Q. Who besides you, Mr. Laux, conducts business for the debtors?

A. I mean, so the debtors' assets are being serviced by Oliphant USA. So, you know, there's a variety of Oliphant USA employees that -- that manage those books and records.

Q. You're a manager of Collins Asset Group. Yes?

A. Yes.

Q. Who besides you is a manager of Collins Asset Group?

A. Hollins Holdings is the sole managing member. But Collins Asset Group doesn't have any employees, if that's what you're asking.

Q. And you're the only person who conducts the business of Collins Asset Group. Is that right?

A. That's correct.

Q. Or at least as a designated manager of the company?



Page 13

A. That's correct.

Q. Right?

Everyone else who conducts business of Collins Asset Group is an employee of the Oliphant companies. Right?

A. Can you say that one more time?

Q. Yes, sir. The Oliphant companies service and manage the assets of Collins Asset Group, don't they?

A. Yes, that's correct.

Q. So the people, the human beings, who are conducting the business of the debtor Collins Asset Group are either entirely or at least predominantly employees of the Oliphant parties, aren't they?

A. Yes, that's correct.

Q. Collins doesn't do any servicing or management of its own assets, does it? It relies on the Oliphant parties to do that. Right?

A. At this time, yes. That's correct.

Q. And how long has that been the case, Mr. Laux?

A. At the end of 2019, Oliphant USA utilized one of its bankruptcy vendors to service -- our bankruptcy and probate vendors to service some of Collins Asset Group's accounts that -- where the consumers had filed bankruptcy were deceased. That's when that relationship really started.

Page 14

There was also a period of time in, I think, the middle of 2020 where Oliphant USA -- Collins Asset Group used Oliphant USA's legal network of attorneys to initiate some collection litigation. And then internally, in -- I think it was the middle of 2022 Collins Asset Group transferred all of its servicing to Oliphant USA, whether that be internal collections with Oliphant USA's own collectors or sub-servicers such as external agencies.

Q. Who does the bookkeeping and recordkeeping for Collins Asset Group? Employees of one of the Oliphant companies?

A. So I help with that. But yes, there -- there's employees of Oliphant USA that keep books and records for Collins Asset Group.

Q. So when I suggest to you, Mr. Laux, that it sounds to me like Collins Asset Group is really a zombie being operated by the Oliphant parties, tell me why I'm wrong when I say that.

MR. BECK: Objection to form.

Q. (BY MR. LEA) Go ahead. You can answer.

MR. BECK: If you're able to answer.

A. I'm not really sure what you mean by "zombie." I don't understand.

Q. (BY MR. LEA) All right. And that's your best

Page 15

answer to that question? That's the best you can do, is tell me you don't understand the question?

MR. BECK: He answered the question. Stop badgering.

MR. LEA: I haven't badgered anybody yet, Richard.

MR. BECK: You're badgering. Move on.

Q. (BY MR. LEA) Do you know what a zombie is, Mr. Laux?

MR. BECK: Like the Hollywood zombie genre? Is that what you're asking?

Q. (BY MR. LEA) Mr. Laux --

MR. DEHNEY: Let's -- let's not waste time.

Q. (BY MR. LEA) What does a zombie mean to you, Mr. Laux?

A. It's not my preferred genre of film, but I believe they are some type of entity that eats brains.

Q. That's all you understand a zombie to be. Yes?

A. Like -- like I said, it's not my genre. I don't know.

Q. What property does Collins Asset Group own in Delaware? Any?

MR. BECK: What -- objection to form. What kind of property are you asking about?

Q. (BY MR. LEA) Mr. Laux, if you don't understand

Page 16

a question I ask you, you'll tell me.

MR. BECK: That's fine. Object to the form.

Q. (BY MR. LEA) Mr. Laux, what property does Collins Asset Group own in Delaware?

A. Collins Asset Group owns some consumer accounts in Delaware.

Q. Okay. What else?

A. I don't believe there's anything else. We don't have real estate, though.

Q. And no other personal property besides some account debtors -- accounts with account debtors who live in Delaware. Is that right?

