# EXHIBIT 17

Page 1

CAUSE NO. 2023CI22575

JUDY A. MUSGROVE, individually ) IN THE DISTRICT COURT
and as beneficiary of the      )
Mainstar Trust, Cust. FBO Judy )
A. Musgrove IRA, et al.,       )
                               )
Plaintiffs,                    )
                               )
v.                             ) 438TH JUDICIAL DISTRICT
                               )
BROOKLYN CHANDLER WILLY,       )
et al.,                        )
                               )
Defendants.                    ) BEXAR COUNTY, TEXAS


            ORAL VIDEOTAPED DEPOSITION OF
                WALTER A. COLLINS
                  APRIL 24, 2025


        ORAL VIDEOTAPED DEPOSITION OF WALTER A.
COLLINS, produced as a witness at the instance of the
Court Appointed Receiver and duly sworn, was taken in
the above-styled and numbered cause on April 24, 2025,
from 9:59 a.m. to 5:10 p.m., before Autumn J. Cheek,
Certified Shorthand Reporter in and for the State of
Texas, reported by computerized stenotype machine at the
Omni Barton Creek Resort, Fazio Conference Room, 8212
Barton Club Drive, Austin, Texas 78735, pursuant to the
Texas Rules of Civil Procedure and the provisions stated
on the record or attached hereto.

Page 2

A P P E A R A N C E S

FOR PLAINTIFFS:
    Mr. Byron L. LeFlore, Jr.
    Mr. Randall A. Pulman (via videoconference)
    Ms. Shari Pulman (via videoconference)
    PULMAN LEFLORE PULLEN & REED LLP
    2161 NW Military Highway
    Suite 400
    San Antonio, Texas 78213
    Phone: 210.222.9494
    Email: bleflore@pulmanlaw.com
FOR COURT APPOINTED RECEIVER:
    Mr. Royal B. Lea, III
    ROYAL LEA LAW OFFICE, PLLC
    319 Maverick Street
    San Antonio, Texas 78212
    Phone: 210.862.2847
    Email: royal@royallealaw.com

FOR COLLINS ASSET GROUP, LLC, ET AL.:

    Mr. Patrick Watts (via videoconference)
    MARTIN GOLDEN LYONS WATTS MORGAN
    1200 S. Big Ben Boulevard
    St. Louis, Missouri 63117
    Phone: 214.346.2630
    Email: pwatts@mgl.law
FOR WALTER COLLINS:
    Mr. Jonathan Robbin
    J. Robbin Law
    200 Business Park Drive
    Suite 103
    Armonk, New York 10504
    Phone: 914.685.5016
    Email:  jonathan.robbin@jrobbinlaw.com

Page 3

A P P E A R A N C E S (Cont'd)

FOR JOSHUA ALLEN:
    Mr. Joshua Dean Frost (via videoconference)
    FIELD MANNING STONE AYCOCK, P.C.
    2112 Indiana Avenue
    Lubbock, Texas 79410
    Phone: 806.796.4000
    Fax:  806.792.9148
    Email: jfrost@lubbocklawfirm.com

ALSO PRESENT IN PERSON:
Mr. Robert Brill, Videographer

ALSO PRESENT AS LISTED SCREEN NAME VIA VIDEOCONFERENCE:

Tammy Owrey

Kendall Stanaland

Nancy Burnett

Holly Boyd

Paul and Wanda Sheetz

Brent Couch

Tommy York (2)

Art and Laurie Del Negro

Gayle Reese

Alvin and Sharon Zigmond

Cody York

Debra's iPhone

Dan's iPhone 13

Page 4

A P P E A R A N C E S (Cont'd)


ALSO PRESENT AS LISTED SCREEN NAME VIA VIDEOCONFERENCE:

Edward's iPad

Yandee@msn.com

Nicolas

Norm

Nita

Bob

Brook's Notetaker (Otter.ai)

BW

JCR



Page 5

INDEX

PAGE

APPEARANCES ..................................... 2
WALTER A. COLLINS
   Examination by Mr. Lea ..................... 9
   Examination by Mr. Leflore ................ 125
CHANGES AND SIGNATURE .......................... 258
COURT REPORTER'S CERTIFICATE ................... 260
FURTHER CERTIFICATION .......................... 264


COLLINS EXHIBITS
NO.          DESCRIPTION                        PAGE
Exhibit 1  ....................................   11
   Notice of Deposition by Email

Exhibit 2  ....................................   11
   Email Chain Regarding Agenda -
   Ferrum Capital, LLC - April 17 - 18,
   2019 with Attachment
Exhibit 3  ....................................   46
   Ferrum Capital, LLC Commercial Loan
   Illustration (FER CAP006089 -
   006092)

Exhibit 4  ....................................   52
   Email Regarding Memorandum of
   Understanding (CAG-Oliphant 016510)

Exhibit 5  ....................................   54
   Email Chain Regarding Walt Collins -
   Collins Asset Group - Sill &
   Associates, LLC - Purchased Assets
   Pools & Fees (CAG-Oliphant 000602)

Page 6

COLLINS EXHIBITS
NO.          DESCRIPTION                        PAGE
Exhibit 6  ....................................   58
   Email (CE 0126)

Exhibit 7  ....................................   61
   Ferrum Spreadsheet 2023
Exhibit 8  ....................................   73
   Oliphant United LLC Investment
   Opportunity (CAG-Oliphant 017079)
Exhibit 9  ....................................   79
   Due Diligence Report Prepared for
   Victory Park Capital
Exhibit 10 ....................................   86
   Email Chain Regarding Note/Terms
   Summary Sheet with Attachment (CE
   00065)

Exhibit 11 ....................................  115
   Email Regarding Ferrum Brochure (CE
   00115 - 116)

Exhibit 12 ....................................  117
   Email Chain Regarding Ferrum
   Marketing Piece (CE 00068)

Exhibit 13 ....................................  121
   Promissory Note (FER CAP016874 -
   16879)

Exhibit 14 ....................................  135
   Liquidation Forecast (CE 00757)
Exhibit 15 ....................................  142
   Cash Flow Model (CE 00757)

Exhibit 16 ....................................  152
   Payment Details (CAG-Oliphant
   0005537)

Exhibit 17 ....................................  187
   Email Chain Regarding Flyer Full
   With Attachment

Page 7

COLLINS EXHIBITS
NO.          DESCRIPTION                        PAGE
Exhibit 18 ....................................  192
   Email Chain Regarding Responses (CAG
   608)
Exhibit 19 ....................................  205
   Collins Asset Group, LLC OF Notes
   Receivable Allocation (CAG-Oliphant
   013629)

Exhibit 20 ....................................  209
   Servicing Agreement (OEO4O1)
Exhibit 21 ....................................  222
   Email Chain Regarding Diversified
   and Sonoqui UCC Lien Terminations
   (CAG-Oliphant 000539)

Exhibit 22 ....................................  225
   Collins Outstanding Assets Sheet
   (CAG-Oliphant 001038)

Exhibit 23 ....................................  229
   Oliphant United/CAG/OLF Notes by
   Portfolio (Oliphant 011745)

Exhibit 24 ....................................  239
   Collins Asset Group Ferrum Portfolio
   4859-4192-1998 V2

Page 8

THE VIDEOGRAPHER:  We are on the record on April 24th, 2025 at 9:59 a.m.