A. I think that's right. I don't know -- I mean, I'm sure we probably have collection licenses and maybe bonds there, but I don't know off the top of my head. I don't know if that would be considered property --

Q. What --

A. -- as I understand the term.

Q. What property does Collins Asset Group own in Texas?

A. Pretty much the same. Consumer accounts.

MR. LEA: Kerry, would you please put up the tax assessment statement.

(Exhibit 1 marked)



Page 29

A. My apologies. I misunderstood.

So I don't know if it would be more or less efficient in either location. I -- I don't know. This is my first time in bankruptcy court.

Q. Okay. You don't have an answer to that question?

A. I mean, I think that is my answer, is that I -- I -- I don't know if it's more or less efficient to be in Texas or in Delaware.

Q. If you had to travel to court in Austin, Texas, Mr. Laux, from your home, about how long would it take you to get there?

A. Based on Austin traffic, probably hour, maybe hour and a half depending on if there's an accident.

Q. Okay. So if court were scheduled at 9 o'clock in Austin, Texas, you think you could leave your home at 7 o'clock that morning and arrive in court by 9 o'clock most mornings?

A. That's possible. Yeah, that's not outside the realm of possibility.

Q. And if court were in San Antonio, Texas, Mr. Laux, at 9 o'clock in the morning, to be safe, what time would you need to leave your home to be in court in downtown San Antonio by 9 o'clock in the morning?

A. I'm less familiar with San Antonio traffic.

Page 30

But maybe the same time, 7 o'clock. I don't know.

Q. So if court were in Delaware at 9 o'clock in the morning, Mr. Laux, what time would you need to leave your home that day to be in court in Delaware?

A. I don't know. It depends on the time of flights and how long they take.

Q. Because you'd have to fly there. Right?

A. If I was -- if -- if you're posing that I leave the same day that that court hearing is, then yes, I would have to fly. It would be a long drive.

Q. Do you know Walt Collins, Mr. Laux?

A. Yes, I know who he is.

Q. Who is he?

A. He's the prior CEO of Collins Asset Group.

Q. How do you know him?

A. I used to work for him.

Q. Where do you think he lives?

A. I don't know exactly. I know -- I believe he lives somewhere in Austin, but I -- I don't know where he lives.

Q. In the Austin, Texas area. Right?

A. That's my belief.

Q. Do you believe, Mr. Laux, that Walt Collins was involved in the origination of the business between Collins Asset Group and Ferrum Capital?

Page 31

A. As far as I know, yes, he was involved.

Q. So which court do you think would be more convenient for Mr. Collins to attend: court in Delaware or court in Austin or San Antonio, Texas?

MR. BECK: Objection to form.

You can answer.

A. Probably Austin, Texas or San Antonio. I -- I don't know how well he is doing these days. He was up in age when he left the company.

Q. (BY MR. LEA) How many people at the Oliphant offices or the Collins Asset Group offices, Mr. Laux, do you think are important -- have important information for the purposes of resolving the dispute between Collins Asset Group and my client, the receiver, over the promissory notes Collins Asset Group made to Ferrum Capital?

A. You're asking me how many employees are -- are currently in this Austin, Texas office that would have information regarding --

Q. Yeah.

A. -- the dispute?

Q. Information on that topic.

A. It may only be me. Damien Alfalla works remotely. He's a contracted worker for Oliphant. I believe he's in New York, I think. I'm not sure. It may

Page 32

only be me here.

Q. Okay. When did Damien Alfalla begin his work for the Oliphant companies and perhaps derivatively Collins Asset Group?

A. I believe sometime in 2024, I think. I -- I don't know the exact date that he started.

Q. You don't think Damien Alfalla has any personal knowledge about anything that happened or transpired between Collins Asset Group and Ferrum Capital, do you?

A. I mean, he -- he came -- he started working with Oliphant long after that relationship with Ferrum Capital started.

Q. And after that relationship had ended. Right?

A. Yes, I believe that's correct.

Q. All right. What about for the relationship, Mr. Laux, between Collins Asset Group and Growth Platforms? Who are the people at Collins Asset Group who have information, useful or relevant, in resolving that dispute?