Counsel, please state your name, location, and firm affiliation for the record, please.

MR. LEA:  Royal Lea representing Pat Lowe, the receiver, from Royal Lea Law Office.

MR. LEFLORE:  I don't think I've got a separate, do I?  Do I have a separate microphone?

THE VIDEOGRAPHER:  Unfortunately, no.  Well, I can take the one --

MR. LEFLORE:  No, that's okay.

Byron LeFlore from Pulman LeFlore Pullen & Reed representing various plaintiffs in the case.  San Antonio.

MR. ROBBIN:  Jonathan Robbin, J. Robbin Law, representing Mr. Collins.

Anyone online maybe, you could start now.

MR. FROST:  Yeah.  Josh Frost on behalf of Joshua Allen.  I'm appearing remotely in Lubbock, Texas.

MR. PULMAN:  Randy Pulman here representing the plaintiffs.  I don't expect to participate, but I'm here online.

THE REPORTER:  If that's it, I'll swear the witness.

MS. PULMAN:  Shari Pulman representing



Page 9

plaintiffs.

MR. ROBBIN:  I think that's all.

MR. FROST:  Is Patrick Watts on?

MR. ROBBIN:  He will be joining, I know that, but I do not see him on yet.

I guess when you see him join on the Zoom, Randy or Josh, if you could just maybe at a logical time tell him to enter an appearance as well.

MR. FROST:  Okay.

WALTER A. COLLINS, having been first duly sworn, testified as follows:

EXAMINATION

BY MR. LEA:

Q   Good morning, Mr. Collins.

A   Good morning, Mr. Lea.

Q   My name is Royal Lea.  You and I met for the first time just a few minutes ago, didn't we?

A   Yes.

Q   You understand, Mr. Collins, that we're here today for your deposition?

A   Yes.

Q   You understand that I and some of the other lawyers will be asking you questions?

A   Yes.

Q   You understand that you're under oath and sworn

Page 10

to tell the truth?

A   Yes.

Q   If I ask you something, Mr. Collins, and you don't hear me because my voice has softened, will you tell me so that I can say it again until you do hear me?

A   You're loud and clear at this time.

Q   If I ask you something and it just doesn't make any sense to you because what I said was stupid, will you tell me so that I can try to ask you a better question?

A   Absolutely.

Q   While I'm asking you questions, Mr. Collins, if you want to take a break for any reason, please just tell us and we will.

A   Yeah.  I have some health issues that could kick in.  I would need a break, but --

Q   Whenever you want a break --

A   -- I'm hoping not.

Q   -- just tell me.

All right.  Mr. Collins, your full name is Walt Collins?

A   Walter Anthony.

Q   Okay.  And you go by Walt?

A   Yes.

Q   And you know that the circumstances in this

Page 11

case involve a company with the name Collins Asset Group?

A   I do.

Q   Is that company named for you?

A   Yes.

Q   Okay.  Mr. Collins, I put a couple of pieces of paper in front of you there, and you'll notice they have little blue stickers on them.  One of them says Exhibit 1 and the second one says Exhibit 2.

(Exhibit Number 1 marked)

Q   (BY MR. LEA)  I want to ask you just a couple of questions about Exhibit 1.

Let's begin with:  Have you seen that email before, Exhibit 1?

MR. WATTS:  Royal, before you proceed -- this is Patrick Watts on behalf of Collins Asset Group and other defendants -- I will be objecting to any deposition exhibits presented to the witness that I'm not presented access to during this remote deposition.

Certainly, obviously, you can proceed, but I won't have the opportunity to review the exhibits or cross-examine the witness, so I'm just getting my objection on the record.

To the extent I can be presented with the exhibits in some manner including using the share screen

Page 12

function, I would be happy to withdraw that objection, but at this moment, I have no access to the exhibits and object to the testimony.

MR. LEA:  Patrick, was that an objection to the form of the question?

MR. WATTS:  It was an objection to the entirety of the testimony.

MR. LEA:  So, Patrick, I'm going to ask you to limit your objections to the form of the questions in the way that Rule 199 requires you to do.

MR. WATTS:  Okay.  I'll object to form, and I'll request a copy of the exhibit as we sit here.

MR. LEA:  All right.

Q   (BY MR. LEA)  Mr. Collins, you can proceed.

Have you seen Deposition Exhibit 1 before?

A   This one, no.

Q   Okay.  Exhibit 1, Mr. Collins, is an email that I sent to many of the lawyers in this case on March 14th scheduling your deposition for today.

A   Oh, okay.

Q   You knew that your deposition was scheduled for today, didn't you?

A   Yes.

Q   Okay.  Did you do anything to prepare for your deposition today?



Page 13

A   Thinking through the -- all the events that are going on.

Q   Okay.

A   And trying to figure out whys and so forth. But, yeah, I had to think through it.

Q   You thought through things?

A   Yes.

Q   Did you study any paperwork to prepare for your deposition today?

A   I believe that you provided my attorney with a number of documents, and I got to look at those.

Q   That was material that you received yesterday?

A   There was material yesterday.

Q   Okay.  Thank you, Mr. Collins.

Mr. Collins, what do you think happened to the money that the Ferrum investors put into Ferrum and was loaned to Collins Asset Group?

MR. ROBBIN:  Objection as to form.

MR. WATTS:  Objection; form subject to that.

Q   (BY MR. LEA)  Go ahead.  You can answer.

A   Would you say it one more time?

Q   Yes, sir.

A   Because I want to -- I really want to -- I like the question.

Page 14

Q   Okay.  You understand -- I mean Collins Asset Group borrowed a bunch of money from Ferrum Capital. Right?

A   Yes.

MR. ROBBIN:  Objection as to form.

Q   (BY MR. LEA)  And you understand that the money Ferrum Capital was loaning to Collins Asset Group came from a bunch of investors --

MR. ROBBIN:  Objection as to form.

Q   (BY MR. LEA)  -- who put money into Ferrum Capital?

A   Ferrum had clients.  That's where I assume it came from.

Q   Okay.  You assume that the money that Ferrum Capital loaned to Collins Asset Group came from those clients, don't you?

MR. WATTS:  Objection; form.

A   All funds have their clients with a fund, and yeah, they all do.

Q   (BY MR. LEA)  Okay.  But you understand that I'm asking you about the funds that Collins Asset Group got from Ferrum Capital, don't you?

A   Yes.

Q   Those funds, the funds that Collins Asset Group got from Ferrum Capital, they came from the clients of

Page 15

Ferrum Capital, didn't they?

MR. ROBBIN:  Object as to form.

A   As best I know, some funds work with other funds, and it could -- it may not be 100 percent from clients.

Q   (BY MR. LEA)  Tell me what sources of money Ferrum Capital had that you know about that didn't come from the investors in Ferrum Capital.

A   I don't.

Q   Okay.  As far as you know, all of the money that Ferrum Capital loaned Collins Asset Group came from the money that was the investor money in Ferrum Capital. Am I correct --

MR. WATTS:  Objection; form.