A. I mean, I'm the only --

MR. BECK: Objection. Objection to form.

A. I'm the only manager of Collins Asset Group, so that would have to be me.

Q. (BY MR. LEA) And the same question for Sill & Associates?

Page 53

and involved in the Texas litigation and I believe specifically in the dispute, you called it, between Oliphant and CAG about the fees payable for servicing from CAG to OSU. Do I recall that correctly?

MR. BECK: OUSA?

MR. LEFLORE: OUSA.

A. So I think the dispute is more between, you know, the Ferrum litigants and Oliphant USA. I mean, I don't think CAG and Oliphant USA disagree on what those fees should be.

Q. (BY MR. LEFLORE) Okay. What should those fees be?

MR. BECK: How does this relate to -- hold on, hold on. How does this relate to venue?

MR. LEFLORE: Well, it relates to venue because you -- the debtor has alleged -- not that I have to justify myself, but the debtor has alleged that the debtor -- debtor does not have the money to hire counsel in Texas because it --

MR. BECK: Okay.

MR. LEFLORE: -- only has 1300 --

MR. BECK: Okay.

MR. LEFLORE: So I'm wondering --

MR. BECK: Fair enough. Go ahead.

You can answer.

Page 54

A. Can you state the question again? Sorry.

Q. (BY MR. LEFLORE) Who is it that is involved -- let me recast it.

Who is it that is involved in determining how much Oliphant should charge to CAG for collecting the Ferrum accounts? Who are the people, the physical people that are involved in that process?

A. That would be myself. Nicholas Swinea is Oliphant USA CIO. And we -- yeah, and we also reached out to a third party to see if the fees that we thought would be reasonable would be. So we -- we basically got their feedback to see if they thought they would be reasonable, and they concurred.

Q. And Nick Swinea? Is that S-w-i-n-e-a?

A. S-w-i-n-e-a. That's correct.

Q. And where does he live?

A. I believe in Hays County, but I don't know his address.

Q. In Texas. And he works out of the Austin office. Correct?

A. That's correct.

Q. And he's worked for -- for Collins Asset Group before. Correct?

A. That's correct.

Q. And any -- any electronic records that are

Page 55

Collins Asset Group records, he's the one in charge of their domain and handling those records and the systems that support any records having to do with Collins Asset Group. Correct?

A. It would be either him or Tom Pawelek, like I mentioned earlier.

Q. Tom Pawelek?

A. Yeah, yeah. I'm sorry.

Q. And is Tom Pawelek in Florida or Texas?

A. Last I checked, he was in Florida. I don't know if he still resides there.

Q. Okay. And you were talking about the -- all of these licenses and the fact that -- that Collins Asset Group still needed to be licensed in order to -- in order for OUSA to collect these debts. Is that your testimony, sir?

A. I know that that's the case for collection litigation. I -- I don't know for certain if that's true for, like, traditional collections, like phone calls that Oliphant USA would make, or letters. I don't know. I'd have to lean heavily on Tatiana's expertise in that regard.

Q. And with respect to those licenses, she's the one that keeps -- keeps track of whether it's a legal requirement that Collins Asset Group have that to perform

Page 56

certain activities. Correct?

A. Yes. With the guidance of counsel, yeah.

Q. I believe you testified in your deposition that --

A. I'm sorry. I didn't understand you.

Q. I believe you testified in your deposition that Oliphant USA owed at least or in the range of a million dollars to CAG for collections made on CAG's behalf. Am I stating that correctly?

A. I don't remember the exact dollar amount. It was somewhere around a million. I don't -- it could be more or less.

MR. BECK: Can I -- are you referring to the 341 or --

MR. LEFLORE: Yes.

MR. BECK: -- the deposition? The 341?

MR. LEFLORE: The 341.

MR. BECK: Thank you.

Q. (BY MR. LEFLORE) About a million dollars?

A. Somewhere, you know, give or take around a million, yes.

Q. If that million dollars were available, would CAG have or the estate have the resources to hire counsel in Texas?

MR. BECK: Objection to form.