Q   (BY MR. LEA)  -- about that?

Am I correct about that, Mr. Collins?

A   You're correct in their clients provided capital, but I'm not sure that they didn't get capital from other funds to participate.

Q   Okay.  But you understand I'm not asking you about any of the other funds, don't you, right now?  I'm asking you about Ferrum Capital.

A   Okay.

Q   All of the Ferrum Capital money you believe came from the investors in Ferrum Capital.

Page 16

MR. ROBBIN:  Objection as to form.

Q   (BY MR. LEA)  Do you believe that?

A   I believe that they had other -- I'm not trying to couch anything.  I think that they had capital from other entities.  Other --

Q   You think Ferrum Capital had capital or money from other sources besides the investors in Ferrum Capital?

A   I'm thinking of one, but possibly, yes.

Q   Tell me those other sources, please.

A   There was -- one of Ferrum's agents, Brooklynn Willy, she had her own operation, and she was very, very impressed -- impressive.  Visited me.  Did her due diligence.  She was introduced by Ferrum, and she was very thorough.  She did the appropriate due diligence.

And so my understanding is Ms. Willy had clients, and so she as that fund manager would have worked with Ferrum in that regard.  And that's where I'm -- that's where I'm -- I'm coming from.

Q   Okay.  Those people who were clients of Brooklynn Willy, their money, don't you believe, went into Ferrum Capital?

A   She had a number of different opportunities. But, yes, her clients' money would have gone to her, and any she gave to Ferrum would come in that manner.



Page 21

Q   Okay.  The -- was there a time when you were at Collins Asset Group and you did monitor and manage the collateral?

A   Oh, yes.

Q   Did you -- am I correct that you stepped away from that role in 2021?

A   Yes.

Q   You were in that role from 2017 when the relationship with Ferrum Capital started?

A   Yes.

Q   And you were there through the fall of 2021?

A   Yes.

Q   In that time period, you had the pulse of the collateral, didn't you?

A   The firm certainly did.  We had state-of-the-art technology that monitored everything.

Q   And in that time period, you were the captain of the ship at the firm, weren't you?

A   Well, at that time I had had some medical issues and all, and I'm reported to, to give me an up -- an update on what's going on.  But I really stepped back more as a -- I'm going to use the term face man of the firm.

Q   Okay.  When was the last time you were actually responsible for the collateral?

Page 22

A   Collins would have been responsible for the collateral to the sales date of the company.

Q   Which is in '21?

A   Yes.

Q   And you -- when was the last date when you feel like you were responsible for Collins, the company?

A   My name is Collins.  I'm a partner in Collins.  I'm a partner in Oliphant.  It's not all mine.  I think when we sold I had 21 percent of the company.

But do I feel that I'm -- I was responsible?  Do my partners feel they're responsible?  All the way down to the wonderful team we have feels responsible.

Q   When you stepped away from the company in 2021, Mr. Collins, was everything on course?  Was the money there for the Ferrum investors to get repaid?

A   Yes.

Q   Okay.  We're at the Barton Creek Resort for your deposition today, aren't we?

A   Yes, we are.

Q   The Collins Asset Group often had company meetings here at the Barton Creek Resort, didn't they?

A   You mean employee meetings or...

Q   Company meetings.

A   Yeah.  Certainly over the years some, yeah.

Page 23

Q   Did Ferrum investors attend some of those meetings?

A   Rarely.  We rarely dealt with their clients.

Now, the door was open.  I saw in one of the articles here that it was referred to as a dog and pony show.  What it really was, was a very sophisticated overview of the company, department head by department head, who are all consummate professionals.

And that's -- and so if Ferrum came in with their -- typically, Ferrum was coming in with their agents.

Brooklynn Willy is a good example.  She would -- she never -- she didn't feel that was necessary.  She was the consummate pro, and I have a great deal of respect for her.  So she did due diligence, came in.  None of her clients.

I can't say no client ever came in because the door is open.  If our lender wanted to bring any of their people or one of their -- I'll call them investors, then the door was open for them to come see our operation.

Q   Did you meet some of the Ferrum investors, Mr. Collins?

A   Yes, but I can't -- I can't remember a particular Ferrum investor, but if they brought -- if

Page 24

they brought investors in, I would have met with them.

Q   And they did bring investors in, didn't they, Mr. Collins?

A   I don't recall that.

Q   If you would at the second item I put there for you, Mr. Collins, Deposition Exhibit 2, which is a copy of CAG-Oliphant 018337 and -338.

MR. WATTS:  Royal, do you plan on presenting a copy to me during this deposition?

MR. LEA:  I don't have an electronic copy for you, Patrick.  It's one of your exhibits.

MR. WATTS:  It's one of my exhibits?

MR. LEA:  Yeah.

MR. WATTS:  Okay.

MR. ROBBIN:  That you circulated this --

MR. WATTS:  I got you.  Do you know which exhibit?

MR. LEA:  I don't.

MR. ROBBIN:  I can find it.

MR. WATTS:  I'll look.  I just can't -- I can't tell what's in front of the witness, that's all, for the record.

MR. ROBBIN:  I can -- do you want me to show him?

MR. LEA:  Patrick, it's Walt Collins'



Page 49

borrower?

A   Yes, I see it.

Q   I'm wondering how the loans that Ferrum took in from its investors could have happened without Collins Asset Group?  Can you explain that?

A   If you're saying they designed a program for Collins, could they design a program for another lender?  It's possible.  I'm not -- I don't really get what you're going -- with what you're trying to get to.

Q   I hear you.  Let me see if I can do a better job.

For the Collins -- I'm sorry.  Let me start over.

For the Ferrum Capital program or line of business that involved Ferrum Capital taking in money from investors, bundling the money up and loaning it to Collins, for that program, if you took Collins out of the equation, then that program wouldn't have worked, would it?

MR. ROBBIN:  Objection as to form.

MR. WATTS:  Objection; form.

A   There are other wonderful firms in my industry.  One of them is sister Oliphant that I've got great respect for.

Yeah, they could have done their program

Page 50

through anybody they wanted to.

Q   (BY MR. LEA)  I appreciate you telling me that.  That's not what I meant to ask you.

A   I'm not -- forgive me, then.

Q   Yeah.  For the program that was tailored to Collins Asset Group, if you took Collins Asset Group out of that picture, then a program -- that program wouldn't have worked?  It would have stopped, wouldn't it?

A   Yes, but it wouldn't have ended that opportunity if they wanted to go pursue it.

Q   All right.  I appreciate you telling me that.

I'm not asking you about any other opportunities other than the business that Ferrum Capital had with Collins Asset Group.

If Collins Asset Group had decided not to do business with Ferrum Capital, then the Ferrum Capital loans from investors for business with Collins Asset Group would not have happened, would it?

A   That's right.

Q   All right.  And at Collins Asset Group in the time period between 2017 and 2021, if someone at Collins Asset Group had decided, you know what, we're not doing business with Ferrum Capital any longer, that person would have been you.  Right?

A   No.  It would be a collective.  I had partners.

Page 51

Q   All right.  Who was the senior spokesperson and decider for Collins Asset Group in the period between 2017 and the fall of 2021?

A   I had a partner -- as I have two partners in Oliphant -- and it would be partners' decision with general counsel and teams sitting there.

Q   I want you to tell me, Mr. Collins, what you think would have happened if at any point in 2017 to '21 -- 2021, you had said, you know what, Collins Asset Group, the company with my name on it, is not doing any more business with Ferrum Capital.  What do you think would have happened?

MR. ROBBIN:  Objection as to form.

MR. WATTS:  Objection as to form.

A   That would mean we were abandoning in the middle of doing business, and we would never, never do that -- or find a premier peer in the industry to take that business on.

Q   (BY MR. LEA)  So suppose you didn't abandon it; you just said we're not taking any more loans in from Ferrum Capital, what would have happened?

MR. ROBBIN:  Objection as to form.

Q   (BY MR. LEA)  If you personally, Walt Collins, had said:  I'm not comfortable with Ferrum Capital.  I want us to stop taking in new money from Ferrum Capital,

Page 52

did you have the discretion and the control within Ferrum Capital --

A   I would not -- not individually, no.

Q   If you had said that, what do you think would have happened?

MR. ROBBIN:  Objection as to form.

MR. WATTS:  Objection; form.

A   We would have worked through that portfolio to return their P&I.

Q   (BY MR. LEA)  Okay.  If you had said from the beginning:  I, Walt Collins, don't want to do this business with Ferrum Capital.  I'm not comfortable with it in 2017 at the very beginning, what do you think would have happened?

MR. ROBBIN:  Objection as to form.

MR. WATTS:  Objection as to form.

A   Could I have talked the team into that?  Perhaps.

THE WITNESS:  That's good coffee.

MR. ROBBIN:  I got it.

Q   (BY MR. LEA)  Mr. Collins, I handed you what I marked as Exhibit 4 to your deposition.

(Exhibit Number 4 marked)

Q   (BY MR. LEA)  It was also Exhibit 6 to the deposition of Jack Davis, and it's tagged

Page 65

provided subject to that.

MR. LEA: Patrick, do you have an objection to the form of the question? If you do, please tell me what the objection to the form of the question is.

MR. WATTS: You're testifying on the record to facts that are not in evidence. You're testifying about information that's not for this witness. You're testifying information that's disputed so --

MR. LEA: None of those are objections to the form, Patrick. Do you want to take a break and get in front of a judge real quick?

MR. WATTS: You just asked me to explain, so I gave you the courtesy.

MR. LEA: Those are not form objections. Be mindful, Patrick, of Rule 199.

Q   (BY MR. LEA) Mr. Collins --

MR. WATTS: Objection to form.

MR. LEA: Okay.

Q   (BY MR. LEA) Mr. Collins, I'm getting out of this kind of right in the middle of the page that in 2023 -- the fall of 2023, Collins reported that it had collected about $49,297,000 on the collateral for the loans from Ferrum Capital.

Page 66

Do you see that 49?

A   49,297-, yeah.

Q   And then I'm getting out of this that Collins Asset Group deducted 64.5 percent for its efforts, taking 31,796,000 out of the 49 million that had been collected?

MR. ROBBIN: Objection as to form.

But can you -- where do you see the -- oh, okay. So you're looking at -- now you're looking at the left of the document, not the right?

MR. LEA: I'm looking at --

A   You're looking at the estimation factors?

MR. ROBBIN: He's looking over here now, I think.

MR. LEA: I'm asking about --

MR. ROBBIN: Yeah, originally you said you want to be right of this.

MR. LEA: No, no. I don't want the right. I want to ask about the left part of it.

MR. ROBBIN: Oh, okay. I was confused.

A   You're looking at 64.5?

MR. ROBBIN: Here. Here.

Q   (BY MR. LEA) Yes, sir. Yeah.

I'm going to -- all of my questions for you, Mr. Collins, are about that portion of Exhibit 7

Page 67

that's circled in blue ink on the copy that Jonathan just gave you. Okay?

A   Okay.

MR. WATTS: Objection.

MR. ROBBIN: So I --

MR. LEA: No, no worries.

MR. ROBBIN: I just want make sure because --

MR. LEA: I do too.

MR. ROBBIN: Again, I just wanted to make sure that everything looks clear on that.

Q   (BY MR. LEA) So I'm getting out of this, Mr. Collins, that the company collected $49,297,000 and claimed for itself 64.5 percent or $31,796,000.

Is that how the deal worked while you ran the company, Mr. Collins, between 2017 and 2021?

A   No.

Q   The way the deal worked while you ran the company in that roughly four-year period, the charge for Collins Asset Group's maker's efforts would not have exceeded 50 percent. Right?

A   Other than the example we both --

Q   The minuscule example you gave me of the out-of-statute collections?

A   Right.

Page 68

Q   It would not have exceeded 50 percent, and sometimes it would have been as low as 30 percent.

Do I have that right?

A   That's right.

They were all standard collection rates.

Q   So the idea that Collins Asset Group would claim 64.5 percent of the money for itself, where did that idea come from?

MR. ROBBIN: Objection as to form.

A   I have great respect for people in that -- in Collins -- Bob Morris, for example, dear friend of mine. And early on in the industry, we started the trade association together.

Are you sure that these numbers are accurate? And then was all this paper out of statute?

Q   (BY MR. LEA) Mr. Collins, all I can tell you is that that's what I've received from Ferrum Capital, and the recently former CFO of Collins Asset Group says he's the guy who created it. That's all I know.

MR. WATTS: Object --

MR. ROBBIN: Objection.

MR. WATTS: Objection; form.

Q   (BY MR. LEA) While you ran the company, Mr. Collins, did the company keep accounts and ledgers and schedules that showed the percentage of collections



Page 69

that belonged to your company, Collins, and the percentages that belonged to Ferrum Capital?

A    Meticulous.  Our systems are accounting, reporting, management of the pools, technology, our acquisition technology, second to none.

Q    Okay.  And I hear you telling me that they were really good systems, but I want to make sure --

A    I'm sorry.  I've got --

Q    No, no, no.  That's fine.  Don't apologize.

Were there schedules or ledgers that showed to the penny what the Collins share of the money was and what the Ferrum Capital share of the money was?

A    Yeah, I don't mean -- I'm not smirking or making light of, but we had a lady -- there's goes my memory -- working for the CFO, controller.  She -- it had -- it had to get to the penny for her.

Q    Okay.  I hear you telling me that, and I appreciate what you said.  I think I know what you mean, but because we're going to be in court --

A    I'm sorry.

Q    -- and because I got a lot of lawyers nipping at me, am I correct, is it true that while you ran the company, the company had detailed ledgers and reports that showed to the penny how much of the money collected was Collins money and how much was Ferrum Capital money?

Page 70

A    Yes.

Q    In fact, the way y'all kept those ledgers, the column in them that showed how much was Collins money was labeled "My Money," wasn't it?

A    I saw that, and whoever was there, that was cute.

Q    But --

A    But, yes.

Q    -- I thought it was cute too, but because we're in court and we shouldn't joke around at all --

A    I understand.

Q    -- those records actually said my money in quote marks?

A    I saw it.

Q    And when it said "My Money" in all seriousness, that was referring to your company's share of the money, wasn't it?

A    Either -- yes.  Yeah, it would have to be.

Q    And there was a column that was labeled Client Money or Lender Money, and that was the share of the money that was attributable to Ferrum Capital, wasn't it?

A    Yes.

Q    And there was a column labeled Agency, and that was the portion of the money that was attributed to

Page 71

agency costs.  Right?

A    Yeah, I'd have to see it again to...

Q    Okay.

MR. WATTS:  Is there a document the witness is testifying off of?  I'm sorry.

MR. ROBBIN:  No.

MR. LEA:  No.

MR. WATTS:  Okay.  Okay.  So no documents have been presented?

MR. LEA:  I'll agree with that, Patrick.

MR. WATTS:  You're referencing and quoting items from a document that I don't have, and I'm not -- and the witness doesn't have, so I'm just confirming.

MR. LEA:  Actually, I don't have it either, Patrick.

MR. WATTS:  Okay.

Q    (BY MR. LEA)  Mr. Collins, if the Collins share of the money had actually been 64.5 percent, do you agree with me that there would never have been enough money to repay the loans from Ferrum Capital?

MR. ROBBIN:  Objection as to form.

A    That's true.

MR. WATTS:  Same objection.

Q    (BY MR. LEA)  I'm sorry, sir?

A    That's true.  I don't -- I don't -- I can't see

Page 72

how it could.

Q    Right.  The deal with Ferrum Capital between Ferrum Capital and Collins Asset Group could never work, and by that I mean Ferrum Capital was never going to get repaid if Collins Asset Group kept for itself 64.5 percent of the collections.

Do I have that right?

MR. ROBBIN:  Objection as to form.

A    Yes.

Q    (BY MR. LEA)  Thank you.

MR. ROBBIN:  Give me a second to object before you answer.

Q    (BY MR. LEA)  Yeah, Mr. Collins, you've probably figured this out by now.  When I ask you a question, one or more of the lawyers is going to object to everything I ask you.  That's just the way it works.

And so if you would, it might be helpful if you paused for a second before answering.  Let them rid themselves of all the objections they want to make, and then unless somebody instructs you not to answer, then you should go ahead and answer.

A    Okay.

Q    Okay.

MR. ROBBIN:  Thank you.  I apologize.

MR. LEA:  No, that -- no, no, no.

Page 85

A   In April and May of '21, just a few months before the sale of the company, our sister Oliphant did not have the money to make acquisitions in those two months that would have hurt them. Collins loaned the money, millions of dollars, to sister firm Oliphant, and as we should, took a UCC-1 out, which very well could have been Ferrum.

And all of this is tracked by -- the missing element in here to me is tracking the UCC-1s.

Q   Okay.

A   And I love my companies. I love people at the companies. Some of it does make sense to me.

MR. LEA: Autumn, Jonathan, is our next number 9?

MR. ROBBIN: Yes.

THE REPORTER: I have down you've marked 9.

MR. LEA: Okay.

MR. ROBBIN: Yeah, the last one we did was 8 -- oh, no. You're at 10, I think. Sorry.

THE WITNESS: I'm sorry. What do I have?

MR. ROBBIN: You're on 10 now.

MR. LEA: I'm on 10?

MR. ROBBIN: Yeah.

MR. LEA: Okay.

Page 86

MR. ROBBIN: Sorry about that.

MR. LEA: No. No worries.

MR. ROBBIN: He's giving you something new. You don't --

THE WITNESS: Oh, well, well.

Q   (BY MR. LEA) Mr. Collins, I've handed you Exhibit 10.

(Exhibit Number 10 marked)

Q   (BY MR. LEA) It's an email exchange or a chain on -- in September of 2017, and it looks like it's between you from Collins Asset Group and Josh Allen at Ferrum Capital. It looks to me like it's talking about an origination fee.

You see that?

A   Yeah. All of our lenders had origination fees.

Q   Okay.

MR. LEA: And, Patrick, it's -- the Collins production number is CE 00065.

MR. WATTS: I have access to this one, so no objection.

Q   (BY MR. LEA) If you look at the second page of Exhibit 10, Mr. Collins, there's a table.

A   Uh-huh. Yeah. This was sent to me.

Q   And is that how the origination fees worked between Collins Asset Group and Ferrum Capital?

Page 87

A   This was -- this was testing the waters. It never turned out like this. They wound up -- unless -- Ferrum never had terribly short or terribly long. I'm sure they were four and five.

But for some reason, they wanted to test what would we do in these maturities and all, but that didn't happen.

Q   Okay. What was the origination fee on the four-year loans that Ferrum Capital made to Collins Asset Group?

A   I think I'm looking at; it's 9s and 10s depending on which maturity.

Q   Okay. And then was there also a servicing fee?

A   They had a maintenance fee that we paid, and we restricted that to two payments.

Q   Okay. So for a million-dollar loan that Ferrum Capital made to Collins Asset Group --

A   Right.

Q   -- tell me how the origination fee worked.

A   It was -- making it simple math?

Q   Yes, sir.

A   A million-dollar note; 900,000 in cash.

Q   Okay. And Ferrum Capital kept 10 percent?

A   That's what they're operating, yes.

Q   Okay. So if it was a million-dollar note, a

Page 88

million dollars of investor money from the Ferrum investors didn't get deployed or put to use, did it?

A   I'm sorry?

Q   Yeah. All right.

Imagine with me -- let me start over.

A   I think I know -- I think I know where you're going.

Q   I'm going to start over.

Imagine with me that people that Josh Allen and Mike Cox and Brooklynn Willy know invested a million dollars in Ferrum Capital, and now that million dollars is available for Ferrum Capital to loan to Collins Asset Group.

Are -- have you followed me so far?

A   Yes.

Q   A million dollars is not going to get put to use to purchase accounts and collateral for Ferrum loans, is it?

A   That's in -- there's loan origination in every one of these. The answer is no. But it's standard.

Q   Okay. I'm wondering where that got disclosed to the Ferrum investors?

A   I have no idea.

Q   Okay.

A   That was standard for us. We would have



Page 105

loan -- or collected a million dollars -- right -- from its investors in, say, 2018 and advanced $900,000 to Collins Asset Group for a loan.  Right?

A    Uh-huh.

Q    And Ferrum Capital keeps $100,000 for itself.  That's the origination fee.  Right?

A    Uh-huh.

Q    Is this making sense to you so far?

A    Yes.

Q    Okay.  And then four years later in 2022 that loan matures.  Right?  They're four-year loans?

A    Sure.

Q    And it -- it's a roller.  That's what y'all called it.  Right?

A    That's what it was called.

Q    Was there another origination fee taken out of that same money?

A    I don't recall.

Q    Should there have been?

A    I don't -- I would rather not have -- I don't know.  I don't know.

Q    Okay.  Why would there be another origination fee taken out of a situation where there was no new money being advanced?

        MR. ROBBIN:  Objection as to form.

Page 106

        MR. WATTS:  Objection as to form.

A    Yeah, I cannot -- I can't -- I just can't recall that.  I don't know if they were or not.

Q    (BY MR. LEA)  Okay.  But does it make sense to you?  Does that make economic sense to you --

        MR. ROBBIN:  Objection as to form.

Q    (BY MR. LEA)  -- that there would be a new origination fee taken out when there was no new money being originated?

        MR. WATTS:  Objection; form.

A    I'm sorry.  I can't...

        Could that make sense?  I don't know.

Q    (BY MR. LEA)  So let me ask you the -- kind of the same substance but make the question a little different for you.

        Can you explain to me how it would make economic sense if there was a second origination fee --

A    That's what I was trying to do.

Q    -- taken out of the same money.  Does that make any economic sense to you?

        MR. WATTS:  Objection; form.

A    I'm able to take that portion of the portfolio that would have been -- have grown, and I'm going to buy new paper with that.  Theoretically, that can be done.

Q    (BY MR. LEA)  Wasn't that money already

Page 107

deployed in the purchase of accounts?

A    Yeah.

Q    So how does it make sense to take another origination fee out of it?

        MR. WATTS:  Objection; form.

Q    (BY MR. LEA)  It doesn't, does it?

A    I'm not coming up with it.

        MR. WATTS:  Objection; form.

Q    (BY MR. LEA)  You're not coming up with one, are you?

A    No.

        MR. WATTS:  Objection; form to that as well.

Q    (BY MR. LEA)  Did Collins Asset Group purchase some of the collateral from Oliphant?

A    Yes.

Q    Can you put any -- how much?  If it was roughly a billion dollars, about how much of the collateral would have come from Oliphant?

A    What I -- the only one I recall was when we needed to step in and help Oliphant with two acquisitions in April and May of '21.

        Did we do anything else?  I just don't recall.  That sticks out because they needed help and we were there.

Page 108

Q    Can you put any -- in dollars, how much are we talking about there?  Roughly?

A    I don't have -- 3,000 a month.  5, 6 million maybe.  7, whatever.

Q    Okay.  On that money, Mr. Collins, was there a markup in the purchase price for Collins to buy it from Oliphant?

A    No.

        MR. LEA:  I'm in a good place to take --

        MR. ROBBIN:  You want to take a break now?

        MR. LEA:  Yeah.

        MR. ROBBIN:  Do some lunch?

        MR. LEA:  Yeah.

        THE VIDEOGRAPHER:  Okay.  Taking us off the record.  We're off the record 12:29 p.m.

        (Recess: 12:29 p.m. to 1:16 p.m.)

        THE VIDEOGRAPHER:  We are back on the record at 1:16 p.m.

Q    (BY MR. LEA)  Mr. Collins, are you ready to proceed?

A    I am.

Q    We put Exhibit 5 there on the top of the stack, and Exhibit 5 was an email chain about the 50 percent -- not more than 50 percent of the collections.  Do you remember that?

Page 113

Q   Does that make sense?

A   I hope not, but that --

Q   Well, if the notes started in late 2017 and early -- and '18 and they're four-year notes --

A   Oh, I was misunderstanding, I think.

Q   -- it seems to me like most of those rollers rolled after your tenure at the company.

Does that make sense to you?

A   Oh, yeah.  Yeah.  Sure.

Q   Okay.  And so --

A   I'm sorry.  A little slow.

Q   No, no, no.  Not at all.  Not at all.

And so I'm thinking in my head -- tell me if I've got it wrong -- if I need to know more about how those rollers really worked and the details and the origination fees, I need to go talk to the folks who were there in late '21 and after into 2022.

Does that make sense?

A   Yeah.  Their CFO and their operations people.

Q   Okay.

A   It'll be both of them.

Q   Okay.  Then before lunch, Mr. Collins, we talked about a situation in early '21, while you were still there, where Collins loaned or advanced some money to Oliphant so that it could go ahead and complete its

Page 114

purchase of some accounts?

A   Two months.  Yeah.  They -- and I think it was LendingClub.  Very good paper they were buying, and it was very important that they keep that up.  And I say "we."  They were our company too, and so Collins loaned several million dollars.  April, May --

Q   Of '21 --

A   -- of '21.

Q   -- to Oliphant?

A   So yes.

Q   Do you remember if that loan was documented?

A   I know it was.

Q   Okay.  Do you know if it was paid back?

A   I don't know that.  But there is a UCC-1 because I asked general counsel, and he had done it.

Q   And who benefited from that UCC-1, Collins or Ferrum Capital?

A   Ferrum.  In all likelihood if that was money of Ferrum's, then it would be Ferrum.

Q   Okay.  You explained to me how when money was collected and -- most of the collections were approximately the 50/50 split with Ferrum Capital, and I understood you to say that the 50 percent that was considered lender money or Ferrum Capital money was used to purchase new accounts, new collateral.

Page 115

Did I understand that right?

A   Uh-huh.  If that's a roller, yeah.

Q   Okay.  Did Ferrum Capital get a UCC on --

A   Absolutely.  All the new paper.

Q   Okay.

A   Our GC was meticulous and his -- and the couple people that helped him with that.

(Exhibit Number 11 marked)

Q   (BY MR. LEA)  That one is going to be for you, Mr. Collins.

MR. LEA:  This one is -- what did we say?  11 -- for Jonathan.

MR. ROBBIN:  Thank you.

MR. LEA:  11 for Byron and 11 for Royal.

A   This had been given me previously, so I understand this very well.

Q   (BY MR. LEA)  I'm sorry?

A   This was given to me previously, and so I understand it well.

Q   You see what I've marked as Deposition Exhibit 11?  You've seen that before?

A   Yes.

Q   Okay.  Tell us what it is.

MR. LEA:  And, Patrick, Deposition Exhibit 11 is -- has CAG-Oliphant Identification

Page 116

Number CE 00115 and 116.

MR. WATTS:  Can you give me some indication of what that is since I don't have access to that?

MR. LEA:  It's an email from Charles Natkins to Mr. Collins and Michael Crossan with comments on a Collins -- Ferrum Capital, Collins Asset Group brochure.

MR. WATTS:  Okay.  And for the record, I don't have access to and counsel has not presented me with a copy of the exhibit, subject to that.

Q   (BY MR. LEA)  Mr. Collins, do you recognize what --

A   I do.

Q   And tell me what it is.

A   Yeah.  Any literature that had our name on it could not have any changes without clearing it with our legal.

This was probably proposed, something they wanted to do.  Whoever -- is this -- is Ferrum involved in this?  Is this a Ferrum?

Q   The -- it looks to me like the brochure is coming from Ferrum Capital, yes, sir, but I don't know.  I wasn't there.  But it looks like it was.

A   Well, it's our GC turning down their request.



Page 137

A    It should be the number of accounts. This would be a small portfolio.

Q    This one was very small.

A    Okay. Then that would be the count.

And the liquidation or the FinTech fresh LendingPoint, they're one and the same. What it's telling you is it's LendingPoint's FinTech fresh paper.

Q    All right. That's helpful because I'm trying to understand how --

A    Oh, sure.

Q    -- how the process works.

And then it's got performance information, which my understanding of it is -- because there's a lot of data behind all these --

A    Right.

Q    -- is that it's running your internal model against the data that's in there, and it is -- it's predicting what the gross liquidation percentage would be, what the net would be, et cetera?

A    And so many other algorithms that you're not seeing all the way down to who -- the street that they were on, lived on, and what the -- what -- the average income. I mean, there's so much to it that you're not seeing. And all of that comes together to price those packages.

Page 138

Q    Yes, sir. And I've actually seen, you know, the raw data files, you know, where it's got -- it's got the -- it's got the FICO score, it's got their address, it's got when the original debt was incurred, how many days late it was when the last payment was made. An incredible amount of data.

A    I know I'm not supposed to run my mouth.

THE WITNESS:  Please forgive me.

A    But just historically with our first product, I would be home at night looking at this thing going, got my ideas. By the time I hit 65, 70 years old, it's all done. It's all done technologically now.

Q    (BY MR. LEFLORE)  Okay. So -- and I have seen how far you can drill down. There are these things called Power BI Reports that Nick Swinea created that were a model -- a reporting tool that was laid over that, and my God, he could drill down to any specific point.

A    There is not a finer CIO in the industry and I'm talking publicly traded and all. Nick is as good as they come.

Q    I've had, for better or worse, the opportunity to look at a lot of his work and --

A    And over on the Oliphant side --

Q    -- I'll agree with you.

Page 139

A    So you have. You have. I didn't realize that.

And on the Oliphant side, we had Andi Zekthi who -- no slouch at all.

There was excellent, excellent analytics.

Q    So as I look at Exhibit 14, it has performance information where it's predicting what the net liquidation percentage would be, and that, as I understand it, is a percentage of the face balances?

A    I'm sorry. I'm...

Q    If you'll look at me under the performance information --

A    Oh, okay.

Q    -- on the left-hand side, it's got gross liquidation, net liquidation.

My understanding is that that's the percentage of -- the percentage they're expecting to get off of the face balance that -- off of the 1.8-million balance?

A    Please forgive. I can't remember anymore. I just can't pull that one out.

Q    Fair enough. Under Collections by Year, I know that the model takes into consideration seasonality and probability of collections based on your proprietary results to determine when -- how much of the face balance is going to be collected in Year 1 versus

Page 140

Year 2, et cetera. And so I see Collections by Year, and it's got Gross. It's got a Percentage, Service Fee, Net Liquidation.

It's got lots of data, and then I see General Forecasting Assumptions. And so it plugs into the model an agency's service fee of 35 percent?

A    That'd be right.

Q    A legal service fee of 30 percent?

A    But not collected.

Q    And then I see it gets up to -- it makes a prediction about how much of the balance of -- is going to have to be referred to legal, and it says that it thinks about 30 percent is going to be referred to legal. And then it gives a percentage, I guess, of the fee.

Is that what I'm reading in the General Forecasting Assumptions?

A    I'm just not familiar anymore. I'm sorry.

MR. WATTS:  Are you under Cost Recovery?

MR. LEFLORE:  I'm under General Forecasting Assumptions on the left side.

MR. ROBBIN:  He's looking at the "liq, liq, liq analysis" --

MR. WATTS:  Got it. Okay. I'm there.

MR. ROBBIN:  -- tab.



Page 141

Q   (BY MR. LEFLORE)  And then looking over to the right-hand side, it's then got a Recovery Forecast that looks in Year 1, Year 2.

Do you see that, sir?

**A   Sure.**

MR. ROBBIN:  Is there a question?

MR. LEFLORE:  I want to make sure we're all on the same page in looking over this data.

Q   (BY MR. LEFLORE)  This Recovery Forecast is what you would use to price the -- to price how much you were going to pay for this receivable.  You needed to know what you thought you were going to collect and when?

**A   Exactly.  Yeah.**

Q   And based on what you thought you were going to collect and when, that would determine what -- what discount you would apply to determine your purchase price.  Correct?

**A   Right.**

MR. WATTS:  I'm going to object to form subject to that.

Q   (BY MR. LEFLORE)  So you didn't want to overpay for the -- for acquiring this balance and pay more than what you needed to recover in collections to make it worth your while.  Correct?

Page 142

MR. WATTS:  Form.  Objection subject to form.

Q   (BY MR. LEFLORE)  Why is it, sir, that it was important to you to know or to predict the frequency of payments and the seasonality and what would be paid in Year 2 and 3?  Why was that important in your pricing determination?

**A   Please forgive me.  Say that one more time.**

Q   Why was it important for you to have a good prediction of what the recovery forecast would be in terms of how much and when would be collected?

**A   To match -- to match any type of maturity, any interest.**

Q   Correct.  That's what I think -- that's my understanding.

**A   Yeah.**

Q   And let me --

**A   And forgive me.  It's been long time, and I've suffered through things and not all of this is clear anymore.**

Q   I fully understand.  I fully understand.

(Exhibit Number 15 marked)

Q   (BY MR. LEFLORE)  I'm going to hand you what I'm going to mark for identification as Deposition Exhibit Number 15, which is just another tab that is --

Page 143

the tab was entitled Cash Flow Model from this same Excel spreadsheet used to price portfolio 18019.

It's a little smaller, but we're not going to try and get into the -- too far into it.

Do you recognize this as another sort of tool or representation of the data that you would use to determine a cash flow model?

**A   I don't specifically recognize it but I know what it is.  I really do.**

Q   And we were talking about you needed to know when payment -- when net payments were going to come in and forecast that so you could match them with maturities, I believe is what you said?

**A   Sure.**

Q   And this cash flow model, as I understand it, does exactly that.

If you look at Cash Flow Financing Inputs on the left-hand side, Face Value, it then gives a purchase price, in this case $276,000.

And then it's got Advanced Debt.  So that would be your financing that you're getting to purchase this portfolio.

And then it's got a Loan Interest Rate of 10 percent, and then a Loan Term -- in this case it happened to be 72 months.

Page 144

Do you see all that, sir?

**A   Yes.**

Q   So my -- my understanding of what this cash flow model is, if I look up at the top under Cash Flow Model in years one through five, my understanding is it's calculating what the model predicts is going to be collected versus what the loan payments would be and the interest payments at 10 percent.

And going over all the way to the right, I see a number 44, all the way over to the right at the top column under Net Back Month.

**A   I've got it.**

MR. WATTS:  Objection; form.

MR. ROBBIN:  He hasn't asked the question yet.

Q   (BY MR. LEFLORE)  Is that 44 -- is that the month that it's predicted that the collections would equal -- the net collections would equal the loan and principal payments due?

**A   That would seem logical --**

MR. WATTS:  Objection; form.

**THE WITNESS:  I'm sorry.**

**A   That would seem logical, but I would have rather have Nick Swinea sitting here beside me to tell me that.**



Page 225

can look at those dates and really miss the value of it.

Q   Got it.

So after July, there was about -- there could have been as much as $14 million worth of collateral that had been pledged to support Sonoqui/Diversified lendings that was switched over and became collateral for Ferrum?

A   Yes.  And good collateral.

Q   That was still collecting?

A   You bet.

Q   Okay.  Well, that may help answer that question.

THE REPORTER:  22.

MR. LEFLORE:  Okay.  22.

(Exhibit Number 22 marked)

Q   (BY MR. LEFLORE)  I'll hand you what's been marked as CAG-Oliphant 001038.  It's dated 8/5/21, and it is a summary of the outstanding -- it's basically a Collins outstanding assets sheet.  It's Assets Allocated Participation Piece, Notes Outstanding to Ferrum.  And I think --

MR. WATTS:  Is this in your package?

MR. ROBBIN:  Yes.

MR. LEFLORE:  It is.

MR. ROBBIN:  It's CAG-Oliphant 001038.

Page 226

MR. WATTS:  Got it.  Okay.  I do have that.  The binder.

MR. ROBBIN:  Yep.

MR. LEFLORE:  Yes.

MR. WATTS:  Got it.  Okay.  I'm good.

Q   (BY MR. LEFLORE)  So, Mr. Collins, is this an example of the kind of stuff that Nick Swinea could pull up from his database on --

A   Absolutely.  Absolutely.

Q   And so as I understand it, this as of a point in time -- let's see.  This --

MR. WATTS:  What point in time?  Can you help us with that?

MR. ROBBIN:  It's on the second page.

Q   (BY MR. LEFLORE)  As of 8/5/21, when this was prepared, this has Face Value of Notes Outstanding of 51 million.  That's the Note Payable Outstanding, and then it's got a Ferrum Allocated Participation Piece of 12.35 million.

Do you know why that's different?  Why one is 12 and one is -- Ferrum Allocated Participation Piece?  It's not a trick question.  This is one I really want to know.

A   No, I see it.  I'm trying to understand the difference.  That is Payable Outstanding.

Page 227

Q   So that's the notes.  That doesn't have to do with collateral.  That's just the notes.

A   Right.

Q   The Allocated Participation Piece I don't quite understand on this.

But while we're looking, let me ask you another question.  As we thumb through this, this slices and dices, it looks like, $960 million worth of face amount debt into Region, State, Year of the Last Payment.  I mean, it's stunning detail.

Is this the kind of stuff routinely kept by Nick in the system?

A   We developed it in 1997 or '8 when Nick was in grade school, I think.

We've been doing this since we really started in the industry, and it has grown.  It's worked on almost daily.

And the answer is yes.  I mean, what this does, it's called the scrub.  You can go through this scrub in an hour and get a really tight handle on the value of a portfolio, and that's what this is all about.  Charge Off Range.  I mean, it's everything.  Your state breakdowns are very important.

Q   So this -- this is a drill-down and a summary of what comprises --

Page 228

A   Yeah.

Q   -- all of the collateral that was pledged --

A   Correct.

Q   -- on the Ferrum-Collins notes.  Correct?

A   Yeah.  Look at this.  I mean, this is so important.

Q   Okay.

A   It's grading.

Q   Uh-huh.

A   And those grades can change depending on the state laws changing, and we change with the state laws.

But what that's telling you is the collectibility grade for that paper.  And it will be done in collections, and it will be done in legal.

Q   Got it.

A   Rank Collection, Rank Legal.

Q   Yeah, Rank Collection, Rank Legal.

If you're collecting in Delaware, it's an A.  If you're collecting in Texas, it's a D?

A   Sure.  And why is that?

Q   The laws.

A   Sure.  Our laws were --

Q   The litigation environment.

A   Our laws were established after the Civil War to protect us from carpetbaggers.

Page 233

Q   And then it's got Projected Payments to Lender, and the first notation is Projection Per ERC model.  And I see that term a lot, the ERC model.

Do you recall which -- was that the estimated recovered cash model.  Does that sound right?

A   It sounds right.  The C has got me.  It's "estimated recovery."  It has to be "cash."

Q   So this is the -- the very first exhibit that I showed you was an analysis of a little FinTech fresh portfolio, and it had all this modeling of what was going to be collected over what time and how long it would take to pay off a 10 percent loan.

This says Projection Per the ERC model.  I think this is what it's projecting is going to be paid off of the portfolios that make up each one of these?

A   Right.

MR. WATTS:  Objection; form.

Q   (BY MR. LEFLORE)  And that's some -- it would make sense for you-all to keep track of what your model was saying was going to be collected and what the actual payments that were due under the note were.  Right?

A   Yeah, you follow those and see where you are.

Q   This is the way you manage your business?

A   Right.  Exactly.

Q   And so it's got the Projection in one column,

Page 234

and then it's got Seconds Pro Forma.  What were seconds?  Because I've seen that term come up a lot of times.  It's broken out Ferrum and then it's got portfolios and then it's got this Seconds Pro Forma?

A   Seconds are normally -- in our world are those that have been collected twice.  They're seconds, and there's a price to them and a fee that you would charge for seconds.  First; seconds; thirds, "tersh."  Making any sense?

Q   Yes, sir.

So the reason why these are seconds is because the portfolios -- the bulk of the portfolios you purchase are directly purchased from the creditor/lender, and you are trying to collect their balances.  Right?

A   Yes.

Q   But then seconds, somebody else has already tried to collect it, and now it's been handed back to the lender or maybe the collection agency that bought it is selling it to somebody else.

A   Right.

Q   So you're picking it up secondhand.  Correct?

A   Exactly.

Q   So some of the Ferrum according to this -- if I look the column under Ferrum, there's about 6.8 million

Page 235

of seconds that were purchased for the Ferrum -- with Ferrum proceeds?

A   Yeah.  And when you say seconds, depending on -- we like that two, three-year-old paper because people have got -- they have gotten back on their feet.  You could be calling someone with fresh paper, and you're six months or a year in.  This guy hasn't gotten a job yet.  You going to beat him to...

We liked the fact -- in that two-to-three-year range when people were getting back on their feet and now they could start payment plans.  They still aren't going be able to pay 5- or $10,000, but they can do a payment plan that makes sense for everybody.

Q   So just so the jury and the judge can understand, just because a debt is fresh -- in other words, it's only 6 months overdue or 12 months overdue -- doesn't mean that it's better.  Because if they couldn't pay it 12 months ago, which is why it went into default, why in the world would they be able to pay it just 12 months later when it's in your hands?

MR. WATTS:  Objection; form.

Q   (BY MR. LEFLORE)  Am I right?

A   You are.

The only paper that I saw as fresh that I

Page 236

ever -- I liked was LendingClub.  Just happened to be.

But when you look at the FICOs on LendingClub --

Q   (Gesturing)

A   Yeah.  Yes.

-- they're recovering faster.  That's what made that paper so exciting and valuable, and that's what Oliphant brought to us.  That's why we went out and raised money so we could participate, because it was the best fresh paper we had ever encountered.

Q   And it was the best fresh paper because you were able to drill down and look with all this granular data and plug it into your black box that Nick Swinea had created and figure out that the average FICO scores of the people that owed this debt were higher than with other portfolios that you might have purchased?

A   It's even in one of the -- it was in something that you sent me that I looked.  It tickled me to see the FICOs because I had forgotten on LendingClub and the other -- that other type FinTech paper, the FICOs made it.

That's why the market went from, when we started, 6, 7, 8 cents to 9, 10, 11, 12.  That's why it's trading at 13, 14 cents now.

Q   And the seconds are not actually worse debt

